## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

MARK JEROME JOHNSON BLOUNT,    (
                              (
     Plaintiff,                    (
                              (
v.                               (
                              (
THE UNITED STATES OF AMERICA;    (    CIVIL ACTION FILE NO.:
MERRICK GARLAND, Attorney General of  (
the United States, in his OFFICIAL and     (    6:23-CV-3106-MDH
INDIVIDUAL capacities; THE BUREAU OF  (
ALCOHOL, TOBACCO, FIREARMS AND    (
EXPLOSIVES, an agency of the United States (
of America; and BERNARD G. HANSEN,   (
Special Agent in Charge of the Bureau of    (
Alcohol, Tobacco, Firearms and Explosives, (
Kansas City Field Division, in his OFFICIAL (
and INDIVIDUAL capacities,           (
                              (
     Defendants.                 (

RECEIVED
APR 07 2023
PAIGE WYMORE-WYNN, CLERK
U.S. DISTRICT COURT
WEST DISTRICT
OF MISSOURI
JB

## COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND ATTORNEY'S FEES

COMES NOW, Plaintiff, Mark Jerome Johnson Blount, Gentleman-Esquire, Juris Doctor graduate of Duke University School of Law and scorer of a 173, the 99th percentile, on the Law School Admissions Test (LSAT) and a 169.6, roughly the 95th percentile, on the Multistate Bar Exam (MBE) portion of the Uniform Bar Exam (UBE), and prays that this Court enter a declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that the National Firearms Act, 26 U.S.C. § 5812, *et seq.*, the Gun Control Act of 1968, and the Firearms Owners' Protection Act of 1986, 18 U.S.C. § 922, *et seq.*, hereinafter, collectively, "National Firearms Acts," are unconstitutional in that they infringe and deprive Plaintiff of his ancient, inalienable, private, individual, absolute, ancestral sovereign common law right to keep and bear

arms, retained by his ancestors, the Founders of this country, and enumerated in the Second Amendment to the United States Constitution, by unconstitutionally prohibiting Plaintiff from possessing machine guns of all descriptions manufactured after 1986, to wit, ordinary military weapons, and severely penalizing Plaintiff for exercising this right, and that said Acts are unconstitutional in that they violate the Commerce Clause of the United States Constitution, in that they attempt to regulate purely intrastate activities.

Said National Firearms Acts being in contravention of law and of the Constitution of the United States, Plaintiff further prays that this Court enjoin the defendants from enforcing their unlawful and unconstitutional prohibition as to Plaintiff's possession of machine guns, to wit, ordinary military weapons, showing the Court as follows:

<u>JURISDICTION OVER THE PARTIES AND VENUE</u>

1.

Plaintiff, Mark Jerome Johnson Blount, Gentleman-Esquire, is a resident of Christian County, Missouri, and resides at 664 N Montego Street, Nixa, Missouri, 65714. Plaintiff is a law-abiding citizen, a member of the Posterity, currently is thirty-two (32) years of age, and has never been charged with nor convicted of a felony. Plaintiff is subject to the jurisdiction of this Court and venue is proper.

2.

Defendant United States of America, through its congress in enacting the National Firearms Acts, exceeded the bounds of the limited sovereign power delegated to it by the Sovereign Body, as enumerated in the United States Constitution, by attempting to regulate Plaintiff's and other law-abiding Posterity's rights to keep and bear machine guns, to wit, ordinary military weapons. In the Constitution of the United States, the "powers over person and

property of which we speak (the rights of keeping and bearing arms) *are not only not granted* to [the government], *but are in express terms denied*, and *they are forbidden to exercise them*," the government has a "*a total absence of power everywhere…so far as these rights are concerned,*" Dred Scott v. Sandford, 60 U.S. 393, 450–51, 15 L. Ed. 691 (1857), and, therefore, with respect to the National Firearms Act, Gun Control Act of 1968, and Firearms Owners' Protection Act of 1986, the United States of America is not acting as a sovereign, but instead is acting "beyond its just constitutional limits, [which] is absolutely an act of usurpation in the government, of that sovereignty, *which the people have reserved to themselves*," and the government is thus subject to the jurisdiction of this Court and venue is proper. ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 24 (LIBERTY FUND ed., 1999) (1803) (emphasis added).

3.

Defendant United States of America may be served by "(A)(ii) send[ing] a copy of [the summons and complaint] by registered or certified mail to the civil-process clerk at the United States attorney's office" for the Western District of Missouri; and, "(B) send[ing] a copy of each by registered or certified mail to the Attorney General of the United States at Washington, D.C." Fed. R. Civ. P. 4.

4.

The civil-process clerk for the U.S. Attorney's Office for the Western District of Missouri can be sent copies of the complaint and summons at the following addresses:

ATTN: Civil Process Clerk
Charles Evans Whittaker Courthouse,
U.S. Attorney's Office, Room 5510,
400 East 9th Street,
Kansas City, MO 64106

and

ATTN: Civil Process Clerk
U.S. Attorney's Office,
Hammons Tower, Suite 500,
901 St. Louis Street,
Springfield, MO 65806

5.

A copy of the summons and complaint may be sent to the Attorney General of the United

States, as is required for effectuating service of process on the United States, by sending the

aforementioned complaint and summons by registered or certified mail to:

ATTN: Merrick Garland, Att. Gen. U.S.
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

6.

The Attorney General of the United States is responsible for defending the laws of said

United States in the federal courts of this country, as, "[e]xcept as otherwise authorized by law,

the Attorney General shall supervise all litigation to which the United States, an agency, or

officer thereof is a party." 28 U.S.C. § 519.

7.

In addition, the Attorney General is in direct control of the Bureau of Alcohol, Tobacco,

Firearms and Explosives, and is ultimately responsible for enforcement of this country's

unconstitutional regulatory framework respecting firearms, as, "[t]here is established within the

Department of Justice *under the general authority of the Attorney General* the Bureau of

Alcohol, Tobacco, Firearms, and Explosives." 28 U.S.C. § 599A (emphasis added). "The

Attorney General, acting through the Director [of the BATF] and such other officials of the

Department of Justice as the Attorney General may designate, shall provide for the coordination

of **all firearms**, explosives, tobacco enforcement, and arson **enforcement functions vested in the Attorney General**." 28 U.S.C. § 599A (emphasis added).

8.

The Attorney General is subject to the jurisdiction of this Court and venue in this Court is proper as this action is being prosecuted under 28 U.S.C. § 1346, which states that "**(a)** Any civil action in a district court against the United States under subsection (a) of section 1346 of this title may be prosecuted only: **(1)** Except as provided in paragraph (2), **in the judicial district where the plaintiff resides**." 28 U.S.C. § 1402 (emphasis added).

9.

Defendant Garland, Attorney General of the United States, in his official capacity, may be served with process by "serv[ing] the United States[, as above,] and also send[ing]a copy of the summons and of the complaint by registered or certified mail to the agency, corporation, office, or employee." Fed. R. Civ. P. 4, at the following address:

> ATTN: Merrick Garland, Att. Gen. U.S.
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, D.C. 20530

10.

Defendant Garland may be served with process in his individual capacity by serving him with the complaint and summons in accordance with Rule 4(e) of the Federal Rules of Civil Procedure.

11.

The Bureau of Alcohol, Tobacco, Firearms and Explosives, hereinafter "BATF," is tasked with enforcing the comprehensive regulatory scheme known as the National Firearms Act, the above-referenced National Firearms Acts. The BATF's responsibilities include:

"**(b)** RESPONSIBILITIES.-Subject to the direction of the Attorney General, the Bureau shall be responsible for investigating-**(1)** criminal and regulatory violations of the Federal firearms, explosives, arson, alcohol, and tobacco smuggling laws." 28 U.S.C. § 599A.

12.

The BATF is subject to the jurisdiction of this Court and venue is proper. Defendant BATF may be served with process by "serv[ing] the United States[, as above,] and also send[ing] a copy of the summons and of the complaint by registered or certified mail to the agency," Fed. R. Civ. P. 4, at the following address:

ATTN: Agent Hansen
1251 NW Briarcliff Pkwy, Suite 600
Kansas City, MO 64116

13.

Defendant Bernard G. Hansen is the Special Agent in Charge ("SAC") of the Kansas City Field Division of the BATF, the BATF field division that is "is responsible for ATF criminal enforcement and industry regulatory activities in the state[] of Missouri," *Kansas City Field Division*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, https://www.atf.gov/kansas-city-field-division (last visited Jan. 29, 2023), where Plaintiff resides, and, thus, the field division which would be responsible for enforcing the unconstitutional regulations laid out in the National Firearms Act, the Gun Control Act of 1968, and the Firearms Owners' Protection Act of 1986 against Plaintiff, which amount to infringements of Plaintiff's fundamental, inalienable, ancient, private, individual, ancestral common law and right to keep and bear military-grade weapons and constitutional right to keep and bear military-grade weapons, when Plaintiff, in the near future so exercises his right by

keeping ordinary military weapons manufactured after the end of the year 1986, to wit, machine guns, in violation of said unconstitutional statutes.

14.

Defendant Hansen is subject to the jurisdiction of this Court and venue is proper. Defendant Hansen may be served with process in his official capacity by "serv[ing] the United States[, as above,] and also send[ing] a copy of the summons and of the complaint by registered or certified mail to the agency, corporation, officer, or employee," Fed. R. Civ. P. 4, at the following address:

ATTN: Agent Hansen
1251 NW Briarcliff Pkwy, Suite 600
Kansas City, MO 64116

15.

Defendant Hansen may be served with process in his individual capacity by serving him with the complaint and summons in accordance with Rule 4(e) of the Federal Rules of Civil Procedure.

16.

All defendants are personally subject to the jurisdiction of this Court and venue is proper because "**(a)** Any civil action in a district court against the United States under subsection (a) of section 1346 of this title *may be prosecuted only*: (1) Except as provided in paragraph (2), *in the judicial district where the plaintiff resides*." 28 U.S.C. § 1402 (emphasis added).

17.

All of the above-named defendants are subject to the jurisdiction of this Court, and venue is proper as to all defendants, as, not only does 28 U.S.C. § 1402 mandate that Petitioner bring this claim in the United States District Court for the District in which Petitioner lives, but also,

28 U.S.C. § 1391 states that "**(b)** VENUE IN GENERAL.-A civil action may be brought in-**(1)** a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;**(2)** a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or **(3)** if there is no district in which an action may otherwise be brought as provided in this section, *any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action*." 28 U.S.C. § 1391 (emphasis added).

<div align="center">SUBJECT MATTER JURISDICTION</div>

<div align="center">18.</div>

Paragraphs 1 through 17 are re-alleged in this paragraph as if fully restated herein.

<div align="center">19.</div>

"*The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution*, *the Laws of the United States*, and Treaties made, or which shall be made, under their Authority;…*to Controversies to which the United States shall be a Party*." U.S. Const. art. III, § 2 (emphasis added).

<div align="center">20.</div>

"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. This Court has jurisdiction over this subject matter, as this is a case or controversy arising under an unconstitutional law passed in contravention of the United States Constitution. Thus, *Plaintiff is invoking the federal question jurisdiction of this Court*.

<div align="center">21.</div>

In addition, according to United States Code, "**(a)** The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

**2)** *Any other civil action* or claim against the United States, not exceeding $10,000 in amount, *founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department*." 28 U.S.C. § 1346 (emphasis added). This is an action in equity for declaratory judgment and injunctive relief and seeks no monetary recompense from the government for its unconstitutional deprivation of Plaintiff's rights.

## STANDING TO BRING CLAIM

22.

Paragraphs 1 through 21 are re-alleged in this paragraph as if fully restated herein.

23.

Plaintiff has standing to bring this suit because Plaintiff has incurred a particularized and concrete injury-in-fact to his ancient, inalienable, individual, private, ancestral common law right to keep and bear arms, as enumerated in the Second Amendment to the United States Constitution, but in no way reliant upon that document for its existence, due to Defendant United States' enactment and the defendants' enforcement of the collective regulatory framework which comprises the National Firearms Acts, which infringe and deprive Plaintiff of his common law and constitutional rights to keep and bear arms by unlawfully and unconstitutionally prohibiting Plaintiff from keeping machines guns, to wit, ordinary military weapons.

24.

Plaintiff plans on purchasing an M-16 rifle, M-4 rifle, Squad Automatic Weapon (SAW), or other machine gun which comprises the standard issue equipment of a service member in the United States military, manufactured after 1987, to wit, an ordinary military weapon, or

converting the AR-15 rifles that he already lawfully possesses to automatic weapons, "weapon[s] which shoot[], [are] designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," 26 U.S.C.A. § 5845(b), to wit, the functional equivalents of M-16 rifles, ordinary military weapons, and possessing said weapons in contravention to the National Firearms Acts in the immediate future.

25.

When Plaintiff converts his AR-15 rifles to fully automatic weapons, to wit, machine guns, said weapons will be machine guns manufactured after 1987.

26.

The National Firearms Act, Gun Control Act of 1968, and Firearms Owners' Protection Act of 1986, unconstitutionally criminalize Plaintiff's planned course of conduct.

27.

The National Firearms Act defines machine guns, the keeping and bearing of which it attempts to heavily regulate, and prohibit with respect to those machine guns manufactured post-1986, as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C.A. § 5845(b).

28.

The National Firearms Acts are unconstitutional in that they unconstitutionally purport to regulate Plaintiff's right to keep and bear ordinary military weapons and work an ***absolute*** deprivation of Plaintiff's right to keep and bear ordinary military weapons not lawfully possessed before the end of 1986, by ***absolutely prohibiting*** the possession of such ordinary military weapons.

29.

The Firearms Owners' Protection Act of 1986 flatly prohibits the possession of machine guns manufactured after the said act went into effect, around the end of the year of 1986. 18 U.S.C.A. § 922(o)(1) stating, "**(o)(1)** Except as provided in paragraph (2), *it shall be unlawful for any person to transfer or possess a machinegun*.

**(2)** This subsection does not apply with respect to--

**(A)** *a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof*; or

**(B)** any lawful transfer or lawful possession of a machinegun *that was lawfully possessed before the date this subsection takes effect*." 18 U.S.C.A. § 922.

30.

18 U.S.C.A. § 922 was enacted in 1986, and took "effect[] 180 days after May 19, 1986." 18 U.S.C. § 922. Thus, 18 U.S.C.A. § 922 flatly and unconstitutionally prohibits Plaintiff's planned course of conduct, the possession of a machine gun, to wit, an ordinary military weapon, made after 1986, and the penalties for violation of said code section are severe, as "[w]hoever knowingly violates subsection (a)(6), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title, *imprisoned not more than 10 years*, or both." 18 U.S.C.A. § 924 (emphasis added).

31.

This code section is regularly enforced and violators are prosecuted fervently, "[a] Cincinnati man was sentenced in U.S. District Court to 37 months in prison for illegally possessing a pistol that had been converted into an automatic weapon, which he used *in self-defense* during a shootout outside a restaurant." Kenneth L. Parker, *Cincinnati Man Sentenced to*

*37 Months in Prison for Possessing Pistol He Converted into Fully Automatic Weapon Using 3D-Printed Parts*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, https://www.atf.gov/news/pr/cincinnati-man-sentenced-37-months-prison-possessing-pistol-he-converted-fully-automatic (last visited October 7th, 2022) (emphasis added).

32.

The National Firearms Act further attempts to prohibit the following activities, stating: "It shall be unlawful for any person—

(a) to engage in business as a manufacturer or importer of, or dealer in, firearms without having paid the special (occupational) tax required by section 5801 for his business or having registered as required by section 5802; or

(b) to receive or possess a firearm transferred to him in violation of the provisions of this chapter; or

(c) *to receive or possess a firearm made in violation* of the provisions of this chapter; or

(d) *to receive or possess a firearm which is not registered to him in the National Firearms Registration* and Transfer Record; or

(e) to transfer a firearm in violation of the provisions of this chapter; or

(f) *to make a firearm in violation of the provisions of this chapter*; or

(g) to obliterate, remove, change, or alter the serial number or other identification of a firearm required by this chapter; or

(h) to receive or possess a firearm having the serial number or other identification required by this chapter obliterated, removed, changed, or altered; or

(i) *to* receive or *possess a firearm which is not identified by a serial number* as required by this chapter; or

**(j)** to transport, deliver, or receive any firearm in interstate commerce which has not been registered as required by this chapter; or

**(k)** to receive or possess a firearm which has been imported or brought into the United States in violation of section 5844; or

**(l)** to make, or cause the making of, a false entry on any application, return, or record required by this chapter, knowing such entry to be false." 26 U.S.C.A. § 5861.

33.

When Plaintiff converts his lawfully possessed AR-15 rifles to fully-automatic machine guns, the functional equivalent of M-16 rifles, ordinary military weapons, in the near future, Plaintiff will have made a firearms in contravention to 26 U.S.C.A. § 5861, and will thus be subject to the unconstitutional penalties for violation of said statute.

34.

The National Firearms Act regulatory scheme unconstitutionally prohibits the Posterity from making their own military weapons, regardless of whether or not those weapons are ever placed within the stream of commerce, an act that not only is not commerce but also is a purely intrastate activity that is beyond the power of Congress to regulate both under the commerce clause, and beyond the power to regulate as that power is expressly denied to Congress as enumerated in the Second Amendment to the United States Constitution. *See* 26 U.S.C.A. § 5822 ("***No person shall make a firearm unless he has (a) filed with the Secretary a written application***, in duplicate, to make and register the firearm on the form prescribed by the Secretary; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the firearm to be made in the application form in such manner as the Secretary may by regulations prescribe; (d) identified

himself in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) ***obtained the approval of the Secretary*** to make and register the firearm and the application form shows such approval. Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.")

35.

As Plaintiff intends to convert his lawfully possessed AR-15 rifles into fully functional automatic weapons, to wit, machine guns, ordinary military weapons, without first asking permission from the Secretary before exercising his inalienable, private, individual, ancestral common law and constitutional right to possess such arms, Plaintiff intends to violate the code section referenced in paragraph 34 and will be subject to the unconstitutional penalties for said violations.

36.

The penalties for violating said unconstitutional provisions are severe, constituting felonies, and the collective acts which comprise the National Firearms Act regulatory scheme are regularly enforced and prosecuted to the fullest. *See* Kurt R. Erskine, *New York Man Pleads Guilty to Unlawfully Dealing More Than 100 Firearms*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, https://www.atf.gov/news/pr/new-york-man-pleads-guilty-unlawfully-dealing-more-100-firearms (last visited October 7th, 2022) ("[A] prolific gun dealer, has pleaded guilty to charges of unlawfully dealing firearms, making a false statement to a federally licensed firearms dealer, and interstate travel and purchase of firearms with intent to deal without a license.").

37.

"Over the years, our cases have established that the irreducible constitutional minimum of standing contains *three elements*. First, the plaintiff must have suffered an '*injury in fact*'— an invasion of a legally protected interest which is (a) concrete and particularized…and (b) 'actual or imminent, not 'conjectural' or 'hypothetical,' ' *Whitmore, supra,* 495 U.S., at 155, 110 S.Ct., at 1723 (quoting *Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)). Second, there must be a *causal connection* between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be '*redressed* by a favorable decision.'" Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992) (emphasis added).

38.

Plaintiff has standing because *Plaintiff has suffered an injury-in-fact*, to wit, Plaintiff has been unconstitutionally deprived by the National Firearms Acts of his right to keep and bear machine guns, ordinary military weapons, at present, without first asking for permission from governmental actors and waiting an inordinate amount of time for approval of his exercise of his inalienable, absolute, ancient, private, individual ancestral right to keep and bear ordinary military weapons. Requiring that Plaintiff ask permission before exercising this absolute right is an unconstitutional deprivation and infringement of that right, prohibited by the United States Constitution.

39.

In addition, the National Firearms Acts expressly prohibit Plaintiff from possessing *any* machine gun, to wit, ordinary military weapons, manufactured or placed into the stream of commerce after the date that the Firearms Owners' Protection Act of 1986 took effect, the latest Act passed by congress as part of the National Firearms Act regulatory scheme, thereby *absolutely* depriving Plaintiff of his ancient, inalienable, absolute, private, individual ancestral right to keep and bear any type of ordinary military weapon whatsoever. Thus, again, Plaintiff suffers an *injury-in-fact* to his absolute right of keeping arms.

40.

These injuries are to Plaintiff's personal, private, individual, absolute, ancient, ancestral, sovereign common law right to keep and bear arms, and his constitutional right to keep and bear arms. Thus, the injury sustained by Plaintiff is individualized, particularized, and concrete.

41.

Because Plaintiff is presently deprived by said acts from possessing those arms to which he is entitled to possess, to wit, machine guns, ordinary military weapons, Plaintiff has suffered *an actual injury at present*, not a hypothetical or conjectural injury.

42.

Even so, as is noted in the complaint above, the government regularly enforces the National Firearms Acts, and said Acts carry severe penalties for their violation. As such*, an infringement of Plaintiff's* ancient, private, individual, absolute, inalienable, ancestral right of keeping and bearing arms, *and the complete deprivation of said right* upon Plaintiff's conviction for a felony firearms offense, due to the lawful exercise of his right to keep and bear arms, in violation of the unconstitutional National Firearms Acts, *would be imminent* should Plaintiff follow his planned course of conduct by possessing a machine gun manufactured after 1987.

43.

The government lacks all power to regulate in this field, and, as such, its actions are unconstitutional. These unconstitutional actions, to wit, the enactment and enforcement of the National Firearms Acts, amount to an ***unconstitutional prior restraint***, depriving Plaintiff of his common law and constitutional rights to keep and bear ordinary military weapons without first asking permission and waiting an inordinate amount of time for permission to possess such weapons, and an ***unconstitutional absolute deprivation*** of his right to keep ordinary military weapons manufactured after 1986. Thus, the infringement of Plaintiff's inalienable right to keep and bear arms is ***fairly traceable*** to the government's unlawful and unconstitutional actions ***which do, in fact, directly infringe and directly cause*** Plaintiff's inalienable right to keep and bear arms to be infringed, thereby ***satisfying the causation requirement*** of standing analysis.

44.

The permission required by the National Firearms Act before Plaintiff is allowed under the National Firearms Act to keep and bear machine guns in circulation before the end of 1986 is much more extensive than a simple background check to ensure that Plaintiff is a law-abiding citizen.

45.

The flat out prohibition as to machine guns made after 1986 is a clear violation of Plaintiff's ancient, inalienable, absolute, private, individual ancestral common law and constitutional right to keep and bear any ordinary military weapons whatsoever.

46.

The relief sought by Plaintiff, a declaratory judgment that the National Firearms Act, Gun Control Act of 1968, and Firearms Owners' Protection Act of 1986 are unconstitutional insofar

as they regulate or prohibit Plaintiff from keeping ordinary military weapons, injunctive relief enjoining Defendants from future enforcement of said act against Plaintiff, and attorney's fees, are within the Court's power and would abate the harm to Plaintiff. As such, the constitutional harm suffered by Plaintiff *is redressable* by this Court.

47.

As stated above, Plaintiff intends to purchase and possess an M-16 rifle, or the like, or to convert his AR-15 rifles to fully automatic weapons, to wit, machine guns and ordinary military weapons, which comprise the ordinary military equipment of service members in the United States armed forces, without complying with the requirements of the Acts which comprise National Firearms Act regulatory framework, and Plaintiff further shows that the BATF and local law enforcement regularly arrest and prosecute individuals for violations of said unconstitutional Acts.

48.

The Supreme Court of the United States has held that one is not required to violate an act, such as the National Firearms Acts, before gaining sufficient injury-in-fact where the act has regularly been enforced, the penalties of violating the act are substantial, and Plaintiff evinces an intent to violate the act. All that is required for standing is that "plaintiffs must allege some threatened or actual injury resulting from the putatively illegal action." United States v. Richardson, 418 U.S. 166, 194, 94 S. Ct. 2940, 2955, 41 L. Ed. 2d 678 (1974).

49.

And here, Plaintiff is *actually* injured by the United States' unlawful and unconstitutional prior restraint requirement that Plaintiff ask permission before exercising his right in a manner that causes an unreasonable and undue delay on the exercise of his unregulatable right to keep

and bear arms, and Plaintiff is *actually* injured by the United States' unconstitutional prohibition as to his possession of ordinary military weapons made after 1986.

50.

Plaintiff is not required to actually violate these Acts before having sufficient standing to challenge them, as the National Firearms Acts are regularly enforced and carry severe penalties, the Supreme Court holding, "[w]hen an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law. See *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) ('*[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights');* see also *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128–129, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) ('[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat'). *Instead, we have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent*. Specifically, *we have held that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.' Babbitt v. Farm Workers,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). Several of our cases illustrate the circumstances under which plaintiffs may bring a preenforcement challenge consistent with Article III." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158–59, 134 S. Ct. 2334, 2342, 189 L. Ed. 2d 246 (2014).

I.     Standing with respect to Declaratory Judgment Action Specifically:

51.

Paragraphs 1 through 50 are re-alleged in this paragraph as if fully restated herein.

52.

Indeed, with respect to declaratory judgment actions in particular, the Supreme Court of the United States has held, "[o]ur analysis must begin with the recognition that, where threatened action *by government* is concerned, *we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced*. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, *but nonetheless does not eliminate Article III jurisdiction*…[W]e d[o] not require the plaintiff to proceed to…risk actual prosecution before he could seek a declaratory judgment regarding the constitutionality of a state statute [because], '*the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity*.' *Id.,* at 480, 94 S.Ct. 1209. *In each of these cases, the plaintiff had eliminated the imminent threat of harm* by simply not doing what he claimed the right to do (enter into a lease, or distribute handbills at the shopping center). That *did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced*. See *Terrace, supra,* at 215–216, 44 S.Ct. 15; *Steffel, supra,* at 459, 94 S.Ct. 1209. *The dilemma posed by that coercion— putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate*.' *Abbott Laboratories v. Gardner,* 387 U.S. 136, 152, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128–29, 127 S. Ct. 764, 772–73, 166 L. Ed. 2d 604 (2007) (emphasis added).

53.

The Supreme Court holding referenced in paragraph 52 is particularly applicable to this case, where Plaintiff's possession of a currently unlawfully prohibited weapon, to wit, an M-16 rifle, manufactured post-1986, or his conversion of his lawfully possessed AR-15 rifles to fully-automatic weapons, the functional equivalents of M-16 rifles, would constitute a criminal felony offense under the unconstitutional National Firearms Acts, which Acts are regularly enforced, and violations of said Acts are felony offenses, upon conviction for which Plaintiff would be stripped entirely of his rights of keeping and bearing arms, subject to substantial prison time, and lose many other fundamental rights, such as the right to vote.

54.

As such, Plaintiff is not required to violate the law and expose himself to criminal liability, which could potentially strip Plaintiff of his constitutional rights, in order to gain standing to challenge the unconstitutional National Firearms Act, Gun Control Act of 1968, and Firearms Owners' Protection Act of 1986, but, instead, has standing under the aforementioned Supreme Court's holding in MedImmune, Inc., his current compliance with the unconstitutional National Firearms Acts being effectively *coerced* by unlawful governmental action.

55.

A declaratory judgment as to the constitutionality of the National Firearms Act, Gun Control Act of 1968, and Firearms Owners' Protection Act of 1986 is necessary in this case because Plaintiff faces uncertainty and insecurity with respect to future actions which Plaintiff intends to take incidental to his common law and constitutional rights to keep and bear arms, as the National Firearms Acts are clearly unconstitutional and wholly beyond the power of the government to enact under English common law, basic universal principles of sovereign power, the plain text of the Second Amendment to the United States Constitution, and American Courts'

traditional (from the time of the Founding up until the Supreme Court's holding in <u>United States</u> <u>v. Miller</u>, 307 U.S. 174 (1939)) understandings of the right of keeping and bearing arms as enshrined and codified in the Second Amendment to the United States Constitution, and, therefore, Plaintiff is unsure as to whether or not he must comply with the National Firearms Act, Gun Control Act of 1968, and Firearms Owners' Protection Act of 1986.

56.

Plaintiff seeks guidance from this Court with respect to the National Firearms Acts' effect on his inanlienable, unabrogable, fundamental, ancient, private, absolute, individual, ancestral sovereign common law right to keep and bear arms and his constitutional right to keep and bear arms so as to direct Plaintiff's conduct with respect to purchasing and possessing, in the near future, an M-16 rifle, or other similar ordinary military weapon in present use by the United States military, or converting his AR-15 rifles to the same, acts which are properly incidental to and entailed within his common law and constitutional rights to keep and bear arms, and acts, which, if taken without direction from this Court, would not only reasonably jeopardize Plaintiff's interests, but almost certainly jeopardize his interest by subjecting Plaintiff to substantial criminal liability, including substantial prison time, and the absolute deprivation of his rights to keep and bear arms, along with other fundamental and constitutional rights.

## SOVEREIGN IMMUNITY NO BAR BECAUSE THE GOVERNMENT IS NOT ACTING WITHIN ITS AGENCY RELATIONSHIP WITH THE SOVEREIGN BODY NOR IN ACCORD WITH THE SOVEREIGN AUTHORITY VESTED IN IT BY THE SOVEREIGN BODY

57.

Paragraphs 1 through 56 are re-alleged in this paragraph as if fully restated herein.

SOVEREIGNTY, SOVEREIGN POWER, AND SOVEREIGN IMMUNITY

58.

A sovereign is "1. [s]upreme in power; superior to all others; highest in power; chief; ***independent of, and unlimited by, any other***; possessing, or entitled to, original authority or jurisdiction; as, a sovereign prince; 2. ***[e]fficacious in the highest degree***; effectual; controlling; utmost; ***highest***; predominant;...Sovereign state, a state which administers its own government, and is ***not dependent upon, or subject to, another power***. [A] Sovereign [is] 1. ***[o]ne who exercises supreme control***; especially, in a monarchy, a [K]ing or [Q]ueen." NOAH WEBSTER, WEBSTER'S COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE 1263 (CHAUNCEY A. GOODRICH et al. ed., NEW EDITION OF 1880, 1886).

59.

In order to be the Sovereign, one must be the person in which all rights and power originate, the one from whom all rights are derived. The government is in no way sovereign in relation to true Americans, the Posterity, the lineal bloodline descendants of the Founding Generation, because our rights are not derived from the government, or the Constitution for that matter, but, instead, are inherited and are derived from our lineal bloodline descent from our Founding Generation ancestors, the original Sovereign Body of this country, and the one's from whom the government derives its rights and power.

60.

Sovereign immunity is an attribute of sovereignty. It is the natural consequence of the plenary power and authority of the Sovereign, and the fact that the Sovereign is answerable to no overlord on earth, save God. Thus, sovereign immunity is an immunity from the exercise of the

jurisdiction of the Sovereign's courts, because the very exercise of jurisdiction is based upon a

Court's power over the person of the named party, and, since the Sovereign has none on earth

who can exercise power over him, insofar as he is acting within his sovereign powers and within

his sovereign realm, that is to say, within his sovereign jurisdiction, within said jurisdiction, his

courts, as a matter of law, cannot exercise jurisdiction over him, "*for all jurisdiction implies

superiority of power*.'" Chisholm Ex'r. v. Georgia, 2 U.S. 419, 458 (1793) (emphasis added).

61.

In this country, the government is in no way superior in power to the Posterity, the lineal

bloodline descendants of the Founding Generation, the Sovereign Body from whom all

sovereignty, governmental power, and legitimacy are derived.


SOVEREIGN IMMUNITY NOT APPLICABLE WHERE SOVEREIGN ACTS OUTSIDE OF
SOVEREIGN JURISDICTION

62.

Paragraphs 1 through 61 are re-alleged in this paragraph as if fully restated herein.

63.

As sovereign immunity is the natural consequence of the plenary power and

uncontrollability of the Sovereign, a sovereign only possesses the attribute of sovereign

immunity where that sovereign is acting in accordance with his sovereign powers and within his

sovereign realm, within his sovereign jurisdiction, both legal and geographical, because a

sovereign is only "sovereign and independent *within his own dominions.*" Chisholm Ex'r. v.

Georgia, 2 U.S. 419, 458 (1793) (emphasis added).

64.

As such, there are two important questions that a Court must address when assessing a claim to sovereign immunity: First, who is the sovereign? Second, where is he sovereign?

65.

The first and second questions are interrelated, as jurisdiction always determines sovereign status.

66.

And while a sovereign may be *a* sovereign with respect to one geographical location or certain powers, it may not be ***the*** sovereign in a given situation, such as when said sovereign acts upon rights which it lacks all power to act upon (legal jurisdiction), or attempts to act upon a people in a location to which it is not the sovereign (geographical jurisdiction).

67.

With respect to fundamental, inalienable, ancient, ancestral, unregulatable, uncontrollable, individual rights, ***free Englishmen have always been individual sovereigns***, as we are uncontrollable in the exercise of these rights, so long as we are acting within the confines of these rights, and we derive these rights from none but our own ancestors. Thus with respect to these rights ***we free Englishmen*** are within our ***sovereign jurisdictions and are rightly identified as the Sovereign***. The king was not the sovereign with respect to these rights, and, thus, outside his sovereign jurisdiction when he acted upon them.

68.

Indeed, as Sir Edward Coke details, no man could be deprived of any of his rights, liberties, or property, "[b]ut by the law of the land...*Per legem Angliae*...And it is not said, *legem et consuetudinem regis Angliae*, lest it might be thought to bind the king only, nor *populi Angliae*, lest it might be thought to bind them only, ***but that the law might extend to all***, it is said

*per legem terrae*, i. *Angliae*." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 50 (E. AND R. BROOKE ed., 1797).

69.

Thus, the Kings of England were limited sovereigns. Where the King was not acting in his sovereign capacity, such as where he infringed the sovereign rights of his subjects, the King was never understood to have sovereign immunity because, as is explained at the end of this section of the complaint, the English nation, as well as the Kings of England themselves, recognized that when so acting against such rights, the Kings of England were not sovereigns, and, therefore, could not possess the natural attribute of sovereignty, to wit, sovereign immunity, but, instead, were subject to the jurisdiction of the laws of the realm, their Courts, and their subjects.

70.

And while the United States government is in no way sovereign, but, rather, the agent of the true Sovereigns, the Posterity, even if the United States government were considered to be a sovereign, ***it, at most, possesses limited investitures of sovereign power***, and thus, is, at most, a limited sovereign, as were the Kings of England at common law, who were subject to the laws of their realm, the jurisdiction of the Courts, and their subjects when they acted beyond the scope of their sovereign powers, such as when the King attempted to act upon the fundamental, inalienable, ancient, private, individual, ancestral sovereign rights of free Englishmen.

71.

And, as the Kings of England, the Sovereigns from whom the Founding Generation inherited their sovereign power, were ***limited sovereigns***, the Founding Generation and their

Posterity, too, when acting in concert as one Sovereign Body, were and are *limited sovereigns,* and possess *no sovereign power or status in relation to the fundamental, inalienable, ancient, private, individual, ancestral, sovereign rights of free Englishmen*, and, thus, possess no sovereign immunity when acting against such rights as one Sovereign Body.

72.

Because the Sovereign Body, the Founding Generation and their Posterity, acting in unison, possesses no power to act against the Posterity's fundamental, inalienable rights, the Sovereign Body, like the Kings of England, cannot be said to be acting in a sovereign capacity when acting against such rights, because, instead of possessing plenary power with respect to said rights, the Sovereign Body possesses no power with respect to said rights, the antithesis of sovereignty.

73.

As the Sovereign Body is completely devoid of sovereign power when acting against the Posterity's fundamental rights, which we inherited by way of our lineal bloodline descent from our Founding Generation ancestors and ultimately from our free English ancestors, possessing said rights from time immemorial, and is not acting in a sovereign capacity when acting upon such rights, the Sovereign Body does not possess the natural consequence of sovereignty when acting against such rights, to wit, sovereign immunity.

74.

Since the Sovereign Body, the Founding Generation and their Posterity, does not possess sovereign immunity when acting against such rights, the government which the Sovereign Body imbued and still imbues with sovereign power and status could not possibly possess sovereign immunity when acting against such rights.

75.

As the King was subject to the jurisdiction of his courts and his subjects for actions taken outside of his sovereign capacity and jurisdiction, for the infringement of free Englishmen's fundamental rights at common law, so too is the United States government at present, and, that is even assuming that this government possesses the vast attributes of sovereignty held by the King of England in days past, which it does not.

## THE POSTERITY, NOT THE GOVERNMENT, IS THE SOVEREIGN

76.

Paragraphs 1 through 75 are re-alleged in this paragraph as if fully restated herein.

77.

Yet, unlike the common law of England, where the King was sovereign in all things except where he acted upon a sovereign inalienable right of his subjects, and was, too, the Font of Sovereignty of his nation, the one from whom all sovereign power and legitimacy flowed, this country is founded upon the principle that the Sovereign Body, the Founding Generation and their Posterity, are the ones in which ultimate sovereign power resides, the ones from whom all sovereign power and legitimacy flows, the Font of Sovereignty.

78.

The government of the United States is in no way the sovereign in this country, it is the agent of the Sovereign Body, the Posterity.

79.

Indeed, when discussing United States government officials' claim to sovereign immunity in <u>Lee</u>, a case in which the Supreme Court of the United States held that officials of

the United States could be sued in their official capacities when acting under the authority, and at the direction, of said United States, when the United States was transgressing its constitutional powers, even though such a suit was effectively a suit against the United States itself, the Court contrasted sovereignty and sovereign power as it existed in England and the United States at the time, stating, "[u]nder our system *the people*, who are there called *subjects*, *are the sovereign*. *Their rights*, whether collective *or individual*, are not bound to give way to a sentiment of loyalty to the person of a monarch. *The citizen here knows no person, however near to those in power, or however powerful himself, to whom he need yield the rights which the law secures to him when it is well administered. When he, in one of the courts of competent jurisdiction, has established his right* to property, *there is no reason why deference to any person, natural or artificial, not even the United States, should prevent him from using the means which the law gives him for the protection and enforcement of that right*." <u>United States v. Lee</u>, 106 U.S. 196, 208-9 (1882) (emphasis added).

<p style="text-align:center">80.</p>

Thus, Sovereign immunity does not apply in this case because the United States government is in no way sovereign, in and of itself, nor the sovereign of this country, and by passing and enforcing the National Firearms Act, the Gun Control Act of 1968, and the Firearms Owners' Protection Act of 1986, the United States has acted outside the bounds of its constitutional authority and infringed Plaintiff's "individual" "rights" to which Plaintiff is "the sovereign." <u>United States v. Lee</u>, 106 U.S. 196, 208-9 (1882).

<p style="text-align:center">81.</p>

In this country, the Original Sovereign, the Font of Sovereignty, the Sovereign Body, was the Founding Generation, the members of the body politic of the thirteen original colonies, who,

upon freeing themselves from the yoke of the King of England, became Sovereigns by "assum[ing] the powers of Government," the sovereign powers possessed by the King, by way of declaring their independence and successfully prosecuting their claim to sovereign power to fruition through victory in the American Revolutionary War. Dred Scott v. Sandford, 60 U.S. 393, 407 (1856). *See* Id. at 406 ("[E]very person, and every class and description of persons, who were at the time of the adoption of the Constitution recognised as citizens in the several States, became also citizens of this new political body; but none other; it was formed by them, and for them and their posterity, but for no one else.")

82.

The Founding Generation imbued the government with its sovereign power, delegating small amounts of the sovereign power which they inherited from the Kings of England to the administrative authority, the "Federal Government," "their agent and trustee," Id. at 395, through express enumerations in the United States Constitution, while retaining all sovereign power not so delegated, for "ourselves and *our Posterity*," U.S. Const. Preamble (emphasis added), as "[t]he powers not delegated to the United States by the Constitution…are reserved to the States respectively, *or to the people*." U.S. Const. amend. X (emphasis added).

83.

The Founding Generation's status as the Sovereign Body, the Font of Sovereignty from whom all sovereign power and governmental legitimacy is derived, and their Sovereign Rights, passed, as do all rights, sovereign powers, and sovereign status, through bloodline descent, to their Posterity, their direct bloodline descendants, one of whom is Plaintiff, the present day Sovereign Body.

84.

Because the government is not the sovereign in this country, but only the agent of the Sovereign when acting within the lawful agency relationship it holds with the Sovereign Body, via the express enumerations of delegated sovereign power contained within the Constitution, the government is not a sovereign and does not possess sovereign immunity, except where so acting as the lawful agent of the Sovereign Body.

### GOVERNMENT'S SOVEREIGN IMMUNITY IS DERIVATE OF THE SOVEREIGN BODY'S IMMUNITY: ONLY EXISTS WHERE GOVERNMENT ACTING WITHIN THE AGENCY RELATIONSHIP IT HOLDS WITH THE SOVEREIGN

85.

Paragraphs 1 through 84 are re-alleged as if fully restated herein.

86.

The United States government, in and of itself, has no sovereign immunity, as it is not the Sovereign.

87.

Rather, the government is merely the "***administrative authority*** of the state," ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 24 (LIBERTY FUND ed., 1999) (1803) (emphasis added), administering the small grants of sovereign power delegated to it at the time of the Founding by the Sovereign Body, the Founding Generation, and subsequently by their Posterity, the lineal bloodline descendants of said Founding Generation, which delegations of power are expressly enumerated in the United States Constitution.

88.

The government's sovereign immunity is derivative to that of the Sovereign Body. *See* ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 24 (LIBERTY

FUND ed., 1999) (1803) (emphasis added) ("In the United States of America the people have *retained the sovereignty* in their own hands (the Posterity are the sovereign): they have in each state distributed to the government, or *administrative authority* of the state," part of that sovereignty, and "[a]s the sovereign power hath no limits to its authority, *so hath the government* of a state *no rights*, but such as are purely *derivative*, and *limited*.") *See also* ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 111 (LIBERTY FUND ed., 1999) (1803) (emphasis added) ("the powers granted under the constitution, *being derived from the people of the United States, may be resumed by them*.")

89.

The cloak of sovereign immunity held by the government is the natural consequence of the government's status as the agent of the Sovereign Body. So long as the government is acting within the course and scope of its agency relationship with the Sovereign Body, meaning so long as it is acting within the confines of the delegated powers vested in it via the enumerations contained within the Constitution, the government is cloaked with the sovereign immunity of the Sovereign Body, though it does not possess such immunity on its own, as to bring the government (the agent) into the Sovereign's courts in this context, where it is acting within the scope of its authorized powers as agent of the Sovereign, is indistinguishable from brining the Sovereign into court himself.

90.

"As the sovereign power hath no limits to its authority," a Sovereign being unregulatable, uncontrollable, irresistible, indominable, and answerable to no one on earth, save God, it is a matter of law, fact, and a universal truth that no Sovereign, within the confines of his Sovereign realm and powers, can be brought to account for his actions in his courts or otherwise, without

his consent, and neither can his agents be made to do so while acting with his express consent and authority. ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 111 (LIBERTY FUND ed., 1999) (1803).

91.

Thus, the government is cloaked with the Sovereign Body's sovereign immunity so long as the government acts within the bounds of the sovereign power vested in it as evidenced by the express enumerations of said power in the Constitution, so long as the government is acting within its authorized agency relationship with the Sovereign.

GOVERNMENT HAS NO SOVEREIGN IMMUNITY IN THIS CASE BECAUSE IT IS ACTING NOT AS THE AGENT OF THE SOVEREIGN BUT AS A USURPER OF THE SOVEREIGN BODY'S SOVEREIGNTY

92.

Paragraphs 1 through 91 are re-alleged as if fully restated herein.

93.

However, where the government acts outside the scope of the agency relationship that it holds with the Sovereign Body, as it does here by enacting and enforcing the National Firearms Acts, it is not acting as the agent of the Sovereign Body, and, thus, is not cloaked with the Sovereign Body's sovereign immunity.

94.

In this case, by enacting and enforcing the National Firearms Acts, the government has unlawfully exceeded the bounds of its agency relationship with the Sovereign Body, and has infringed that sovereign power retained by the Sovereign Body, for "ourselves and our Posterity," U.S. Const. Preamble, and, thus, has not acted as our agent, but in "***USURPATION***"

of the sovereignty held by the Sovereign Body and in a manner that amounts to "***treason against***

***the sovereignty***." ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES

24 (LIBERTY FUND ed., 1999) (1803) (emphasis added).

95.

As the United States government has not acted within the scope of the agency

relationship that it has with the Sovereign, it is not cloaked with the Sovereign's sovereign

immunity from suit in the courts of the Sovereign.

EVEN IF THE EXPRESS ENUMERATIONS OF DELEGATED SOVEREIGN POWER
CONTAINED WITHIN THE CONSTITUTION VESTED THE GOVERNMENT WITH
SOVEREIGN POWER AND SOVEREIGN STATUS WITH RESPECT TO THOSE POWERS,
AS A MATTER OF LAW, THE GOVERNMENT CAN ONLY POSSIBLY BE SOVEREIGN,
AND, THEREFORE, HAVE SOVEREIGN IMMUNITY, INSOFAR AS IT HAS BEEN
VESTED WITH SOVEREIGN POWER

96.

Paragraphs 1 through 95 are re-alleged as if fully restated herein.

97.

But, assuming arguendo, that the government is, itself, somehow, in some way, sovereign. As

a matter of law, it can only be sovereign insofar as it was vested with sovereign power by the

Sovereign Body, the Founding Generation.

98.

At the time of the Founding, the Sovereign Body, the Founding Generation, became

sovereigns when they threw off the yoke of the British monarch and freed themselves of any

overlord on earth, save God.

99.

The Founding Generation inherited and assumed all that sovereign power held by their predecessor sovereign, the King of England, ***but no more***, as power, like matter, is neither created nor destroyed, but is finite, and one can inherit no more power from a predecessor sovereign than that which was held by said predecessor sovereign. *See* Johnson v. M'Intosh, 21 U.S. 543, 584, 5 L. Ed. 681 (1823) (emphasis added) ("***[N]either the declaration of independence, nor the treaty confirming it, could give us more than that which we before possessed, or to which Great Britain was before entitled***.")

100.

Thus, insofar as the King's sovereign power existed, the Founding Generation, as a Sovereign Body, inherited that power and were unregulatable, uncontrollable, supreme in power, and, thus, were Sovereigns.

101.

Insofar as the King of England lacked the sovereign power to act, as he did with respect to the private, individual, ancient, inalienable, ancestral sovereign rights of free Englishmen, the Founding Generation, acting as one Sovereign Body, in unison, lacked the power to act, and each member of the Founding Generation remained an individual Sovereign with respect to these rights.

102.

As Sovereigns, the Founding Generation acted as a Sovereign Body to form the United States government, delegating to it small portions their joint sovereign power, figuratively divesting themselves of their inherited sovereign power only insofar as they vested that power in their respective State and federal governments, as "[t]he powers not delegated to the United

States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, *or to the people*." U.S. Const. amend. X (emphasis added).

103.

As a corollary, the State and federal governments were imbued with sovereign power only insofar as that power was expressly enumerated in their respective constitutions, and can only possibly be considered sovereign with respect to the powers which were thus delegated.

104.

The government is in no way sovereign in any way when acting beyond the power thus delegated in its Constitution. *See* ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 23-4 (LIBERTY FUND ed., 1999) (1803) (emphasis added) ("The GOVERNMENT or administrative authority of the state, *is that portion only of the sovereignty, which is by the constitution entrusted to the public functionaries: these are the agents and servants of the people*.")

105.

Because the federal government is a government of limited, enumerated powers, it could, at most, be a limited, enumerated sovereign.

106.

Where the government has no power to act, as a matter of law, it cannot be considered a sovereign, as a sovereign is "1. *[s]upreme in power*; superior to all others; *highest in power*; chief; *independent of, and unlimited by, any other*; possessing, or entitled to, original authority or jurisdiction; as, a sovereign prince; 2. *[e]fficacious in the highest degree*; effectual; controlling; utmost; *highest*; predominant;...Sovereign state, a state which administers its own government, and is not dependent upon, or subject to, another power. [A] Sovereign [is] 1. *[o]ne*

*who exercises supreme control*; especially, in a monarchy, a [K]ing or [Q]ueen." NOAH WEBSTER, WEBSTER'S COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE 1263 (CHAUNCEY A. GOODRICH et al. ed., NEW EDITION OF 1880, 1886).

107.

And, with respect to the ancient, inalienable, private, individual, ancestral common law right to keep and bear arms, as retained by the Founding Generation for "[themselves] and [their] Posterity," U.S. Const. Preamble, the government has no power whatsoever to act where the right exists because the power over this right was not only "***not granted*** to [the government], ***but [is] in express terms denied***, and ***they are forbidden to exercise [power over this right]***," the government has "***a total absence of power everywhere…so far as these rights are concerned***." Dred Scott v. Sandford, 60 U.S. 393, 450–51, 15 L. Ed. 691 (1857).

108.

In attempting to unlawfully regulate this right, the United States is acting beyond its investiture of sovereign power, which it received from the Sovereign Body, and is instead acting as a usurper of the Posterity's sovereignty, and those perpetuating this usurpation are traitors. *See* ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 24 (LIBERTY FUND ed., 1999) (1803) (emphasis added) ("In the United States of America the people have ***retained the sovereignty*** in their own hands (the Posterity are the sovereign): they have in each state distributed to the government, or ***administrative authority*** of the state," part of that sovereignty, and "[a]s the sovereign power hath no limits to its authority, so hath the government of a state ***no rights***, but such as are purely ***derivative***, and ***limited***; the ***union of the sovereignty of a state with the Government, constitutes a state of USURPATION and absolute TYRANNY, over the PEOPLE…***Since the union of the sovereignty with the government, constitutes a state

of absolute power, or tyranny, over the people, *every attempt to effect such a[] union is treason against the sovereignty*.").

<div align="center">109.</div>

Because the United States is acting beyond its grant of sovereign power, and beyond the joint sovereign power held by the Sovereign Body, when it attempts to regulate the absolute rights of keeping and bearing arms, it is not acting in a sovereign capacity, and, thus, it is not a sovereign, nor the sovereign, in this case.

<div align="center">110.</div>

Plaintiff's ancestors, members of the Founding Generation of this country, retained the sovereign power inherent in their right of keeping and bearing arms, and all other plenary sovereign power not specifically delegated to the government, when they divested themselves of the limited, enumerated, and specified sovereign power, enumerated as powers of the federal government in the Constitution, and vested that limited, enumerated, and specified sovereign power, specifically enumerated in the Constitution, in the federal government. *See* ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 111 (LIBERTY FUND ed., 1999) (1803) (emphasis added) (The Virginia Ratification Convention espousing in its form of ratification of the United States Constitution and proposed bill of rights, "that the powers granted under the constitution, *being derived from the people of the United States, may be resumed by them, whenever the same shall be perverted to their injury or oppression*; and that *every power not granted* [by the Constitution to the government], *remains with [the people]* and at their will: that therefore *no right, of any denomination, can be cancelled, abridged, restrained, or modified by the congress*, by the senate, or house of representatives, *acting in any capacity*.")

<div align="center">111.</div>

*As sovereign immunity is an attribute of sovereignty, a natural consequence of the uncontrollable character of Sovereigns, and the United States is not the Sovereign in this case, nor acting in a sovereign capacity when enacting and enforcing the National Firearms Acts,* and never could be with respect to the Posterity's ancient, inalienable, private, individual, ancestral common law right of keeping and bearing arms, either under the terms of the Constitution or otherwise, as both the United States government lacks the sovereign power to regulate or act upon this right based upon the plain, clear, and unambiguous text of the United States Constitution and the Sovereign Body of this country is devoid of power to act upon the Posterity's ancient inalienable right of keeping and bearing arms, *the United States lacks sovereign immunity in this case and this Court has jurisdiction to proceed with this case*.

112.

Owning machine guns, to wit, ordinary military weapons, is well within Plaintiff's right to keep and bear arms, Plaintiff's retained sovereign power, retained by his ancestors for him. Thus, in this case, Plaintiff is the Sovereign, not the government. The government is acting as a usurper of the Posterity's sovereignty, and traitorously to the trust reposed in it by the Founding Generation and their Posterity.

113.

Based upon the express terms of the Constitution, the government can in no way be considered sovereign or a sovereign when it acts against the ancient, inalienable, private, individual, ancestral sovereign right of the Posterity to keep and bear arms, and, thus, based upon the plain words of the Constitution, the government cannot possess sovereign immunity when it acts against said right, as sovereign immunity is the natural consequence of sovereignty.

But the government's lack of sovereign status and power with respect to this right is not couched upon the Second Amendment to the United States Constitution alone, but, also, is based upon the fact that this right has always been a fundamental, absolute, inalienable, private, individual, ancestral sovereign right anciently held by the Posterity and their ancestors from time immemorial in their individual capacities.

## THERE ARE CERTAIN FUNDAMENTAL RIGHTS WHICH AMOUNT TO SOVEREIGNTY IN THE HANDS OF THE POSTERITY, WHICH ARE SOVEREIGN POWER AND STATUS IN THE HANDS OF THE INDIVIDUAL

114.

Paragraphs 1 through 113 are re-alleged as if fully restated herein.

115.

Even if the United States government had been vested with sovereign status through the express enumerations of delegated sovereign power contained within the Constitution, the Posterity, the lineal bloodline descendants of the Founding Generation, would have only been divested of their sovereign status insofar as they vested the government with sovereignty and sovereign power.

116.

And, even if the Sovereign Body had vested the government with *all of their joint sovereign power and all of their joint sovereign immunity*, the government would still have *no power to act upon the ancient, inalienable, private, individual, ancestral sovereign right of the Posterity to keep and bear arms*, and the government *would still lack sovereign immunity in this case*.

117.

The sovereign power to regulate this right could not have been granted by the Sovereign Body, the Founding Generation and their Posterity, in ether their State or federal constitutions, as, as the Virginia Ratification Convention notes, "there are ***certain natural rights***, of which men, when they form a social compact, ***cannot deprive or divest their posterity***," these rights being inalienable, or fundamental, rights, which have always been beyond the power of all Sovereigns in the Anglo-American chain of power to act upon. ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 112 (LIBERTY FUND ed., 1999) (1803) (emphasis added).

118.

Because the Founding Generation, the Sovereign Body, as a matter of law, only inherited that sovereign power held by their predecessor sovereigns within their chain of power, and the Kings of England could not act upon such rights, the Sovereign Body lacked the power to act upon such rights or imbue their governments with such power. And this is why the Virginia Ratification Convention, after recognizing that there are ***certain natural rights which men cannot divest or deprive from their Posterity***, and recognizing as one of those rights, "[t]hat the people have a right to keep and bear arms," did not include in the list of proposed ***amendments*** to the United States Constitution any amendment which attempted to prevent the general government from acting upon this right, as the most learned members of the Founding Generation, the "aristocratic Virginians," who included among their members the very men that wrote the Declaration of Independence and the United States Constitution, understood that the Sovereign Body lacked the power, even acting unanimously, or through their governments, to act upon this fundamental, ancestral sovereign right, held by members of the Founding Generation and their Posterity in their individual capacities. Id. at 114-8.

119.

From the very start of the common law, there were certain inalienable rights,

fundamental, ancient, private, individual, ancestral sovereign rights, held by free Englishmen,

that had always been beyond the power of all Sovereigns in the Anglo-American/Anglo-Saxon

chain of power to regulate, these rights being nothing more than sovereign power and sovereign

status in the hands of free Englishmen, to which each free Englishman was and is an individual

sovereign, and which rights the Founding Generation, acting in concert, could not "***deprive or

divest [from] their posterity***," ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE

UNITED STATES 112 (LIBERTY FUND ed., 1999) (1803) (emphasis added), because, when we

made ourselves sovereign, through the successful prosecution of our claim to sovereignty in the

War for Independence, we only assumed that sovereign power held by the King, and we could

assume no more and he could give no more than that sovereign power which he held. *See*

Johnson v. M'Intosh, 21 U.S. 543, 584, 5 L. Ed. 681 (1823).

120.

Many of these ancient, inalienable, private, individual, ancestral sovereign rights were

listed in Magna Charta.

121.

Yet, as Sir Edward Coke explains, Magna Charta, like the original Bill of Rights to the

United States Constitution, did not grant any rights, rather, it was "for the most part, ***but

declaratories of the ancient common laws of England***, to the observation, and keeping whereof,

the king was bound and sworn." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF

THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER

STATUTES A PROEME (E. AND R. BROOKE ed., 1797).

122.

Thus, these fundamental, inalienable rights had always been beyond the sovereign power of all Kings in the Anglo-American/Anglo-Saxon chain of power to regulate, and the foundational documents of the Anglo-American world, such as Magna Charta and the English Bill of Rights of 1689, which enumerated the sovereign rights of the subjects in relation to the King's sovereign power, were nothing more than enumerations of rights already extant, and forced recognitions on the part of the Kings of England as to such rights and those rights' limitations on the King's sovereign power.

123.

And, although different rights may have been detailed in these two documents, that's not because the other rights were not fundamental rights, but, rather, because these charters were intended to force the King of England at those times to recognize and enumerate those fundamental rights which he personally had infringed.

124.

That it is a matter of law that these rights have always been the individual, personal, ancestral, inalienable rights of free Englishmen, beyond the power of the Kings to act upon, and that any such actions by the King as to such rights were not taken in the King's capacity as a sovereign, is evidenced by the fact that when King Henry III attempted to repeal the Magna Charta and the Charta de Foresta, his actions were taken to be unlawful and of no effect, because, as Sir Edward Coke details, "it was to no end to cancell…when [Magna Charta was], for the most part, but declaratories of the ancient common laws of England."EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES A PROEME (E. AND R. BROOKE ed., 1797).

125.

And, again, by Magna Charta, the King did not grant to his subjects any rights that they did not before possess, but, rather, that charter was simply an enumerated ***recognition of the pre-existing inalienable rights of free Englishmen***, in which the King "observ[ed]" said rights and "swor[e]" to stay within his sovereign powers and not to transgress such powers by infringing the ancient, inalienable, private, individual, ancestral sovereign rights of his free English subjects. EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES A PROEME (E. AND R. BROOKE ed., 1797).

126.

Magna Charta, then, was the King's own forced recognition of his status as a ***limited sovereign***, and a document by which the King vowed to ***stay within his sovereign jurisdiction*** for the rest of eternity, by not transgressing his sovereign powers in such a manner as to infringe the sovereign, ancient, inalienable, private, individual, ancestral rights of his free English subjects.

127.

This oath and affirmation, was reaffirmed not just by King Henry III, but also by King Edward I "by act of parliament in the 25 year of his raign: and the said two charters have been confirmed, established, and commanded to be put in execution by 32 severall acts of parliament in all." Second Part of the Institutes of the Laws of England, EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES A PROEME (E. AND R. BROOKE ed., 1797).

128.

As was recognized at common law, the King had **no** power to act with regards to the fundamental, inalienable, ancestral, private, individual, sovereign rights of his subjects, and his acts with respect to these rights were unlawful and of no force at common law.

129.

In fact, when **the King, his judges, or his ministers** did attempt to act upon these rights, **these actions were** considered **null and void ab initio, and were of no effect**, as "albeit judgments in the kings courts are of high regard in law, and judicia are accounted as juris dicta, yet it is provided by act of parliament, that if any judgment be given **contrary to any of the points of the great charter**, or Charta de Foresta, by the justices, or by any other of the kings ministers, &c. **it shall be undone, and holden for nought**." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES A PROEME (E. AND R. BROOKE ed., 1797).

130.

Even Parliament, the highest court in the realm, recognized that it, too, was bound by Magna Charta, as the rights contained therein were nothing more than enumerations of the ancient, inalienable, private, individual, ancestral sovereign rights of free Englishmen, Sir Edward Coke detailing, "[*t]he highest* and most binding **laws** are the statutes which are **established by parliament**; and by authority of that **highest court** it is enacted (**only to shew their tender care of Magna Charta**, and Charta de Foresta) that if **any statute be made contrary to the great charter,** or the charter of the forest, **[it] shall be holden for none**: by which words all former statutes made against either of those charters are now repealed; and the nobles and great officers were to be sworn to the observation of Magna Charta, and Charta de Foresta." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE

Exposition of Many Ancient and Other Statutes A PROEME (E. and R. Brooke ed., 1797).

131.

With respect to these ancient, inalienable, private, individual, sovereign, ancestral rights held by free Englishmen in their individual capacity, neither parliament nor the king could act upon, deprive, or divest these rights from the individual, as, "*[n]o man shall be* disseised, that is, put out of seisen, or *dispossessed of* his free-hold (that is) lands, or livelihood, or of *his liberties*, or free-customes, that is, of such franchises, and *freedomes*, *and free-customes*, *as belong to him by his free birth right*, unlesse it be by the lawfull judgement, that is, verdict [of guilt for a criminal offense] of his equals (that is, *of men of his own condition*) or by the law of the land (that is, to speak it once for all) by the due course, and processe of law…No man *shall be in any sort destroyed unless it be by the verdict of his equals, or according to the law of the land*." Edward Coke, The Second Part of the Institutes of the Laws Of England: Containing the Exposition of Many Ancient and Other Statutes 45 (E. and R. Brooke ed., 1797).

132.

"*Every oppression against law, by colour of any usurped authority, is a kind of destruction,* for, *quando aliquid prohibetur, prohibetur et omne, per quod devenitur ad illud*: *and it is the worst oppression, that is done by colour of justice.*" Edward Coke, The Second Part of The Institutes of the Laws Of England: Containing the Exposition of Many Ancient and Other Statutes 48 (E. and R. Brooke ed., 1797).

133.

It was only through personal wrongdoing that a man could deprive himself of his inalienable rights.

134.

And so, also, the King's constables could not "take corn or other chattels of any man" without just compensation therefor, even when taking such corn or chattels to supply castles which were "kept for the defence of the realme," because such a taking without just compensation was "an unjust oppression of the subject," and infringed his ancient, inalienable, absolute right to possession and use of his property. EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 33 (E. AND R. BROOKE ed., 1797).

135.

Neither could the King take for "the kings carriage," any "demean, or proper cart for the necessary use of any ecclesiastical person, or of any knight, or of any lord, for or about the demean lands of any of them," a right extending to "all degrees, and orders of the lesser, and greater nobility, or dignity, as of knighthood, dukes, marquesses, earles, viscounts, and barons." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 35 (E. AND R. BROOKE ed., 1797).

136.

And, "neither the king, nor any of his baylies, or minsters, shall take the wood of any other…but by license of whose wood it is." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 35 (E. AND R. BROOKE ed., 1797).

137.

These rights, which the King could not divest from his subjects, under the law, were limitations upon the King's sovereign power, and absolute, ancestral, sovereign rights in the hands of free Englishmen, which existed inviolate, so long as they were not forfeited by abuse of said rights and by due process of law.

138.

And so it was also with the nobleman's, and noblewoman's, right to a trial by a jury of his or her peers. While a nobleman could be "indicted of treason, or felony, before commissioners of oier and terminer, or in the kings bench,…or…before the coroner…he shall be tried *per judicium parium fuorum*," by the judgment of his peers, when he "appeares and pleads to issue." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 48 (E. AND R. BROOKE ed., 1797).

139.

This ***absolute, inalienable, private, individual, sovereign, ancestral right*** to a trial by a jury of one's peers at common law is perhaps the best example of sovereignty in the hands of the free men of England, and most analogous to the right of keeping and bearing arms held by Plaintiff at present, as this was a right existing since ancient times, held by the ancestors of noblemen and women, which could not be divested from said nobles, even upon the highest charges of treason, but, rather, only upon conviction for felony or treason (which ultimately resulted in a sentence of death, and, by death, this ancestral right was divested from the person, but not before).

140.

Sir Edward Coke details, "[t]his triall by peeres was very auncient," and though a "woman that is noble by birth, doth marry under the degree of nobility, yet shee shall be tried by her peers," because the right passed to her through her blood. EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 49-50 (E. AND R. BROOKE ed., 1797).

141.

The fact that a woman, who was noble by birth, did not lose her right to a trial by a jury of her peers when she married beneath her is nothing more than evidence of a universal truth, that ancient, inalienable, private, individual, ancestral sovereign rights pass through the blood from generation to generation, as the right to keep and bear arms has passed to Plaintiff, through his bloodline descent from his Founding Generation ancestors and his noble Blount family ancestors.

142.

Thus, a noblewoman or nobleman of England, who were noble by way of descent, possessing noble blood, retained their ancient, inalienable, private, individual, absolute, ancestral right to a trial by a jury of their peers, regardless of who they married, and this right could not be deprived or divested from them, much like the right to keep and bear arms cannot be deprived or divested from Plaintiff, a member of the law-abiding Posterity, who inherited this absolute right from his arms-bearing ancestors.

143.

However, one who was not of noble birth, but held noble rank by virtue of marriage or by the grace of the King, did not possess the ancient, inalienable, private, individual, ancestral absolute right to a trial by a jury of peers of the realm, precisely because, while such rights are

beyond the power of the King to regulate, like the right to keep and bear arms, and all other sovereign, ancient, inalienable, private, individual, ancestral rights, one must actually be descended from a rights-holder of the ancient right to possess the right at present, as all rights, titles, and power pass through bloodline descent from antecedents to their Posterity.

144.

Thus, if a woman "be noble by marriage, and [re-]marry under the degree of nobility she loseth her dignity, for as by marriage it was gained, so by marriage it is lost, and she shall not be tried by…peers." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 50 (E. AND R. BROOKE ed., 1797).

145.

"The common law hath so admeasured the prerogative of the king, *as he cannot take, nor prejudice the inheritance of any*." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 36 (E. AND R. BROOKE ed., 1797).

146.

And the right of keeping and bearing arms is so fundamental, ancient, and inherent in the very nature of being a free man, and necessary for the successful, stable, and lawful maintenance of a free society, that, not only has the right to keep and bear arms been considered one of those ancient, fundamental, private, individual, absolute, ancestral sovereign rights which pass from generation to generation through the blood, *the inheritance of the Posterity of the free men of England*, but also, intrinsic to the very status of being a free man itself, as when a lord was to manumit his enslaved serf, or villein, at common law, he was to "deliver the slave to the sheriff

in a full county, proclaim him exempt from the bond of servitude by manumission, shew him open gates and ways, and deliver him *free arms, to wit, a lance and a sword*,'" the **ordinary military weapons of that day and age**, "'thereupon he is a free man,'" by the laws of King William the Conqueror. ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 430 (LIBERTY FUND ed., 1999) (1803) (emphasis added).

147.

The Founders, too, recognized that there were some ancient, inalienable, private, individual, ancestral rights, which had been held from the dawn of time by all free Englishmen, and to which each and every free Englishman, and to which each and every successive generation of free Englishmen and women were entitled and possessed as absolute individual sovereigns.

148.

These fundamental rights were detailed in the Bill of Rights to the United States Constitution, though such an enumeration of these rights was unnecessary, as the power over these rights was not and could not have been granted to the government. Which is why it has been universally held that these rights are "not granted by the Constitution; neither [are they] in any manner dependent upon that instrument for [their] existence." United States v. Cruikshank, 92 U.S. 542, 547, 23 L. Ed. 588 (1875).

149.

Because these certain rights, inalienable, fundamental, ancient, private, individual, ancestral rights, have always been beyond the power of all Kings within the Anglo-American chain of power to regulate, one such right being the right of keeping and bearing arms, the Founding Generation had no sovereign power to regulate these rights, not even when acting as a

unanimous sovereign body, because the power to regulate these rights had always been beyond

the legitimate sovereign power of the Kings of England, from whom the Founding Generation

inherited their sovereign powers, and the entire Founding Generation, acting unanimously as a

Sovereign Body, could do no more than could the King, from whom they inherited their

sovereign power, acting with the full force of his individual sovereignty.

150.

The right to keep and bear arms, as it existed at common law, and as it exists in America,

is an inalienable right, a right that cannot be alienated from the individual, and it cannot be

regulated by the government where it exists. *See* New York State Rifle & Pistol Assn., Inc. v.

Bruen, No. 20-843, 20 (U.S. Jun. 23, 2022) ("The government must…justify its regulation by

demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

Only then may a court conclude that the individual's conduct ***falls outside*** the Second

Amendment's 'unqualified command.'").

151.

It has always been the case that free Englishmen of quality possessed, and still possess,

the right to keep and bear arms, and this right has always been beyond the power of any

Sovereign in the Anglo-American chain of power to regulate.

152.

Indeed, this right is so fundamental and inherent in the very status of being a free man in

England or America, that villeins, serfs or peasants in the English feudal system that were so low

on the social strata so as to be considered the chattel property, i.e. slaves, of their noble lords,

upon being manumitted, or freed, by their lord, were to be given "*free arms*, to wit, a lance and a

sword," the ordinary military weapons of that day and age, as part of the legal ceremony required

to manumit a villein and in recognition of their new status as a free man, as decreed by William the Conqueror. *See* ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 430 (LIBERTY FUND ed., 1999) (1803) (emphasis added) ("In England, the mode of enfranchising villeins is said to have been thus prescribed by a law of William the Conqueror. 'If any person is willing to enfranchise his *slave*, let him with his right hand, deliver the slave to the sheriff in a full county, proclaim him exempt from the bond of servitude by manumission, shew him open gates and ways, and deliver him *free arms*, to wit, a lance and a sword; thereupon he is a free man.'")

<div align="center">153.</div>

It is only **slaves** that possess no ancient, inalienable, private, fundamental, absolute, individual, ancestral sovereign rights within a chain of power, as only a **slave** has no absolute rights which the sovereign is bound to respect. This is why the status of **slave** usually goes hand in hand with the act of **conquest**, as when two distinct chains of power meet, the conquering chain is bound to respect no rights of the people of the conquered chain, as, with regard to the conquering sovereign, those people have no ancient, ancestral, fundamental, inalienable rights, no rights whatsoever but such as the conquering sovereign is willing to recognize. *See* Johnson v. M'Intosh, 21 U.S. 543, (1823) ("The title by conquest is acquired and maintained by force. The conqueror prescribes its limits."); *see also* ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 410 (LIBERTY FUND ed., 1999) (1803) ("Slaves, says Justinian, are either born such, [because they possess **no ancestral rights** within a chain of power,] or become so. They are born slaves when they are the children of **bond women** (women who possessed no rights); and they become slaves, either by the laws of nations, that is, by captivity; for it is the practice of our generals to sell their captives...This is all based upon the idea that] '[t]he

conqueror…according to the civilians, had a right to the life of his captives; and having spared

that, has a right to deal with him as he pleases.")

154.

The present chain of power that is extant in America is the Anglo-American chain of

power, a chain in which Plaintiff and other members of the Posterity comprise the present-day

Sovereign Body, Plaintiff's ancestors comprised the Sovereign Body at the time of the Founding

up until the present, and, even when the King of England was the recognized acting sovereign in

that chain, a chain to which Plaintiff's ancestors always possessed, and Plaintiff currently

possesses, ancient, inalienable, private, individual, absolute, ancestral sovereign rights, one of

which being the right to keep and bear arms.

155.

Within this chain of power, the right to keep and bear arms is so fundamental and ancient

that the free men of England did not even feel it necessary to enumerate this right in the Magna

Charta, because even the tyrant King of England, John, respected his subjects' inalienable right

to keep and bear arms, though it was this right which was the bedrock upon which that Charter

was founded.

156.

Because sovereignty is nothing more than unrestrained power, and the Posterity cannot

be regulated insofar as we are acting within our common law and constitutional rights to keep

and bear arms, and our actions do not amount to an *abuse* of those rights, thus being plenary in

power, unrestrainable, unregulatable, irresistible, and uncontrollable insofar as we are acting

within the confines of the rights of keeping and bearing arms, the power inherent in these rights

of keeping and bearing arms is the sovereign unlimited power to keep and bear arms, insofar as

the confines of the rights exist, and it is this inherent sovereign power that the sovereign body, the Founding Generation, retained for "ourselves and our Posterity," U.S. Const. Preamble, and could not have acted upon nor divested from themselves or their Posterity even if they had so desired.

157.

Indeed, with respect to this right, each member of the Posterity is, as each free Englishman of quality was, individually, a Sovereign, only restrainable insofar as we restrain ourselves, so long as we are acting within the confines of the right, with "no limits short of the moral power of the citizens to exercise it." Bliss v. Com., 12 Ky. 90, 92 (1822).

158.

And, again, as is detailed in the foregoing portions of the complaint, the Founding Generation had no desire to divest their Posterity of the ancient, inalienable, private, individual ancestral sovereign right to keep and bear arms, even if it had been within their power to do so (which it wasn't), as the "powers over person and property of which we speak *are not only not granted* to Congress, *but are in express terms denied*, and *they are forbidden to exercise them*," the governments, both State and federal, have "*a total absence of power everywhere…so far as these rights are concerned*." Dred Scott v. Sandford, 60 U.S. 393, 450–51, 15 L. Ed. 691 (1857) (emphasis added).

159.

*Because the government*, as does the Sovereign Body, *lacks all power* to act upon the ancient, inalienable, private, individual, absolute, ancestral sovereign right of the Posterity to keep and bear arms, *the government is not acting in a sovereign capacity* when it enacted and enforces the challenged provisions of the National Firearms Acts, and thereby infringes

Plaintiff's right of keeping ordinary military weapons by criminalizing his intended course of conduct in purchasing and possessing a machine gun, manufactured after 1987, which weapons comprise part of the ordinary military equipment of service members in the armed forces of the United States.

160.

Because the government is not acting in a sovereign capacity when enacting and enforcing the National Firearms Acts, it does not possess the natural consequence of sovereign immunity.

EVEN IF THE GOVERNMENT WAS VESTED WITH ALL THAT SOVEREIGN IMMUNITY HELD BY THE FOUNDING GENERATION, THE SOVEREIGN BODY, IT STILL COULD HAVE NO MORE SOVEREIGN IMMUNITY THAN THE KING OF ENGLAND, AND THE KING OF ENGLAND POSSESSED NO SOVEREIGN IMMUNITY WHEN HE WAS NOT ACTING IN HIS SOVEREIGN CAPACITY, SUCH AS WHEN HE INFRINGED THE PRIVATE, INDIVIDUAL, INALIENABLE, ANCIENT, ANCESTRAL RIGHTS OF FREE ENGLISHMEN

161.

Paragraphs 1 through 160 are re-alleged as if fully restated herein.

162.

It is common sense, and a matter of law, that, under the form of government established in the United States at the time of the Founding, that the members of the body politic of the original thirteen colonies and their Posterity are the ones in whom the sovereignty rests in this country.

163.

This is doubly the case when taking into account the fact that *every Founding Father*, and *every member of the body politic*, at that time understood that the *Sovereign Body of this*

*country* were the members of the body politic of the thirteen original colonies who fought for our independence, won our independence, and ratified their State and federal constitutions, thereby imbuing this government with its sovereignty, its very existence.

164.

In this country, the government has never been understood to be the sovereign, and, as such, at the time of the Founding and long thereafter, it was doubtful that the government possessed vast attributes of any form of sovereign immunity.

165.

Ultimately, many courts have illogically held that the government possesses vast attributes of sovereign immunity because the King of England did at common law, and erroneously attributed to that King absolute sovereign immunity from suit.

166.

At the same time, courts, including the Supreme Court of the United States, have held sovereign immunity inapplicable where the government is not acting within its investitures of sovereign power contained within the express enumerations of said power in the Constitution.

167.

While the Supreme Court holding in Lee, which holds that sovereign immunity is inapplicable where the government is not acting within its investitures of sovereign power as enumerated in the Constitution, is undoubtedly correct, even if the Sovereign Body had desired to vest its government with all that sovereign immunity which it itself held, to wit, that sovereign immunity held by the King of England at common law, the King of England at common law was a *limited sovereign*, and, thus, possessed only *limited sovereign immunity*.

168.

As sovereign immunity is the natural consequence of sovereignty, the King only possessed sovereign immunity where he was acting within his sovereign powers and within his sovereign realm, to wit, where he was acting within his sovereign jurisdiction, both legal and geographical, and, thus, acting in his sovereign capacity.

169.

Even "Sir *William Blackstone*," "author of the Commentaries," and, "if not the introducer, at least the great supporter," of "*a plan of systematic despotism*," to wit, the modern-day erroneous doctrine of sovereign immunity, understood and explained that the King of England was only sovereign and only possessed sovereign immunity "*within his own dominions,*" both legal and geographic, "because no Court can have jurisdiction over him: *for all jurisdiction implies superiority of power*."

170.

But, where the King acted outside of his sovereign jurisdiction, and, therefore, not in his sovereign capacity, that is to say, where the King transgressed his sovereign powers and infringed the ancient, inalienable, private, individual, ancestral rights of free Englishmen, rights which the King, like the present United States government, had a complete absence of power to act upon, the King did not possess the natural consequence of sovereignty, to wit, sovereign immunity, because he had no sovereign power with respect to those rights.

171.

As the ancient, inalienable, private, individual, ancestral rights of free Englishmen were always beyond the sovereign power of the Kings of England to regulate, and the free men of England were unrestrainable, uncontrollable, and answerable to no one on earth for their exercise of these absolute sovereign rights, so long as they were acting within the confines of these rights,

the free men of England were individual sovereigns, and the Posterity today are individual

sovereigns, with respect to these rights.

172.

"The common law hath so admeasured the prerogative of the king, *as he cannot take,*

*nor prejudice the inheritance of any*." EDWARD COKE, THE SECOND PART OF THE INSTITUTES

OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER

STATUTES 36 (E. AND R. BROOKE ed., 1797).

173.

Where the King attempted to act upon these fundamental rights, he transgressed that

limited sovereign power that he held, acted outside of his sovereign jurisdiction, and, thus, did

not possess sovereign immunity from the jurisdiction of his court nor his subjects.

174.

This was recognized by not just the free men of England and parliament, but, also, by the

Kings of England themselves from the earliest days of the common law, it being enacted, in the

time of King Edward III, "[f]or the pleafure of God and quietnesse of our subjects as to save our

conscience, and to keep our oath, by the assent of our great men and other of our councell, we

have commanded our justices, that they shall from henceforth do even law and execution of right

to all our subjects, rich and poor, *without having regard to any person*, without letting to do

right for any letters or commandment which may come to them from *us*, or from any other, or by

any other cause." EDWARD COKE, THE FOURTH PART OF THE INSTITUTES OF THE LAWS OF

ENGLAND: CONCERNING THE JURISDICTION OF COURTS 69-70 (W. CLARKE AND SONS ed.,

1809).

175.

And, by Magna Charta, King John recognized that he was subject to the jurisdiction of the laws, his courts, and his subjects when he so pledged, "[s]ince, moreover, for God and the amendment of our kingdom and for the better allaying of the quarrel that has arisen between us and our barons, we have granted all these concessions, desirous that they should enjoy them in complete and firm endurance forever, we give and grant to them the underwritten security, namely, that the barons choose five and twenty barons of the kingdom, whomsoever they will, who shall be bound with all their might, *to observe and hold, and cause to be observed, the peace and liberties we have granted and confirmed* to them by this our present Charter, *so that if we*, or our justiciar, or our bailiffs or any one of our officers, *shall in anything be at fault towards anyone, or shall have broken any one of the articles of this peace or of this security*, and the offense be notified to four barons of the foresaid five and twenty, the said four barons shall repair to us (or our justiciar, if we are out of the realm) and, laying the transgression before us, petition to have that transgression redressed without delay. And if we shall not have corrected the transgression (or, in the event of our being out of the realm, if our justiciar shall not have corrected it) within forty days, reckoning from the time it has been intimated to us (or to our justiciar, if we should be out of the realm), *the four barons aforesaid shall refer that matter to the rest of the five and twenty barons, and those five and twenty barons shall, together with the community of the whole realm, distrain and distress us in all possible ways*, namely, by seizing our castles, lands, possessions, and in any other way they can, until redress has been obtained as they deem fit, saving harmless our own person, and the persons of our queen and children; and when redress has been obtained, they shall resume their old relations towards us. *And let whoever in the country desires it*, swear to obey the orders of the said five and twenty barons for the execution of all the aforesaid matters, and along with them, to *molest us to the utmost of his*

*power*; and we publicly and freely grant leave to everyone who wishes to swear, and we shall never forbid anyone to swear. All those, moveover, in the land who of themselves and of their own accord are unwilling to swear to the twenty five to help them in constraining and molesting us, we shall by our command compel the same to swear to the effect foresaid." *Magna Charta 1215*, YALE LAW SCHOOL AVALON PROJECT, https://avalon.law.yale.edu/medieval/magframe.asp (last visited Jan. 31, 2023).

176.

Because of his unwillingness to abide by the law, as enumerated in Magna Charta, the free men and lords of England subjected King Henry III to their jurisdiction and will by means of the Provisions of Oxford in 1258, "plac[ing] the king under the authority of a Council of Fifteen, to be chosen by twenty-four men made up of twelve nominees of the king, and twelve nominees of the reformers. The chief ministers, the Justiciar and Chancellor were to be chosen by and responsible to the Council of Fifteen, and ultimately to the community of the realm at regular parliaments to be held three times a year." *The Provisions of Oxford*, United Kingdom Parliament, https://www.parliament.uk/about/living-heritage/evolutionofparliament/originsofparliament/birthofparliament/overview/simondemontfort/provisionsoxford/ (last visited Jan. 29, 2023).

177.

The council subsequently passed the Ordinance of the Magnates in 1259, by which they too, acting as a body of magnates, promised to exercise power only within the confines of the law, recognizing that they, acting with all the might of the King, could no more infringe the ancient, inalienable, private, individual, ancestral, sovereign rights of free Englishmen than could the King himself, acting individually.

178.

In 1264, the free men of England held King Henry III accountable for his attempted transgressions of their ancient, inalienable, sovereign ancestral rights, by his attempted rescission of Magna Charta, at the Battle of Lewes, the result of which was that Henry III was subjected to the jurisdiction of the will of his subjects and forced to sign the Mise of Lewes.

179.

Shortly thereafter, "in the 52 yeare of his raigne," Henry III, "confirmed" the Magna Charta by "act of parliament." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES A PROEME (E. AND R. BROOKE ed., 1797).

180.

This limited sovereign status held by the Kings of England is exemplified by the trial and execution of King Charles I.

181.

King Charles I was subject to the jurisdiction of the High Court of Parliament because his actions were "outside the law," and, thus, not taken in his sovereign capacity, but, rather, were actions which amounted to usurpations of the sovereign rights of free Englishmen, and, thus, were acts of "treason." *The full proceedings of the High Court of Iustice against King Charles in Westminster Hall, on Saturday the 20 of January, 1648 together with the Kings reasons and speeches and his deportment on the scaffold before his execution* http://name.umdl.umich.edu/A40615.0001.001 (last accessed March 27th, 2023).

182.

If the King of England had been an unlimited sovereign, sovereign as to all things, and, therefore, possessed unlimited sovereign immunity, then no act on his part could have ever amounted to an unlawful treasonous act, because he would have had plenary power and authority with respect to all matters.

183.

However, as is evident not just from the trial of King Charles I, but from English history as well, the Kings of England were not universal, unlimited sovereigns, and never had been, but, rather, were limited sovereigns in that there were certain ancient, fundamental, inalienable, private, ancestral rights held by free Englishmen, as individual sovereigns, which were beyond the power of the Kings and Parliament to act upon, and, when the King did so attempt to act upon these rights, such acts amounted to unlawful, treasonous acts, for which the Kings of England, acting not within their sovereign capacity, lacked sovereign immunity and were subject to the jurisdiction of their courts and free subjects.

184.

Indeed, when King Charles I was arraigned at the start of his trial, it was read, "[t]hat the said Charles Stuart being admitted King of England, and therein trusted with a *limited power*, to govern by, and *according to the laws of the Land, and not otherwise*; And by his Trust, Oath, and Office, being obliged to use the Power committed to him, For the good and benefit of the People, *and for the preservation of their Rights and Liberties*; Yet nevertheless out of a wicked design, to erect, and uphold himself *an unlimited and Tyrannical power*, to rule according to his will, and to *overthrow the Rights and liberties of the people*; Yea, to take away, and make void the foundations thereof, and of all redress and remedy of *misgovernment* which by the *fundamental constitutions of this kingdome, were reserved on the peoples behalf*, in the right

and power of frequent and successive Parliaments, or nationall meetings in Councel; he the said Charls Stuart, for accomplishment of such his designes, and for the protecting of himself and his adherents, *in his and their wicked practises to the same ends*, hath *traiterously and maliciously* leavied war against the present parliament, and the people therein represented." *The full proceedings of the High Court of Iustice against King Charles in Westminster Hall, on Saturday the 20 of January, 1648 together with the Kings reasons and speeches and his deportment on the scaffold before his execution* http://name.umdl.umich.edu/A40615.0001.001 (last accessed March 27th, 2023).

185.

King Charles I's trial was held *without his consent and in contravention of his will* because when he infringed the ancient rights of his free English subjects, by exercising "an unlimited and Tyrannical power," he was not acting in a sovereign capacity, and, as such, did not possess the natural consequence of sovereignty, to wit, sovereign immunity. Id.

186.

King Charles I was summarily tried and executed, at the will of his people, and was thus subject to their jurisdiction, for his attempted usurpation of their rights and his attempted establishment of an unlimited monarchy, because, when he acted upon the rights and liberties of free Englishmen, he was outside of his sovereign realm, and within the sovereign realm of his subjects in their individual capacities.

187.

Thus it was that King Charles I was subject to the jurisdiction of his courts and his subjects without his consent.

188.

But, the trial and execution of Charles I was not the first time that Kings of England were subject to the jurisdiction of their courts and subjects when they transgressed their lawful sovereign powers and infringed the rights of the free men of England, and it would not be the last. *See* the Battle of Runnymede and Magna Charta, the Battle of Lewes, the Glorious Revolution and the English Bill of Rights of 1689, and the battles of "Lexington, Concord, Camden, River Raisin, Sandusky, and the laurel-crowned field of New Orleans." Nunn v. State, 1 Ga. 243, 251 (1846).

189.

However, with respect to many common matters that did not implicate the inalienable rights of free Englishmen, the King was well within his sovereign powers to act.

190.

Thus, at common law, the King was held to have sovereign immunity, and, therefore, immunity from suit in his Courts, unless he so consented to be sued, so long as he was acting within his sovereign jurisdiction, in a sovereign capacity, meaning, so long as he did not infringe the fundamental, inalienable, ancient, ancestral right of free Englishmen.

191.

It is because the "***cases appropriate to judicial proceedings***" at common law, even against the King, surrounded "***common matters***," and ***not sovereign fundamental rights***, that the King's immunity from suit in his courts at common law was so broad. *United States v. Lee*, 106 U.S. 196, 205 (1882). So far as the King did not transgress the sovereign power that he held in such a way as to infringe a fundamental right, he was immune from suit without his consent.

192.

However, the King was always subject to the jurisdiction of his courts and his subjects when he infringed a sovereign individual right of free Englishmen, the adjudication of sovereign inalienable rights in days past taking place most often on the battlefields of England and America, where *the King was always subject to the jurisdiction of the highest Court in the land*, the greatest arbiter of the rights of men and the power of sovereigns, to wit, *the battlefield*, which Court's jurisdiction was exercised regularly over the King's person, to the successful enforcement of said ancient, fundamental, inalienable rights, and the forced recognition of said rights by the Kings of England. *See* the Battle of Runnymede and Magna Charta, the Battle of Lewes, the Glorious Revolution and the English Bill of Rights of 1689, and the battles of "Lexington, Concord, Camden, River Raisin, Sandusky, and the laurel-crowned field of New Orleans." Nunn v. State, 1 Ga. 243, 251 (1846).

193.

Indeed, the English Bill of Rights of 1689, *passed after the conclusion of the Glorious Revolution, a series of battles by which the free English subjects dethroned and cast King James II out of England,* exclaims that, historically, the King has always been viewed, and has always been a *limited sovereign*, and subject to the jurisdiction of his subjects when he transgressed his limited sovereign powers, exclaiming, "*[w]hereas the late King James the Second*, by the assistance of divers *evil counsellors, judges and ministers* employed by him, *did endeavour to subvert and extirpate* the Protestant religion and *the laws and liberties of this kingdom*;

*By assuming and exercising a power of dispensing with and suspending of laws* and…

*By causing several good subjects being Protestants to be disarmed*…

and by divers *other arbitrary and illegal courses*;

And whereas of late years partial ***corrupt and unqualified persons*** have been returned and served on juries in trials, and particularly divers jurors in trials for high treason ***which were not freeholders***…

***All which are utterly and directly contrary to the known laws and statutes and freedom of this realm***;

And whereas the said late King James the Second having abdicated the government…

And thereupon the said Lords Spiritual and Temporal and Commons, pursuant to their respective letters and elections, being now assembled in a full and free representative of this nation, taking into their most serious consideration the best means for attaining the ends aforesaid, ***do in the first place (as their ancestors in like case have usually done) for the vindicating and asserting their ancient rights and liberties declare***…

That the subjects which are Protestants may have arms for their defence ***suitable to their conditions*** and as allowed by [the common] law…

That the ***freedom of speech*** and debates or proceedings ***in Parliament*** ought not to be impeached or questioned in any court or place out of Parliament…

***And they do claim, demand and insist upon all and singular the premises as their undoubted rights and liberties***, and that no declarations, judgments, doings or proceedings to the prejudice of the people in any of the said premises ought in any wise to be drawn hereafter into consequence or example; ***to which demand of their rights*** they are particularly encouraged by the declaration of his Highness the prince of Orange as being the only means for obtaining a full redress and remedy therein." *English Bill of Rights of 1689*, YALE LAW SCHOOL AVALON PROJECT, https://avalon.law.yale.edu/17th_century/england.asp (last visited Jan. 30, 2023).

194.

And one of the ancient, inalienable, fundament, private, individual ancestral rights for which these Kings were held to account by their subjects was the right of keeping and bearing arms. For in the Declaration of Rights of 1689, it is enumerated that the tyrant Stuart kings had attempted to divest from the lawful free English subjects their right of keeping and bearing arms, "[b]y causing several good subjects being Protestants to be disarmed." *English Bill of Rights of 1689*, YALE LAW SCHOOL AVALON PROJECT,

https://avalon.law.yale.edu/17th_century/england.asp (last visited Jan. 30, 2023).

195.

And, by the very Revolution upon which this country was founded, the King was held liable for, and subject to the jurisdiction of the Founding Generation, Plaintiff's ancestors, "when they separated from Great Britain and formed new sovereignties, and took their places in the family of independent nations…and…declared their independence, and assumed the powers of Government **to defend their rights by force of arms**." Dred Scott v. Sandford, 60 U.S. 393, 407 (1856).

196.

Thus, it has always been the case, both at common law as in this country, that "*[n]o man…is so high that he is above the law. No officer of the law may set that law at defiance* with impunity. *All the officers of the government*, from the highest to the lowest, *are creatures of the law, and are bound to obey it*.

*It is the only supreme power in our system* of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, *and to observe the limitations which it imposes* upon the exercise of the authority which it gives." United States v. Lee, 106 U.S. 196, 220 (1882) (emphasis added).

197.

And, even with respect to **common matters**, at least historically, when the King acted

unlawfully at common law, he lacked all sovereign immunity and was "suable in his own courts

and in his kingly character as other persons were. [According to] the authority of Chief Baron

Comyns, 1 Digest, 132, Action, C. 1, and 6 Digest, 67, Prerogative; and of the Mirror of Justices,

chap. 1, sect. 3, and chap. 5, sect. 1." *United States v. Lee*, 106 U.S. 196, 205 (1882). And

subsequent to the reign of King Edward I, the petition of right was the means by which to bring

the King to court regarding **common matters**, and, while this petition of right was a petition to

the King to bring him into court and, thus, it was held that bringing the King to court via this

petition was based upon the consent of the King, as the Supreme Court details in <u>Lee</u>, petitions

of rights were universally granted, so there was no de facto sovereign immunity possessed by the

Kings of England, even for **common matters**.

198.

And so it was said that the King could not disturb the common law.

THE KING COULD NOT DISTURB THE COMMON LAW

199.

"By no means common right, or common law should be disturbed, or delayed, no, though

it be ***commanded under the great seale, or privie seale, order, writ, letters, message, or***

***commandment whatsoever, either from the KING, or any other, and that the justices shall***

***proceede, as if no such writs, letters, order, message, or other commandment were come to***

***them.***" EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND:

CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 55 (E. AND R.

BROOKE ed., 1797).

200.

"*Nulli vendemus…**And therefore, every subject of this realme, for injury done to him** in bonis, terris, vel persona*, by any other subject, be he ecclesiastical, or temporall,  free, or bond, man, or woman, old, or young…or any other without exception, ***may take his remedy by the course of law, and have justice, and right for the injury done to him, freely without sale, fully without any deniall, and speedily without delay***." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 55 (E. AND R. BROOKE ed., 1797).

201.

"That the common lawes of the realme should by no meanes be delayed, for the law is the surest sanctuary, that a man can take, and the strongest fortresse to protect the weakest of all," and while the King may "***stay*** his owne suite," he could not dismiss it, nor was he immune from suit. EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 55 (E. AND R. BROOKE ed., 1797).

202.

"The law is called…right, because it is the best ***birthright*** [Englishmen] hath, for thereby his goods, lands, wife, children, his body, life, honor, and estimation are protected from injury, and wrong." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 56 (E. AND R. BROOKE ed., 1797).

203.

Because the King could not disturb the common law, it being beyond his power to deprive free Englishmen of their ancient, inalienable, fundamental, private, individual, ancestral sovereign right to due process of law, and, furthermore, *because the King did not possess sovereign immunity at common law*, and otherwise, *when he was not acting in a sovereign capacity*, such as when he acted beyond his sovereign power in such a manner so as to infringe the private, ancient, inalienable, fundamental, absolute, individual, ancestral sovereign rights of his free English subjects, *the government of the United States of America*, or any State for that matter, *could not possibly possess sovereign immunity when acting in such a manner as to infringe the Posterity's ancient, inalienable rights, and the U.S. government does not, in fact, possess sovereign immunity, in this case*, because when the government enacted the challenged provisions of the National Firearms Acts and enforces said provisions as to Plaintiff, it is acting beyond any sovereign power or authority that it could possibly have, and beyond that express authority delineated in the United States Constitution, in such a manner so as to infringe Plaintiff's ancient, fundamental, absolute, inalienable, private, individual, ancestral sovereign right to keep any arms whatsoever, but, especially the right to keep ordinary military weapons.

CONCLUSION TO SOVEREIGN IMMUNITY ANALYSIS

204.

And, while, the doctrine of sovereign immunity that existed at common law was so expansive *with respect to common matters well within the sovereign power of the King to act upon because the King*, not the people nor parliament, *was the Sovereign, the Font of Sovereignty, the person from whom all sovereign power and governmental legitimacy flowed*, as James Wilson details, the principles behind that doctrine of sovereign immunity, "*never*

*extended to the American States*." Chisholm Ex'r. v. Georgia, 2 U.S. 419, 457-58 (1793) (emphasis added).

<center>205.</center>

As stated above, it is a matter of law, a universal truth, that a Sovereign only possesses sovereign immunity where he acts in a sovereign capacity, to wit, in accord with his lawful sovereign powers and within the geographical territory to which he is sovereign, because sovereign immunity is the ***natural consequence of the plenary power and authority of the Sovereign***. "The law, says Sir *William Blackstone*, ascribes to the *King* the attribute of sovereignty: he is sovereign and independent ***within his own dominions***; and owes no kind of objection to any other potentate upon earth. Hence it is, that no *suit* or action can be brought against the *King*, even in civil matters; because no Court can have jurisdiction over him: ***for all jurisdiction implies superiority of power***.'" Chisholm Ex'r. v. Georgia, 2 U.S. 419, 458 (1793) (emphasis added).

<center>206.</center>

And, in this country, the State governments and federal government are in no way ***superior in power***, but, rather, ***inferior in power and amenable to the will of the Posterity***.

<center>207.</center>

The Sovereign in this country is the Posterity, the lineal bloodline descendants of the original Sovereigns, the Founding Generation. We are the ones whose ancestors freed themselves from their overlord, the King of England, thereby assuming the sovereign powers of that predecessor sovereign, becoming sovereign at that moment; and whose ancestors, as a Sovereign Body, vested small amounts of that sovereignty in very limited and specified ways in the governments, both State and federal, while at the same time retaining all sovereignty not so

specifically vested, and, ultimately, retaining the ultimate sovereignty to do away with these governments any time that it so pleased them or us. Lastly, we, the Posterity, are the ones to whom the Founding Generation's sovereign status, joint sovereign power (sovereign power held by the Sovereign Body), and ancient, fundamental, private, absolute, individual, ancestral sovereign rights (individual sovereign status and power) passed, as do all rights and status, through our bloodline descent from said progenitors.

208.

The King's sovereign power at common law was more general and less defined than that sovereign power delegated to the governments (both State and federal) in this country. It was only certain and widely recognized, by both the King and his subjects, that the King did not possess sovereign power where his power confronted an ancient inalienable right which had been beyond the power of all sovereigns in the Anglo-Saxon chain of power to regulate, meaning, where it confronted sovereignty itself.

209.

Thus, generally, in the waning days of the common law, neither the King, ***nor his agents***, could be dragged into court against his will. However, as James Wilson, Founding Father and Supreme Court Justice notes in Chisholm, the King was traditionally subject to suit by his subjects for any unlawful acts at common law, even acts relating to common matters, stating, "[i]n *England*, according to Sir *William Blackstone*, no suit can be brought against the *King*, even in civil matters. So, in that *Kingdom*, is the law, at *this* time, received. ***But it was not always so***. Under the *Saxon* Government, a very different doctrine was held to be orthodox. Under that Government, as we are informed by the Mirror of Justice, a book said, by Sir *Edward Coke*, to have been written, in part, at least, before the conquest; under that Government it was ordained,

that the *King's* Court should be open to all Plaintiffs, by which, without delay, they should have

remedial writs, ***as well against the King or against the Queen, as against any other of the***

***people***. The law continued to be the same for some centuries after the conquest. ***Until the time***

***of Edward I. the King might have been sued as a common person***. The form of the process was

even imperative. *'Præcipe Henrico Regi Angliæ' c*. 'Command *Henry*

*King* of *England' c.Bractan*, who wrote in the time of *Henry III*. uses these very remarkable

expressions concerning the *King 'in justitia recipienda, minimo de regno suo comparetur'*— '***in***

***receiving justice, he should be placed on a level with the meanest person in the Kingdom*.'"

<u>Chisholm Ex'r. v. Georgia</u>, 2 U.S. 419, 460 (1793) (emphasis added).

<div align="center">210.</div>

Traditionally, then, the King could be sued in his own courts, even with respect to

common matters, and this was especially true where the King was acting beyond his capacity as

a sovereign, meaning in a manner that infringed upon an inalienable sovereign right of free

Englishmen.

<div align="center">211.</div>

And while, in later times, it was required that one be issued a petition of right to drag the

King into his own courts, as the Supreme Court of the United States details in <u>Lee</u>, these

petitions were freely, uniformly, and universally granted. And if the King is freely granting

petitions, thus, universally consenting to adjudicating claims against him, there was no

opportunity for him not to consent to adjudicate such matters and for the courts to exercise their

jurisdiction over him, where he was acting outside of the law, thus disproving the later erroneous

doctrine of absolute sovereign immunity.

<div align="center">212.</div>

In any case, this country is founded upon opposite principles of sovereignty, as to where the Sovereignty of this country and the sovereign power of this country reside, to that in England, and, as a matter of law, the doctrine of sovereign immunity cannot apply to bar suits against the government in this country except where the government has the status of the agent of the Sovereign, from which agency relationship it derives its sovereign immunity, that is to say, where the Sovereign Body, the Founding Generation or their Posterity, expressly vested sovereign power in the government through enumeration in the constitution of said government; as, sovereign immunity is not a sovereign power in and of itself, but, rather, an attribute of sovereignty, a natural consequence of the plenary power of the sovereign, a recognition of that plenary power by the courts of the sovereign.

213.

In this country, the government has *no power* to act except where it has been *expressly granted* power to act by the Founding Generation, the Sovereign Body, in its founding charter. The government, where it has not been granted such power, has "*a total absence of power everywhere*." Dred Scott v. Sandford, 60 U.S. 393, 450–51, 15 L. Ed. 691 (1857) (emphasis added).

214.

A total absence of power is the antithesis of sovereignty and sovereign power.

215.

In this country, the Founding Generation and their Posterity, one of whom is Plaintiff, are the Font of Sovereignty, the Sovereign Body, the ones from whom all sovereign power and governmental legitimacy flows.

216.

The government is not sovereign in any respect in which the Founding Generation did not

delegate sovereign power to it in its charter document, the Constitution, which delegations of

sovereign power, specifically enumerated in the Constitution, clothe the government with

sovereign status, so long as said government faithfully administers these powers as agent of the

Sovereign Body, while ultimate sovereignty still rests in the Sovereign Body, the Posterity.

<div align="center">217.</div>

While "[i]n governments whose original foundations cannot be traced to the certain and

undeniable criterion of an original written compact," such as England, where sovereign power

rested in the King and his ancestors from time immemorial, "where tradition supplies the place

of written evidence" as to the extent of that sovereignty; sovereign immunity, insofar as the

Sovereign does not infringe a fundamental right, which rights have rested and been nothing more

than sovereign power in the hands of free Englishmen from time immemorial, is a sound

principle wrested not just in history and tradition, but logic as well. ST. GEORGE TUCKER, VIEW

OF THE CONSTITUTION OF THE UNITED STATES 18-19 (LIBERTY FUND ed., 1999) (1803). "But

the American Revolution has formed a new epoch in the history of civil institutions, by reducing

to practice, what, before, had been supposed to exist only in the visionary speculations of

theoretical writers…The world for the first time since the annals of its inhabitants began, saw an

original written compact formed by the free and deliberate voices of individuals disposed to unite

in the same social bonds…and in which…the ***sovereignty of the people***, and the responsibility of

their ***servants*** are principles fundamentally, unequivocally established; in which the ***powers of

the several branches of government*** are ***defined***, and the ***excess of them…in the legislature, as

in the other branches, finds limits which cannot be transgressed*** without offending against the

*greater power from whom all authority,* among us, *is derived*; to wit, *the PEOPLE.*" Id. at 19 (emphasis added).

218.

Thus, in this country, the government is like the King's chancellor at common law, a "servant" of the Sovereign, Id., vested with limited delegations of sovereign power, but still subject to the King's authority, and subject to being held accountable by the King, in the King's courts, for abuses and unlawful uses of the power which the King thus delegated, at the King's pleasure.

219.

As a member of the Posterity, Plaintiff comprises a part of the Sovereign Body, the Font of Sovereignty, the collective body of descendants of the Founding Generation who comprise the "sovereignty" of this country. Id.

220.

The government, Plaintiff's chancellor, has exceeded the bounds of sovereign authority vested in it by the Constitution by enactment of the National Firearms Act, the Gun Control Act of 1968, and the Firearms Owners' Protection Act of 1986, and Plaintiff can hold the government accountable for such malfeasance in Plaintiff's courts at Plaintiff's pleasure.

221.

As the Supreme Court of Georgia long held, in line with logic and reason, a firm understanding of the founding principles of this country, a proper understanding as to the resting place of sovereign power, the source from which all sovereign power flows, the Posterity, and the constitutional order, sovereign immunity does not apply "where a party seeks injunctive relief against the state or a public official *acting outside the scope of lawful*

*authority*." International Business Machines Corp. v. Evans, 265 Ga. 215, 216 (Ga. 1995) (emphasis added).

<div align="center">222.</div>

And, as James Wilson so fluently articulates in Chisholm, "[t]he only reason, I believe, why a free man is bound by human laws, is, *that he binds himself*. Upon the same principles, upon which he becomes bound *by the laws*, he becomes amenable to the *Courts of Justice*, which are formed and authorised by those laws. If one free man, an original sovereign, may do all this; why may not an aggregate of free men, a collection of original sovereigns, do this likewise? If the dignity of each *singly* is undiminished; the dignity of all *jointly* must be unimpaired." Chisholm Ex'r. v. Georgia, 2 U.S. 419, 456 (1793).

<div align="center">223.</div>

Owning machine guns, to wit, ordinary military weapons, is well within Plaintiff's right to keep and bear arms, Plaintiff's retained sovereign power, retained by his ancestors for him. Thus, in this case, Plaintiff is the Sovereign, not the government. The government is acting as a usurper of the Posterity's sovereignty, and traitorously to the trust reposed in it by the Posterity, and, thereby, lacks any attribute of sovereign status, including the necessary consequential attribute of sovereign immunity, but, instead, can be held to account for this usurpation of Plaintiff's sovereign right to keep and bear arms before the Courts of the Plaintiff.

<div align="center">CONGRESS HAS WAIVED ANY ALLEGED SOVEREIGN IMMUNITY THAT THE
GOVERNMENT MAY POSSESS WITH RESPECT TO THIS CLAIM</div>

<div align="center">224.</div>

Paragraphs 1 through 223 are re-alleged as if fully restated herein.

<div align="center">225.</div>

However, even if this Court decides to apply the erroneous, illogical, and legally incorrect conception of sovereign immunity, based upon faulty premises, which fails to recognize the difference in where sovereign power ultimately resided in England at common law and where it resides in America, and, additionally, fails to recognize the very extent of the King's sovereign immunity at common law, this suit is still not barred by any form of the doctrine of sovereign immunity because Congress has waived any alleged sovereign immunity in this case.

226.

By 28 U.S.C. § 1346(a)(2), Congress has expressly authorized, and waived any alleged sovereign immunity held by the government regarding, "[*a]ny other civil action* or claim against the United States, not exceeding $10,000 in amount, *founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department.*" 28 U.S.C. § 1346.

## SOVEREIGN IMMUNITY NO BAR TO THIS SUIT AS TO DEFENDANTS GARLAND AND HANSEN IN THEIR OFFICIAL CAPACITIES

227.

Paragraphs 1 through 226 are re-alleged as if fully restated herein.

228.

Additionally, sovereign immunity is no bar to suits against government officials in their official capacity, when they are acting at the behest and direction of the United States government, when said actions amount to unconstitutional infringements of the constitutional and common law rights of the Posterity. *See* <u>United States v. Lee</u>, 106 U.S. 196, 208-9 (1882).

## SOVEREIGN IMMUNITY NO BAR TO THIS SUIT AS TO DEFENDANTS GARLAND AND HANSEN IN THEIR INDIVIDUAL CAPACITIES

229.

Paragraphs 1 through 228 are re-alleged as if fully restated herein.

230.

Lastly, if this Court decides to apply the erroneous, illogical, and legally incorrect conception of sovereign immunity, based upon faulty premises, which fails to recognize the difference in where sovereign power ultimately resided in England at common law and where it resides in America, this suit, at least against Defendants Garland and Hansen in their unofficial individual capacities, is not barred by sovereign immunity in any way. As the Supreme Court of Georgia, whose holdings regarding sovereign immunity are largely in line with the Supreme Court of the United States, states in Lathrop, "[i]nasmuch as Article I, Section II, Paragraph IX of the Constitution of 1983 requires that sovereign immunity apply today [to bar suits against government officials in their official capacity],…our decision[] 'd[oes] not mean that citizens aggrieved by the unlawful conduct of public officers are without recourse. *It means only that they must seek relief against such officers in their individual capacities*.'" Lathrop v. Deal, 801 S.E.2d 867, 885-86 (Ga. 2017).

## OFFICIAL IMMUNITY DOES NOT BAR THIS SUIT

231.

Paragraphs 1 through 230 are re-alleged as if fully restated herein.

232.

This suit against Defendants Garland and Hansen, in their individual capacities, is not barred on the basis of official immunity either, because this suit seeks only *prospective, injunctive and declaratory equitable relief from the future enforcement of the unconstitutional*

*provisions* of the National Firearms Act, Gun Control Act of 1968, and Firearms Owners'

Protection Act of 1986, herein cited in this complaint, as to Plaintiff. Specifically, the provisions

which attempt to unconstitutionally regulate and prohibit Plaintiff's possession of machine guns,

to wit, ordinary military weapons.

233.

Official "immunity questions should be decided at the earliest possible stage of the

litigation." Clinton v. Jones, 520 U.S. 681, 686 (1997).

234.

Even the President, the highest executive branch official, and the figurative head of the

country, only has "absolute immunity from *civil damage actions* arising out of the execution of

*official duties of office*." Clinton v. Jones, 520 U.S. 681, 687 (1997) (emphasis added).

235.

Official immunity, however, does not apply to bar suits for *prospective injunctive and*

*declaratory relief*, especially when an executive branch official is acting outside of his

constitutional authority.

236.

"The principal rationale for affording certain public *servants* immunity *from suits for*

*money damages* arising out of their *official acts* is *inapplicable to unofficial conduct*. In cases

involving prosecutors, legislators, and judges we have repeatedly explained that the immunity

serves the public interest in enabling such officials to perform their designated functions

effectively without fear that a particular decision may give rise to *personal liability*." Clinton v.

Jones, 520 U.S. 681, 692-93 (1997) (emphasis added).

237.

"The rationale underlying our official immunity jurisprudence in cases alleging constitutional violations brought against federal officials is similar." Id. at 693.

238.

As the Supreme Court makes clear, the doctrines of official and absolute immunity only apply to suits for money damages seeking to hold public officials personally financially liable in their individual capacities for actions taken while acting in their official capacities as high-ranking government officials, and these doctrines do not act as a bar to suits only seeking prospective equitable relief, as here.

239.

"[T]he rationale [behind official immunity] provided the principal basis for our holding that a former President of the United States was 'entitled to absolute immunity *from damages liability* predicated on his *official acts*,' *Fitzgerald*, 457 U.S. at 749. See *id.*, at 752 (citing *Ferri v. Acherman*). Our central concern was to avoid rendering the President 'unduly cautious in the discharge of his official duties.'" Clinton v. Jones, 520 U.S. 681, 693-94 (1997) (emphasis added).

240.

However, as the Supreme Court notes, in Clinton, when rejecting the president's argument that he was immune from *any type of suit* during the pendency of his presidency, "Petitioner argues that in this aspect the Court's concern was parallel to the issue he suggests is of great importance in this case, that a sitting President might be distracted by the need to participate in litigation during the pendency of his office. In context, however, it is clear that our dominant concern was with the diversion of the President's attention during the decision making

process *caused by needless worry as to the possibility of damages actions* stemming from any particular official decisions." Clinton v. Jones, 520 U.S. 681, 694 (1997) (emphasis added).

241.

Thus, the doctrine of official immunity has never been concerned with the distraction that *any type* of litigation would pose to even the highest level executive branch officials, but, instead, only provides immunity from suits for monetary relief predicated upon the actions taken by these officials while acting within their official capacities.

242.

The Supreme Court states in Clinton, "[a]s we explained in *Fitzgerald*, 'the sphere of protected action must be related closely to the immunity's justifying purposes." Clinton v. Jones, 520 U.S. 681, 694 (1997). Thus the action protected by official immunity is only that action which is within the bounds of the public servant's constitutional powers, as the purpose for official immunity is to protect government officials from *civil liability in the form of money damages* for actions taken within *the legitimate sphere of their official position*.

243.

And, "[t]his reasoning provides *no support* for an immunity for *unofficial conduct*," Id., as the enforcement of an unconstitutional law must be characterized, since, when the government passes an unconstitutional law it acts outside the scope of the agency relationship that it possesses with the Sovereign and loses its status as wielder of sovereign power that its agency relationship with the Sovereign confers upon it, but, instead, acts only in an ultra vires, unofficial capacity. Thus, any agent of the agent (the government) of the Sovereign (the Posterity) must also be stripped of his official status when he so acts, as the government itself has lost that official character.

244.

Actions which are beyond the bounds of constitutional authority vested in the government, and, thereby, beyond the power which the agents of the government could potentially possess, are not protected by official immunity, even in suits for money damages.

245.

And, while, "[t]his reasoning [behind official immunity] provides no support for an immunity for **unofficial conduct**," Id., neither does it provide support for immunity from suits which do not seek compensatory damages, but, instead, only **prospective relief from future unconstitutional acts or future enforcement of unconstitutional laws**.

246.

As James Wilson, Founding Father, explains, in a most poignant statement, relied upon by the Supreme Court in Clinton, "**although the President is 'placed on high…[he is] far from being above the laws**, he is amenable to them in his private character as a citizen.'" Clinton v. Jones, 520 U.S. 681, 696 (1997) (emphasis added).

247.

And if the President himself is amenable to the laws, surely the agents of the President, the Attorney General, Defendant Garland, and the Special Agent in Charge of the Kansas City Division of the BATF, Defendant Hansen, are amenable to the laws as well.

248.

The Constitution being the Supreme Law of the Land, the charter document that literally outlines and defines the delegated sovereign powers which have been vested in the administrative authority of this country, the government, by the true Sovereigns, the Sovereign Body, the Founding Generation and their Posterity; **any member of the executive branch, from**

*the President down to his lowest appointee,* including the Attorney General and the Special

Agents in Charge of the various field divisions of the BATF, *can be held to account personally*

*for any actions taken which are clearly unconstitutional* and exceed the authority vested in the

government by the Sovereign Body through the express enumerations of said authority contained

within the United States Constitution, as *no man or official is above the law*.

249.

This is especially so, *as here*, where government officials are sued in their individual

capacity in a suit seeking *only prospective equitable relief so as to restrain said officials only*

*from the future enforcement of unconstitutional laws and the perpetration of unlawful acts*

*taken in the unlawful execution of their office*, as is the case when Defendants Garland and

Hansen attempt to enforce the provisions of the National Firearms Acts against Plaintiff, said

Acts purporting to absolutely bar Plaintiff from possessing ordinary military weapons

manufactured after 1986, in contravention to and in infringement of his ancestral common law

and constitutional rights to keep and bear arms.

250.

Ultimately, *because the doctrine of official immunity*, whether that be absolute

immunity or any lesser form of qualified immunity, *only applies to suits seeking monetary*

*relief*, even if the unlawful enforcement of these unconstitutional Acts were considered to be

*official acts* of the above-referenced defendants, Plaintiff could still proceed against them in their

individual capacities for injunctive prospective relief and declaratory judgment, because, while

"the doctrine of official immunity ordinarily would bar a suit against state officers in their

individual capacities for *official acts* involving an element of discretion…[a]s to *retrospective*

*relief*— monetary damages and other relief for wrongs already done and injuries already

sustained," where "***the plaintiff d[oes] not seek retrospective relief***," but, instead, only

"***prospective relief—relief from the threat of wrongful acts and injuries yet to come—***

***especially in the form of injunctions and declaratory judgments[,] [a]s we explain below,***

***official immunity generally is no bar to claims against state officers in their individual***

***capacities for injunctive and declaratory relief from the enforcement of laws that are alleged***

***to be unconstitutional, so long as the injunctive and declaratory relief is only prospective in***

***nature***." <u>Lathrop v. Deal</u>, 801 S.E.2d 867, 885-86 (Ga. 2017) (emphasis added).

<div align="center">NO SEPARATION-OF-POWERS CONCERNS</div>

<div align="center">251.</div>

Paragraphs 1 through 250 are re-alleged as if fully restated herein.

<div align="center">252.</div>

Neither are separation-of-powers concerns posed by this complaint, as, just as in <u>Clinton</u>,

"there is no suggestion that the Federal Judiciary is being asked to perform any function that

might in some way be described as 'executive.' [Plaintiff] is merely asking the courts to exercise

their core Article III jurisdiction to decide cases and controversies. Whatever the outcome of this

case, ***there is no possibility that the decision will curtail the scope of the official powers of the***

***Executive Branch***" under the Constitution, as an unconstitutional act is not a lawful act within

the official powers of the government, not even when all three branches of the government act in

concert to effectuate the act. <u>Clinton v. Jones</u>, 520 U.S. 681, 701 (1997) (emphasis added).

<div align="center">253.</div>

As the Supreme Court explains, "the separation-of-powers doctrine requires that a branch

not impair another in the performance of it[s] ***constitutional duties***." <u>Id</u>.

<div align="center">254.</div>

And in Clinton, *"[the President] err[ed] by presuming that interactions between the Judicial Branch and the Executive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions*. '[O]ur…system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence[,] the absence of which would preclude the establishment of a [country] capable of governing itself effectively.' *Mistretta*, 488 U.S., at 381(quoting *Buckley*, 424 U.S., at 121). As Madison explained, separation of powers does not mean that the branches 'ought to have no *partial agency* in, or *controul* over the acts of each other.' *The fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution*. Two long-settled propositions, first announced by Chief Justice Marshall, support that conclusion.

First, *we have long held that when the President takes official actions, the Court has the authority to determine whether he has acted within the law*. Perhaps the most dramatic example of such a case is our holding that President Truman exceeded his constitutional authority when he issued an order directing the Secretary of Commerce to take possession of and operate most of the [country's] steel mills in order to avert a national catastrophe…Despite the serious impact of that decision on the ability of the Executive Branch to accomplish its assigned mission, and the substantial time that the President must necessarily have devoted to the matter as a result of judicial involvement, *we exercised our Article III jurisdiction to decide whether his official conduct conformed to the law*. Our holding was an application of the principle established in *Marbury v. Madison*, 1 Cranch 137 (1803), that *'[i]t is emphatically the province*

*and duty of the juridical department to say what the law is*.'" <u>Clinton v. Jones</u>, 520 U.S. 681, 702-3 (1997).

255.

If the President, the Chief Executive Officer of this country, can be held to account in court for his unconstitutional acts which are beyond the power of his office, so too can his agents, Defendants Garland and Hansen. This is especially so as here, in the civil rights context, because " 'in civil rights…there is a public interest in an ordinary citizen's timely vindication of…h[is] most fundamental rights[s] against alleged abuse[s] of power by government officials.'" <u>Clinton v. Jones</u>, 520 U.S. 681, 689 (1997).

CONCLUSION TO OFFICIAL IMMUNITY SECTION

256.

Paragraphs 1 through 255 are re-alleged as if fully restated herein.

257.

As explained by the Supreme Court in <u>Clinton</u>, the doctrine of official immunity, even absolute immunity, has never immunized the President nor any other Executive Branch officials from suits seeking to declare that their conduct is unconstitutional where an actual case or controversy exists.

258.

Here, Plaintiff seeks only *prospective relief in the form of a declaratory judgment*, declaring that Plaintiff's right to keep and bear arms exists inviolate and that the National Firearms Act, the Gun Control Act of 1968, and the Firearms Owners' Protection Act of 1986 infringe that right by attempting to prohibit Plaintiff from possessing machine guns manufactured or possessed after 1987, to wit, ordinary military weapons, *and an injunction*,

restraining Defendants Garland and Hansen from enforcing said unconstitutional acts against

Plaintiff in an attempt to prohibit Plaintiff from exercising his common law and constitutional

rights to keep and bear arms.

259.

As this suit does not seek compensatory damages, no form of money damages

whatsoever, nor any form of retrospective relief, the doctrine of official immunity, whether that

be in the form of absolute immunity or any form of lesser qualified immunity, does not apply,

and it is the duty of this Court to "say what the law is." <u>Marbury v. Madison</u>, 1 Cranch 137

(1803).

## THE SOVEREIGN BODY OR FONT OF SOVEREIGNTY

260.

Paragraphs 1 through 259 are re-alleged as if fully restated herein.

261.

As is noted above, a sovereign is "unlimited…by any other." NOAH WEBSTER,

WEBSTER'S COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE 1263 (CHAUNCEY A.

GOODRICH et al. ed., NEW EDITION OF 1880, 1886).

262.

In order to be Sovereign, one must derive one's rights from oneself or one's ancestors;

one must be the but for cause of one's rights, the one in whom said rights originated, or the

descendant of the one in whom one's rights originated and from whom said rights passed via

bloodline descent, because a Sovereign is, by definition, "*independent of, and unlimited by, any*

*other*; *possessing, or entitled to, original authority*…2. *[e]fficacious in the highest degree…not*

*dependent upon,* or subject to*, another power*." NOAH WEBSTER, WEBSTER'S COMPLETE

DICTIONARY OF THE ENGLISH LANGUAGE 1263 (CHAUNCEY A. GOODRICH et al. ed., NEW EDITION OF 1880, 1886).

263.

When the Founding Generation declared their independence from Great Britain, and successfully prosecuted their claim to fruition by winning the Revolutionary War, they became the Font of Sovereignty, the Sovereign Body, the "sovereignty," of a new nation, from which all sovereign power and governmental legitimacy flowed. ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 19 (LIBERTY FUND ed., 1999) (1803) (emphasis added). At that point in time they became "***independent of, and unlimited by, any other***; ***possessing, or entitled to, original authority***…2. ***[e]fficacious in the highest degree***…***not dependent upon,*** or subject to***, another power***." NOAH WEBSTER, WEBSTER'S COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE 1263 (CHAUNCEY A. GOODRICH et al. ed., NEW EDITION OF 1880, 1886).

264.

As Sovereign status, rights, and power, as all other rights, passes through the blood, the Sovereign Body, or Font of Sovereignty, in the present day is the Posterity, the lineal bloodline descendants of the Founding Generation, those individuals who possessed ultimate sovereignty, "[t]he exercise of, or right to exercise, supreme power; dominion; [or] sway," upon freeing themselves from the rule of the British King and founding this country, which "was formed by them, and for them and their posterity, but for no one else," Dred Scott v. Sandford, 60 U.S. 393, 406 (1856), expressly retaining the sovereign fundamental rights from governmental power which are enumerated in the Bill of Rights and all those powers which were not expressly delegated to the government through express enumerations within the Constitution, and whose sovereign status was passed to the Posterity through their lineal bloodline descent from said

Founding Generation. NOAH WEBSTER, WEBSTER'S COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE 1263 (CHAUNCEY A. GOODRICH et al. ed., NEW EDITION OF 1880, 1886),

265.

Only the Posterity can rightly be said to be the Sovereign Body, or Sovereigns, in this Country, for it was only our ancestors, the English colonists, who braved the oceans, settled in a hostile wilderness, cleared the forests, fought off and domesticated the savage Indian tribes, protected their hearths and homesteads from savage and tyrant alike, and turned this unprofitable wilderness into a paradise, ultimately asserting their ancient sovereign rights and liberties by defeating the greatest military force known to the annals of history, the armies and navies of the British Empire. Only Plaintiff's ancestors, and the ancestors of other members of the Posterity, possessed the irreducible courage, boldness, chivalry, and honor, to march into battle and defend their private, individual, sovereign ancestral rights as against the usurpations of a tyrant king, and they did so for "ourselves and our Posterity." U.S. Const. Preamble. Thus, in this country, only the Posterity at present, can rightly be considered Sovereigns, or any part of the Sovereign Body, as a sovereign is "***not dependent upon… another power***," and only the Posterity are not dependent upon any other person or document for their rights, our rights passing to us from our Founding Generation ancestors, the most courageous, honorable, intelligent, and respectable men to ever walk the face of this earth. NOAH WEBSTER, WEBSTER'S COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE 1263 (CHAUNCEY A. GOODRICH et al. ed., NEW EDITION OF 1880, 1886).

266.

All those that came to this land of paradise and liberty after the Founding Generation's assertion of their ancient rights and liberties, those who in no way contributed to the sovereignty

of this land, and in no way imbued the government or themselves with sovereign power, but, rather, fled from their homelands when oppressed, never asserting any alleged rights that they may or may not have held as against any purported usurpations of said alleged rights, and who submitted to our authority in the hopes of living lives of freedom and peace, do not comprise the Sovereign Body of this country, and are not Sovereigns, as their "rights," privileges, and freedoms are held by the grace of the Founding Generation and their Posterity, whom provided said "rights," privileges, and freedoms to them, and, thus, they are ***not*** "***not dependent upon… another power***" for their "rights" and liberties. NOAH WEBSTER, WEBSTER'S COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE 1263 (CHAUNCEY A. GOODRICH et al. ed., NEW EDITION OF 1880, 1886).

267.

In addition, sovereignty and sovereign status cannot be asserted for third parties. One must make oneself sovereign, because, by the very act of making another sovereign, one is making the other dependent upon the first for its freedom, all of its rights, privileges, and sovereignty; and, by definition, a sovereign is not dependent upon another for its rights or powers.

268.

And, while, it is uncontestable that Congress has the power of "naturalization[;] of any one, of any color, who was born under allegiance to another Government," *Dred Scott v. Sandford*, 60 U.S. 393, 419 (1856), and that this power confers the status of "*citizen*" unto said persons; and, that these naturalized individuals and their descendants will henceforth "become entitled to all the rights, and privileges, and immunities, guarantied by [the Constitution] to the citizen," *Dred Scott v. Sandford*, 60 U.S. 393, 403 (1856); it is equally true and obvious that

these individuals can in no way be considered Sovereigns, the Font of Sovereignty, or part of the Sovereign Body of the United States, as these individuals are *conferred* their citizenship status by congress, and, therefore, are ***granted all of their "rights," privileges, and immunities*** on the basis of said rights, privileges, and immunities being so enumerated in the Constitution. They ***do not inherently possess their "rights," privileges, and immunities, as do the Posterity, whose rights are in no way dependent upon the Constitution for their existence, but, rather, these newcomers, new members of the citizenry, possess their rights OF THE POSTERITY'S GRACE***. They are ***not the but for cause of their "rights," the ones in whom said rights originated and are not "not dependent upon… another power"*** for their "rights" and liberties. NOAH WEBSTER, WEBSTER'S COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE 1263 (CHAUNCEY A. GOODRICH et al. ed., NEW EDITION OF 1880, 1886).

269.

And, as Sir Edward Coke so concisely notes in his Second Part of the Institutes of the Laws of England, "what the Sovereign giveth, the Sovereign can taketh away," which is why a **life peer**, though technically a "peer" of the realm, could be tried by an ordinary jury because ***he did not possess the ancient right to a trial by a jury of Peers, and only held his status as a Peer of the Realm "of the King," meaning, at the grace of the King. It was not his birthright nor inheritance.***

Any right or status that one does not possess by bloodline descent is granted at the grace of the Sovereign and can be taken by the Sovereign at any time.

270.

And the same is the case for those who are or descend from *naturalized citizens* alone. Membership in the Body Politic is ***not their birthright nor inheritance***, but, rather, held by the

grace of the Sovereign Body, the Founding Generation and their subsequent generations of

Posterity, and, as such, the Sovereign Body can strip them of this status at any time, insofar as

these descendants of naturalized citizens do not also descend from members of the Founding

Generation.

271.

All of those individuals who came to this country after the time of the Founding, and

their descendants who currently comprise the citizenry, and do not also descend from a member

of the body politic at the time of the Founding, are dependent upon the Constitution's continuing

existence for their "rights;" *they derive* their rights from the Constitution, and, thus, derive their

rights from the Founding Generation who ratified said Constitution and thereby imbued said

document with its power and authority; *they are limited* by the Founding Generation in their

rights and liberties because the Founding Generation, at the time of the Ratification, delineated

which powers they would imbue in the government and which powers they would not.

272.

This is in contrast to the Posterity, whose ancient rights and liberties, many of which are

enumerated in the Bill of Rights to the Constitution, one of which being the right of keeping and

bearing arms, are in no way dependent upon the Constitution for their existence, but, rather, have

been held from time immemorial by our free English and American ancestors, and have existed

inviolate as against all sovereign Kings of England in the Anglo-Saxon/Anglo-American chain of

power and all Sovereign Bodies and governments within the Anglo-American chain of power,

the successor sovereigns to said Kings of England.

273.

Furthermore, it is a universal truth that a non-sovereign can never restrain the sovereign power of the Sovereign. As such, those that do not comprise the Posterity cannot use these rights, privileges, and freedom, which they only possess by our good will, to usurp our ancient sovereign rights. For this purpose, the current "democratic process" would be wholly ineffective.

274.

Therefore, any attempt by congress to act upon the Sovereign Power and Rights of the Posterity via the National Firearms Acts is null and void, to the extent that such actions were directed or ratified by congressmen elected at the will of citizens of this country whose ancestors were not present and members of the body politic at the time of the Founding.

275.

And, as the right to keep and bear arms has always been beyond the power of all Sovereigns within the Anglo-American chain of power to regulate, even the Sovereign Body of this country, the Posterity, cannot act upon this right, even if acting in concert, because we possess no more sovereign power, acting as a body, than did our predecessor sovereigns, acting as individual sovereigns.

276.

Therefore, any attempt by congress act upon the Sovereign Power and Rights of the Posterity via the National Firearms Acts is null and void, regardless of whether or not congress at that time was comprised unanimously of individuals elected by the Sovereign Body.

277.

There is no point in time, from the time of the Founding to the present, at which anyone residing within this country and voting in its elections, or participating in its legislatures, had the

lawful power to regulate or abrogate the Posterity's right of keeping and bearing arms by
enacting the National Firearms Acts, or voting to elect the legislators who so enacted said act.

## SOVEREIGN POWER IS FINITE AND MUST COME FROM SOMEWHERE

### 278.

Paragraphs 1 through 277 are re-alleged as if fully restated herein.

### 279.

It is a universal truth that power, like matter, is neither created nor destroyed, but is finite,
and, instead is inherited from predecessor Sovereigns within one's chain of power, the chain of
legitimate power, by way of bloodline descent, which links each Sovereign to every predecessor
Sovereign in their chain. Because one can give no more power or rights to one's successor in
interest than one possesses, every successor Sovereign is bound by the limitations on sovereign
power held by their predecessors Sovereigns.

### 280.

And, while this universal truth is a matter of law so basic as to need no explication, this
principle is exemplified by the King's power at common law with respect to a baron's tenants'
property rights, and the services that could be required of said tenants, when a baron's barony
escheated to the crown. According to the premier jurist of the common law, Sir Edward Coke,
there was a provision of Magna Charta by which "it is declared, and enacted, that if any man
hold of any escheat, as of any honour, or other escheats, which are baronies, and were in the
kings hands; first, if he die, his heire being of full age, his heire ***shall give no other reliefe to the
king then he did to the baron***. 2. ***Nor doe none other service to the king, then he should have
done to the baron***." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF

ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 64 (E. AND R. BROOKE ed., 1797).

Thus, the King had no more right to demand tax or services of his tenants than did his predecessor-in-interest, the Baron from whom the land escheated, precisely because the King had no more power over the land or tenants than that which passed to him through escheatment from his predecessor-in-interest.

Indeed, ***"[T]he king shall hold the honour or baronie as the baron held it , that is, of such estate, and in such manner and forme , as the baron held it***." And because it was the Baron who created the tenures of the newly-acquired tenants of the King, the King could exercise no royal "prerogative" over these newly-acquired tenants, their property rights, or their lands, because "no prerogative can be annexed to a tenure created by a subject," and, thus, because the Baron who held the lands before they escheated to the crown, the King's predecessor-in-interest, from whom all of the King's rights in relation to the personal services and property rights of the tenants came, lacked royal prerogative over the property rights of said tenants, and, so, too, did the King's "progenitors, or predecessor kings of this realme" lack royal prerogative to act upon the property rights of these tenants, the King himself, at present, lacked the royal prerogative over these lands because he could have no more power than could his predecessors in title and power. Id. at 63-64.

And, like most of the provisions of Magna Charta, announcing and enumerating the pre-existing ancient rights of free Englishmen, "[a]ll this is merely declaratory of the common law." Id. at 63.

281.

Thus, as is exemplified above, because neither the King's predecessor-in-title nor his predecessor sovereigns possessed the royal prerogative with respect to the property rights of tenants of baronies which escheated to the crown, the King could not possibly possess such power in relation to those rights, and, therefore, could demand no more relief or service than his predecessor-in-title from said tenants, because, it is a ***universal truth that any given sovereign can only possess so much sovereign power as that held by his predecessor sovereigns, whether that be with respect to property, rights, or the general police power***.

282.

As a corollary, there were certain sovereign powers held by the free men of England, inalienable, ancient, fundamental, ancestral rights, possessed by them in their individual capacities, which had always existed from time immemorial and acted as restraints on all Kings' sovereign powers. Because ***no*** sovereign within the Anglo-Saxon chain of power possessed the power to regulate or act upon these rights, they could not pass such power to their successor sovereigns.

283.

Because the Kings of England, our predecessor sovereigns within the Anglo-American chain of power, did not possess the sovereign power to act upon the fundamental rights of free Englishmen, one such right being the right of keeping and bearing arms, the Founding Generation, who as a Sovereign Body assumed the sovereign power of the Kings of England, could not possess sovereign power over such rights.

FOUNDING GENERATION, AS A SOVEREIGN BODY, THE FONT OF SOVEREIGNTY, HELD NO POWER AS TO FUNDAMENTAL RIGHTS AND COULD NOT DELEGATE SUCH POWER TO THEIR GOVERNMENTS, THOUGH THEY HAD NO DESIRE TO DO SO

284.

Paragraphs 1 through 283 are re-alleged as if fully restated herein.

285.

As Sovereigns, the Founding Generation had absolute sovereign power, within the confines of the Anglo-American chain of power, to delegate sovereign power to their newly formed governments. However, there were certain fundamental, inalienable, "***ancient***," D.C. v. Heller, 554 U.S. 570, 598, 128 S. Ct. 2783, 2800–01, 171 L. Ed. 2d 637 (2008) (emphasis added), ancestral rights, which had always been beyond the power of all Sovereigns to regulate within the Anglo-American chain of power, as "there are ***certain natural rights***, of which men, when they form a social compact, ***cannot deprive or divest their posterity***; ***among which are*** the enjoyment of life and liberty, with ***the means of*** acquiring, possessing, and ***protecting property***, ***and pursuing and obtaining*** happiness and ***safety***." The Virginia Ratification Convention exclaiming one of these natural rights to be "[t]hat the people have a right to keep and bear arms." ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 112-4 (LIBERTY FUND ed., 1999) (1803) (emphasis added).

286.

These fundamental rights, always existing beyond the power of all Sovereigns to regulate, were beyond the power of the Founding Generation to regulate or divest from the class of rights-holders, themselves and their Posterity, as the Founding Generation inherited their sovereign power from the King of England, the Supreme Court of the United States explicating in Johnson v. M'Intosh, "neither the declaration of independence, nor the treaty confirming it, ***could give us more than that which we before possessed, or to which Great Britain was before entitled***." Johnson v. M'Intosh, 21 U.S. 543, 584, 5 L. Ed. 681 (1823). The founding generation was thus limited in its ability to act upon such rights because they lacked the sovereign power to

do so, the Kings of England never having that power. And while it is a matter of law that one can have no more rights or power than one's predecessor-in-interest or title, this absence of power with respect to fundamental rights is additionally evident from the fact that the above-referenced Virginia Ratification Convention did not find it necessary to send to the Constitutional Convention any amendments pertaining to the right of the people to keep and bear arms, or any other fundamental rights for that matter, in order to restrain the federal governments actions with respect to said right. St. George Tucker, View of the Constitution of the United States 115-8 (Liberty Fund ed., 1999) (1803).

287.

And, in any course, the Founding Generation had no desire to divest either "[themselves] or [their] Posterity," U.S. Const. Preamble, of their ancient, inalienable, private, individual, ancestral, sovereign common law rights to keep and bear arms, among other fundamental rights, which they expressly enumerated in the Bill of Rights to the United States Constitution, and "*not only not granted* [the power] to Congress [to regulate them], *but…in express terms denied* [it that power], and…*forbid[] [the government] to exercise* [power over these rights]." Dred Scott v. Sandford, 60 U.S. 393, 450–51, 15 L. Ed. 691 (1857) (emphasis added). Thus, the governments, both State and federal, have "*a total absence of power everywhere…so far as these rights are concerned*." Id. (emphasis added).

288.

When the Founding Generation drafted and ratified the Constitution, they "surrendered [only] a *portion of their* independent *sovereignty* to a new Government, which, for certain purposes, would make the people of the several States one people, and which was to be supreme and controlling *within its sphere of action* throughout the United States; *but this Government*

was to be carefully limited in its powers, and to exercise no authority beyond those expressly granted by the Constitution, or necessarily to be implied from the language of the instrument." Dred Scott v. Sandford, 60 U.S. 393, 435 (1856) (emphasis added).

289.

"The people of the United States…*delegated* to [the State and federal governments] *certain enumerated powers*, *and forbid[] [them] to exercise others*. [These governments] ha[ve] *no power over the person or property of a citizen but what the citizens of the United States have granted*. And *no* laws or usages of other nations, or *reasoning of statesmen or jurists*…*can enlarge the powers of the Government, or take from the citizens the rights they have reserved*." Id. at 451 (emphasis added).

290.

The Founding Generation created governments of "enumerated and limited powers," Id. at 434, divesting themselves of their sovereign power only so far as they expressly vested that power in the State and federal governments and expressly retaining the sovereign power "not [expressly] delegated," which, the power over the ancient right of keeping and bearing arms not being so delegated, was "reserved… *to the people*." U.S. Const. amend. X (emphasis added). Thus, the government's "powers over the citizen strictly defined, and limited by the Constitution, from which it derives its own existence, and by virtue of which alone it continues to exist and act as a Government and sovereignty[,] *[i]t has no power of any kind beyond it*." Dred Scott v. Sandford, 60 U.S. 393, 449 (1856) (emphasis added).

291.

In the Bill of Rights, the Founding Generation specifically enumerated *certain universal truths*, such as the 10th Amendment, which was no more than a statement of universal truth

regarding the division of sovereign power in our system of government (federal power, state power, and the power retained by the Founders and their Posterity (all that power not vested in their governments)), and the 2nd Amendment, which was no more than a recognition of a fundamental right which was beyond the full might of the joint sovereign power of the Sovereign Body to act upon, and, too, like the 10th Amendment was no more than a universal truth, to wit, "that a well regulated militia being necessary to the security of a *free state* (universal truth), the (common law) right of the people to keep and bear arms shall not be infringed," because it is beyond the power of the government and the Sovereign Body to do so.

292.

And though Bill of Rights enumerated the unrestrainable sovereign power which the Founding Generation expressly retained with respect to certain rights, though this enumeration was not necessary, because "Congress was given no power to abridge the[se] ancient right[s] of individuals." District of Columbia et al. v. Heller, 554 U.S. 570, 599 (2008).

293.

This was especially so with regard to the common law right to keep and bear arms, because the power to regulate this right could not have been granted to the government even if the Founding Generation had desired to do so (which it did not), as the power to regulate or act upon this right had always been beyond the power of all Kings of England, from whom the Founding Generation inherited their sovereign power, and the Sovereign Body, the Founding Generation, acting in concert could do no more than their predecessor sovereigns acting alone.

294.

The power to regulate this sovereign, inalienable, ancient, private, ancestral common law right could not be granted to *any government* because "there are *certain natural rights*, of which

men, when they form a social compact, *cannot deprive or divest their posterity*; *among which are* the enjoyment of life and liberty, with *the means of* acquiring, possessing, and *protecting property*, *and pursuing and obtaining* happiness and *safety*." ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 112 (LIBERTY FUND ed., 1999) (1803) (emphasis added).

<center>295.</center>

The above-referenced principle, in Paragraph 294, was the basis of the Supreme Court of Georgia's holding, in <u>Nunn</u>, a case involving the right to keep and bear arms decided *before* a Second Amendment analogue was present in the Constitution of the State of Georgia, and a case which the Supreme Court of the United States has held, on numerous occasions, to be "particularly instructive" as to the common understanding of the right to keep and bear arms at the time of the Founding, <u>New York State Rifle & Pistol Assn., Inc. v. Bruen</u>, No. 20-843, 50 (U.S. Jun. 23, 2022), where the Supreme Court of Georgia explained, "[i]t is true, that these adjudications (on the right of keeping and bearing arms) are all made on clauses in the State Constitutions; but these instruments confer *no new rights on the people which did not belong to them before*. *When*, I would ask, *did any legislative body in the Union have the right to deny to its citizens the privilege of keeping and bearing arms in defence of themselves and their country?* If this right, *'inestimable to freemen,'* has been guarantied to British subjects, since the abdication and flight of the last of the Stuarts and the ascension of the Prince of Orange, *did it not belong to our colonial ancestors in this western hemisphere?* Has it been a part of the English Constitution ever since the bill of rights and act of settlement and been forfeited here by the substitution and adoption of our own Constitution? *No notion can be more fallacious than this! On the contrary, this is one of the fundamental principles, upon which rests the*

*great fabric of civil liberty*, reared by the fathers of the Revolution and of the country. And the Constitution of the United States, in declaring that the right of the people to keep and bear arms, should not be infringed, *only reiterated a truth* announced a century before, in the act of 1689, 'to extend and *secure the rights and liberties of English subjects*' — whether living 3,000 or 300 miles from the royal palace….Is it not *an unalienable right*, which lies at the bottom of *every free government?*" Nunn v. State, 1 Ga. 243, 249-50 (1846) (emphasis added).

<center>296.</center>

And, even if this right could have been divested from the Posterity, which it could not and cannot, the Founding Generation had *no desire* to divest either "ourselves or our Posterity," U.S. Const. Preamble, of this ancient, inalienable, private, individual, ancestral, sovereign right, the Supreme Court of Georgia concluding, "[i]f this right, 'inestimable to freemen,' has been guarantied to British subjects, since the abdication and flight of the last of the Stuarts and the ascension of the Prince of Orange, did it not belong to our colonial ancestors in this western hemisphere? *Has it been* a part of the *English* Constitution ever since the bill of rights and act of settlement and been *forfeited here by the substitution and adoption of our own Constitution*? No notion can be more fallacious than this! *On the contrary, this is one of the fundamental principles, upon which rests the great fabric of civil liberty, reared by the fathers of the Revolution and of the country*." Id.

<center>297.</center>

The Supreme Court of Georgia, in Nunn, understood, in line with the majority of Americans at the time of the Founding and post-Founding, that the right to keep and bear arms protected not just the right to keep and bear ordinary military weapons, but the right to keep and bear any types of weapons whatsoever, even dangerous and unusual weapons, stating, the right

"'of the people to bear arms shall not be infringed.' **The right of the whole people, old and young, men, women and boys,** *and not militia only*…[the right] *to keep and bear arms of every description, and not such merely as are used by the militia* shall not be *infringed*, curtailed, or broken in upon, in the smallest degree." <u>Nunn v. State</u>, 1 Ga. 243, 251 (1846) (emphasis added).

<div align="center">298.</div>

This is because the Court in <u>Nunn</u> understood that the Second Amendment did no more than state a universal truth, that the right of the people to keep and bear arms shall not be infringed because the Sovereign Body, the Founding Generation and their Posterity, lack the sovereign power to act upon such fundamental rights, these rights being beyond the sovereign power of our predecessor sovereigns to act upon, stating, "Is [the right to keep and bear arms] not *an unalienable right*, which lies at the bottom of *every free government?*" <u>Nunn v. State</u>, 1 Ga. 243, 249-50 (1846) (emphasis added).

<div align="center">299.</div>

The Second Amendment, not being a grant of the rights of keeping or bearing arms, but, rather, merely a recitation and recognition by the Sovereign Body, the Founding Generation, of an absolute limitation on the extent of its joint Sovereign powers, and an enumeration of a fundamental, inalienable, ancient, private, individual, ancestral right which had always been beyond the power of all predecessor sovereigns within the Anglo-American chain of power to regulate or act upon, clearly recognized that the Sovereign Body and their agent, the government, lacked all power to act upon or regulate the right to keep and bear arms as it existed at common law, and enshrined that right for all of eternity in our foundational charter document, the United States Constitution.

300.

Because the common law right to keep and bear arms is an absolute right, and exists inviolate so long as one does not ***abuse*** one's right of keeping and bearing arms in such a manner as to constitute a ***cognizable nuisance***, to wit, so long as one does not use one's own so as to infringe the rights of others, as no man is within his rights to cause a nuisance; and, in accordance with nuisance doctrine, the common law right of keeping arms entailed to right to keep ***any and all arms***, as the keeping of arms alone, without more, can never amount to a cognizable nuisance, the right of keeping arms which the Founding Generation recognized as being beyond their power to act upon, and enumerated as such in the Second Amendment to the United States Constitution, entails the right to keep ***any arms whatsoever***.

301.

The common law right to keep arms is absolute and unqualified and has been beyond the power of all Sovereigns to regulate. This pre-existing right was enshrined in the Second Amendment to the United States Constitution, though, as has been shown above, it need not have been, and it is "not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." United States v. Cruikshank, 92 U.S. 542, 553, 23 L.Ed. 588 (1876).

302.

Even if this right had been actionable by the Founding Generation, it was not their intention to act upon this right, and this right was expressly retained through enumeration in the Second Amendment to the United States Constitution.

303.

And, ***while the Founding Generation could not act upon the ancient common law right of keeping and bearing arms in the slightest***, as the Supreme Court of Kentucky makes clear in <u>Bliss</u>, ***it was within the power of the Founding Generation to retain a right of keeping and bearing arms more expansive than that held at common law***.

304.

Thus, at the bare minimum, the right to keep and bear arms held by the Posterity at present is the common law right held by our Founding Generation ancestors, and their antecedents from time immemorial.

305.

Entailed within this retained common law right is the right to keep ***any weapons whatsoever***, and, even based upon the most restrictive interpretations of the protected class of arms in American jurisprudence, "under the Second Amendment," the right to keep "ordinary military" weapons. <u>United States v. Miller</u>, 307 U.S. 174, 178 (1939). This right was retained from the power of all governments to act upon.

306.

The ancient, sovereign, inalienable, absolute, personal, private, individual, ancestral common law right to keep and bear arms was the bare minimum right of keeping and bearing arms retained by the Founding Generation, the Font of Sovereignty, for "ourselves and our Posterity," U.S. Const. Preamble, and, as with all sovereign power and rights, the sovereign power inherent in this right passed to the Posterity, the direct lineal bloodline descendants of the Founding Generation, through the blood.


<u>PLAINTIFF IS A MEMBER OF THE POSTERITY</u>

307.

Paragraphs 1 through 306 are re-alleged as if fully restated herein.

308.

The "Posterity" are the direct lineal bloodline descendants of the Founding Generation, "[t]he race that proceeds from a progenitor; offspring to the furthest generation; the aggregate number of persons who are descended from an ancestor or a generation; - contrasted with ancestry." NOAH WEBSTER, WEBSTER'S COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE 1017 (CHAUNCEY A. GOODRICH et al. ed., NEW EDITION OF 1880, 1886).

309.

Plaintiff is a member of the Posterity, being a direct lineal bloodline descendant of Isaac Blount of Hencoop Swamp, Pitt County, North Carolina, a Revolutionary War Veteran whom served in the North Carolina Militia during the Revolutionary War as part of the militia raised from the New Bern District, and a member of the "political body who, according to our republican institutions, form[ed] the sovereignty," Dred Scott v. Sandford, 60 U.S. 393, 404 (1856), of both the Colony of North Carolina at the time of the Declaration of Independence and of the State of North Carolina at the time of ratification of the United States Constitution. (Ex. 1; Ex. 1A; Ex. 1C). Plaintiff's ancestor, Benjamin Blount of Hencoop Swamp, Isaac Blount's father, was a member of the Pitt County, North Carolina, Committee of Safety at the time of the events leading up to the Revolutionary War, the body of freeholders who were charged with "providing for the security of the *Liberties of the people*," who elected representatives to represent said County in the Colonial Assembly, which in turn sent representatives of the Colony to the Continental Congress, and through that body declared independence from the tyrant King of England and his tyrannical parliament, that body of free men of England who were

"Determined never to become Slaves to any Power upon Earth," and who "agree[d] and appreciate[d] under all the tyes of Religion, Honor and Regard for *Posterity* that we will adopt and endeavor to execute the measures which the General Congress now sitting at Philadelphia may conclude on for preserving our Constitution and opposing the execution of the several ***Arbitrary and Illegal Acts of the British Parliament***." (Ex. 1B) Plaintiff is also a collateral descendant of William Blount, Representative of the State of North Carolina to the Constitutional Convention, Signer of the United States Constitution, and first cousin of said Benjamin Blount of Hencoop Swamp. (Ex. 1)

310.

As a member of the Posterity, Plaintiff's common law right to keep and bear arms, and the unregulatable, unrestrainable, sovereign power inherent in that right, restrained only by the confines of the right itself (nuisance doctrine), was retained for Plaintiff by Plaintiff's Founding-era ancestors, passed to Plaintiff through Plaintiff's direct, legal, and lineal bloodline descent from said ancestors, and resides in Plaintiff at present.

311.

Plaintiff's common law right to keep and bear arms is beyond the power of the government to regulate and "***no right, of any denomination, can be cancelled, abridged, restrained, or modified by the congress***, by the senate, or house of representatives, ***acting in any capacity***." ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 111 (LIBERTY FUND ed., 1999) (1803) (emphasis added).

312.

Neither can any court's holding bring this right within the power of the government to regulate, as no branch of government may expand the powers of the government beyond that power which was vested in it by the Sovereign Body.

## PLAINTIFF'S ANCESTORS ALWAYS POSSESSED THE RIGHT TO KEEP AND BEAR ARMS

### 313.

Paragraphs 1 through 312 are re-alleged as if fully restated herein.

### 314.

Plaintiff biologically, legally, and lineally descends, through the Blount family of Washington County, Georgia; Hancock County, Georgia; Pitt County, North Carolina; Beaufort County, North Carolina; and Chowan County, North Carolina, from Captain James Blount, Esquire, of Mulberry Hill Plantation, Chowan Precinct, Colony of North Carolina, eldest surviving son of James Blount, Esquire of Astley, eldest son of Thomas Blount, Esquire of Astley, who was a lineal descendant and member of the Blount family of Glasshampton Hall, Astley, Worcestershire; a cadet branch of the Blount family of Kinlet Hall, Kinlet, Shropshire; a cadet branch of the Blount family of Sodington Hall, Mamble, Worcestershire. (Ex. 1)

### 315.

All of the aforementioned branches of the Blount family of Sodington Hall, were descended from a family of noble rank, and comprised and still comprise a part of the lower nobility, to wit, the landed gentry and knightly class, and inherited the ancient, absolute, inalienable, private, ancestral right to keep and bear arms through the blood, by way of their lineal, legal, and bloodline descent from their arms-bearing antecedents, who possessed this ancient right from time immemorial, being members of an armorial family, entitled to bear

familial arms in recognition of their ancient ancestral right to keep and bear arms and status as

perennial warriors. (Ex. 1D)

316.

The Blount family has *always* been entitled to keep and bear arms, and Plaintiff's

ancestral right to keep and bear arms, based upon descent from this family, has always been

beyond the power of all Sovereigns to regulate.

317.

Plaintiff, through his Blount antecedents, is a collateral descendant of the Blount family,

Barons Mountjoy, and Charles Blount, 8th Baron Mountjoy, Conqueror of Ireland and Suppressor

of Tyrone's Rebellion, being Plaintiff's ancestor's cousin. (Ex. 1E)

318.

As barons, Peers of the Realm, the Blount family of Mountjoy "ha[d] offices and duties

annexed to their dignities of great trust and confidence, for two purposes. 1. *Ad consulendum*

*tempore pacis*. 2. *Ad defendendum regem et patriam tempore belli*. *And prudent antiquity hath*

*given unto them* two ensigns to resemble, and to put them in mind of their duties; for first they

have an honourable and long robe of scarlet resembling counsel, in respect whereof they are

accounted in law, *de magno consilo regis*. 2. *They are girt with a sword that they should ever be*

*ready to defend their king and country.*" EDWARD COKE, THE SECOND PART OF THE

INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT

AND OTHER STATUTES 5-6 (E. AND R. BROOKE ed., 1797).

319.

Additionally, Plaintiff's Blount family ancestors married into other families of noble and

royal rank, from whom Plaintiff descends, and who, too, possessed the ancient, inalienable,

private, individual, ancestral sovereign right of keeping and bearing arms, and passed this right down to Plaintiff through his bloodline descent from said families, including the de Croft family of Croft Castle, Herefordshire, descended from Edward I, King of England, and Owain Glyndwr, the last Welsh prince of Wales; and including the de Cornwall family, descendants of King John of England, from whom Plaintiff descends through both branches of the de Cornwall family, the de Cornwall family of Kinlet and their junior line cousins, the Cornwall family of Burford.

320.

Being a family of noble and royal descent, and of perennial knightly status, Plaintiff's family and ancestors were part of the class of "great M[e]n or other lawful Person[s] of good repute," who were in "no Danger of Offending against" the Statute of Northampton. *13 Edw. I (1285) (Eng.) (Statutes for the City of London),* DUKE UNIVERSITY SCHOOL OF LAW, DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/13-edw-i-1285-eng-statutes-for-the-city-of-london/ (last visited Jan. 29, 2023); WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 136 (1st ed.1716).

321.

Plaintiff's ancestors held their lands of the King by virtue of knights service, and, as such, were subject to being distrained for knight's service.

322.

In the time of King Edward II, the Statutum De Militibus, a writ of the King, was issued, whereby "the king doth grant that all they which ought to be knights, and be not, &c. In these words consist the locke and key of this writ, *viz. **who by the common lawes of this realme ought (that is, de jure) to be compelled to be a knight**. For the understanding whereof…seven things

fall into consideration." EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS

OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 594

(E. AND R. BROOKE ed., 1797).

323.

"First, of what degree knighthood is…It is resolved in our bookes without any

contradiction, that the [title] of…knight is a [title] of dignity, and of the inferiour degree of

nobility." Id.

324.

"Secondly, of what quality he that is to be a knight ought to be, *debet*, &c. We have not

found that a baron, being a lord of parliament, or higher degree, hath been distrained *ad arma*

*militis suscipienda*. **But he that is distrained, &c. ought to be a <u>gentleman of name and blood</u>**,

*claro loco natus,* or else *non debet*, he ought not to be compelled by this writ to take the dignitie

of knighthood upon him." Id. at 594-5 (emphasis added).

325.

"**Of ancient time those that held by knights service were regularly gentile**, and those

who held by socage, or in burgage, were yeomen or burgesses: **and this appeareth by the**

**ancient rule of law**, * *Lex Angliae nullum scutagiam aut servitium militare de sockmannis aut*

*burgensibus expetit.* It appeareth also by many **ancient records**, and particularly by this writ, that

*sockmannus*, &c. *et qui terras tenant in socagio*, &c. *et nullum faciunt forinsecum servitium*, that

is, **those who hold in socage**, **of what value soever**, and **do no knights service, ought not to be**

**knights**, *no debent*, &c. And our writ saith, *Nullus distringatur pro burgagiis suis*, &c. no man

ought to be distrained to be a knight for the land **which he holds in burgage, &c. of what value**

*soever*. But ***though it were of ancient time a badge of gentry to hold by knights service***…" Id. at 595 (emphasis added).

<center>326.</center>

"A knight is by creation, and not by descent, ***a gentleman is by descent***…But for any thing that I have reade and doe remember in the raigne of H. 4. or ever before, ***gentlemen of the name and blood*** had very rarely the addition of *generosus* or *armiger*, as of a state or degree, ***but were distinguished from yeomen, who serve by the plow, by their service, viz. knights service, forinsecum servitium,*** but in the raigne of H. 5. and ever since, they have had the addition of ***gentlemen or esquires***…And great discord and discontentment would arise within the realme, if yeomen and tradesmen should be called to the dignity of knighthood, to take the place and precedency ***of the ancient and noble gentry of the realme. And the eldest sonne of a knight is an esquire, as his father ought to be, before he was called to the dignity of knighthood.***" Id. at 595-6 (emphasis added). Being senior male line descendants of a noble gentry family, to wit, the Blount family of Astley, Worcestershire, descended in the male line from Sir Thomas Blount, Knight, of Kinlet, Plaintiff's ancestors were Esquires by birth, gentlemen of the name and blood, who regularly used the title of Esquire upon arriving in the Colony of North Carolina in the 1600s, though they occupied no professional position which would have conferred such a status upon them. (Ex. 1F; Ex. 1G).

<center>327.</center>

"Fourthly, to what end he ought to be called to this dignity of knighthood. And our writ doth truly answer, ***ad arma militaria suscipienda***, to take upon him ***military armes***, or the armes of a knight for the honour, and service, and defence of the realme." Id. at 597 (emphasis added).

<center>328.</center>

As Plaintiff's ancestors comprised the knightly class, who were entitled, by virtue of their birth, to keep and bear arms, as the right of keeping and bearing arms had always been an inalienable, private, individual, ancient, ancestral right held by them and their antecedents from time immemorial, Plaintiff's ancestors were buried in tombs in the churches of St. Peter's Church in Astley, Worcestershire, and the parish church of Kinlet, Shropshire, St. John the Baptis Church, upon which rested effigies of said ancestors in full suits of armor and bearing swords, to wit, the ordinary military weapons of their day and age. Thus, even in death, Plaintiff's ancestors bore arms.

329.

Being perennial warrior class nobles, Plaintiff's ancestors were not just entitled to keep and bear arms of military classification, but were expected to keep and bear such weapons for defense of the realm from both external and internal threats, the Statute of Northampton excepting from its purview any man who "*arms himself* to suppress Rioters, Rebels, or Enemies, and endeavors to suppress or resist such Disturbers of the Peace or Quiet of the Realm." WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 136 (1st ed.1716) (emphasis added).

330.

*No sovereign* ever held the power to regulate Plaintiff's ancestors' right of keeping and bearing arms. Plaintiff's ancestors' right existed inviolate.

331.

As it was always beyond the power of all sovereigns within the Anglo-American/Anglo-Saxon chain of power to regulate Plaintiff's ancestors' right to keep and bear arms, it could not possibly be within the power of the present government, limited in its power to those expressly

enumerated powers delegated to it by the Sovereign Body, who inherited any powers they may have to regulate Plaintiff's ancient, ancestral, private, individual, inalienable right to keep and bear arms, which passed to him via his lineal bloodline descent from said Blount family, from the aforementioned predecessor sovereigns, whom *lacked all power* to regulate Plaintiff's antecedents' right to keep and bear arms, as the Sovereign Body could not have vested such power which they lack in their respective governments.

332.

This is especially so when one considers that Plaintiff's ancestors, members of the Founding Generation, not only *expressly retained* the sovereign power inherent in their "ancient right," District of Columbia et al. v. Heller, 554 U.S. 570, 599 (2008), to keep and bear arms, but also that they retained *all sovereign power* not expressly granted to the government, and, with respect to the right to keep and bear arms, and the other rights enumerated in the Bill of Rights, they "not only *not granted* to [the government the power to regulate such rights], *but…in express terms denied [it that power]*, *and…forbid[] [it] to exercise [power over those rights]*." Dred Scott v. Sandford, 60 U.S. 393, 450, 15 L. Ed. 691 (1857) (emphasis added).

## THE COMMON LAW RIGHT

333.

Paragraphs 1-332 are re-alleged as if fully restated herein.

334.

The rights of keeping and bearing arms are ancient, inalienable, private, individual, ancestral sovereign rights of free Englishmen of quality, and have always been beyond the power of all Sovereigns in the Anglo-American/Anglo-Saxon chain of power to regulate.

335.

These rights are so fundamental that not even King John, the tyrant King of England, disputed these rights, and, as such, these rights were not enumerated in the Magna Charta, though these rights are the bedrock upon which that Great Charter was founded.

336.

Indeed, Magna Charta was to be enforced not only by the *force of arms* of the twenty five sureties of Magna Charta, great nobles of the realm, but also the force of arms of *all the free men of England*, "[s]ince, moreover, for God and the amendment of our kingdom and for the better allaying of the quarrel that has arisen between us and our barons, we have granted all these concessions, desirous that they should enjoy them in complete and firm endurance forever, we give and grant to them the underwritten security, namely, *that the barons choose five and twenty barons of the kingdom, whomsoever they will, who shall be bound with all their might, to observe and hold, and cause to be observed, the peace and liberties we have granted and confirmed to them by this our present Charter*, so that *if we*, or our justiciar, or our bailiffs or any one of our officers, *shall in anything be at fault towards anyone, or shall have broken any one of the articles of this peace or of this security*, and the offense be notified to four barons of the foresaid five and twenty, the said four barons shall repair to us (or our justiciar, if we are out of the realm) and, laying the transgression before us, petition to have that transgression redressed without delay. *And if we shall not have corrected the transgression* (or, in the event of our being out of the realm, if our justiciar shall not have corrected it) *within forty days*, reckoning from the time it has been intimated to us (or to our justiciar, if we should be out of the realm), *the four barons aforesaid shall* refer that matter to the rest of the five and twenty barons, and those five and twenty barons shall, *together with the community of the whole realm*, *distrain*

*and distress us in all possible ways, namely, by seizing our castles, lands, possessions, and in any other way they can*, until redress has been obtained as they deem fit…*And let whoever in the country desires it, swear* to obey the orders of the said five and twenty barons for the execution of all the aforesaid matters, and along with them, *to molest us to the utmost of his power*; and we publicly and freely grant leave to everyone who wishes to swear, and we shall never forbid anyone to swear." *Magna Charta 1215*, YALE LAW SCHOOL AVALON PROJECT, https://avalon.law.yale.edu/medieval/magframe.asp (last visited Jan. 31, 2023).

<center>337.</center>

The rights of keeping and bearing arms, being absolute, ancient, inalienable, ancestral, private, individual sovereign rights at common law, their exercise is *limited only by nuisance doctrine*, to wit, the common law doctrine of affray, *bearing* arms *with the intent and in such a manner* as will naturally terrify the public, *as all rights are so bound by nuisance doctrine*, no man being within his rights to cause a nuisance, as "[*t]he principle on which all right to regulate the use in public of these articles of property, is, that no man can so use his own as to violate the rights of others*, or of the community of which he is a member." Andrews v. State, 50 Tenn. 165, 185 (1871) (emphasis added).

<center>338.</center>

The *nuisance doctrine* limitation on the rights of keeping and bearing arms cannot be viewed as a limitation on those rights in any way whatsoever, but, rather, only a limitation on one's ability to use said rights in a manner which amounts to an *abuse* of those rights, by *infringing* the private rights of others.

<center>339.</center>

The common law rights of keeping and bearing arms are individual rights and were held by the individual qua individual, with the class of full rights-holders being defined by individual ancestral status.

340.

The ***right to bear arms*** was a differential right at common law based upon whether one was a "Great man (upper nobility) or other lawful Person of good repute (lower nobility)," the class of full rights-holders, or not. *13 Edw. I (1285) (Eng.) (Statutes for the City of London),* DUKE UNIVERSITY SCHOOL OF LAW, DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/13-edw-i-1285-eng-statutes-for-the-city-of-london/ (last visited Jan. 29, 2023).

341.

This differential right to bear arms was, itself, based upon ***nuisance doctrine***, and was due to the fact that the bearing of arms by peasants and other low ranking members of society was ***per se a nuisance***, ***per se to the terror of the public***, because, as the peasantry in no way comprised the warrior class, the most reasonable conclusion that one could draw from a peasant bearing arms in public is that the peasant was on a rampage or intended to commit some sort of mischief or evil act.

342.

Indeed, ***the very presence of lower-class individuals at certain times and certain places***, too, was held to be a ***nuisance per se***, regardless of ***whether or not they were bearing arms***. *See 13 Edw. I (1285) (Eng.) (Statutes for the City of London),* DUKE UNIVERSITY SCHOOL OF LAW, DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/13-edw-i-1285-eng-statutes-for-the-city-of-london/ (last

visited Jan. 29, 2023) ("It is enjoined that none be so hardy *to be found going or wandering about the Streets of the City, after Curfew* tolled at St. Martins le Grand, with Sword or Buckler, or other Arms for doing Mischief, or *whereof evil suspicion might arise*; *nor any in any other Manner*, *unless he be a great Man or other lawful Person of good repute*, or their certain Messenger, having their Warrants to go from one to another, with Lanthern in hand.")

343.

However, while the right to *bear arms* was a differential right, all *free Englishmen* were entitled to and possessed the *absolute right* to *keep arms*, any arms whatsoever, but, especially *ordinary military weapons*, as is evidenced by the laws of England and of King William the Conqueror which prescribed the manner by which *villeins, the original slaves, the lowest form of white peasantry, were to be manumitted, or made free men, by their lords, said edict stating*, "'[i]f any person is willing to enfranchise his *slave*, let him with his right hand, deliver the slave to the sheriff in a full county, proclaim him exempt from the bond of servitude by manumission, shew him open gates and ways, and deliver him *free arms, to wit, a lance and a sword*,'" the *ordinary military weapons of that day and age*, "'thereupon he is a free man.'" ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 430 (LIBERTY FUND ed., 1999) (1803) (emphasis added).

344.

This is because the keeping of arms alone, without more, can never amount to a cognizable nuisance, to wit, can never be to the terror of the public or an infringement of someone else's rights.

345.

***Keeping arms*** is a purely ***private act***, and while lower class free Englishmen may have been a ***per se nuisance*** while ***bearing arms in public***, because such actions were ***per se an affray, to the terror of the public***, the ***private act of keeping arms***, even by peasants, ***can never amount to a nuisance***, and, to the contrary, is ***per se no nuisance***, because it can never be to the ***reasonable*** terror of the public for a ***law-abiding free man to keep arms***.

346.

As stated above, the unlimited, absolute, ancient, inalienable, private, individual ancestral rights of keeping and bearing arms belonged to the individual qua individual, not individual as a member of a group, as is noted by the fact that all regulations as to ***abuses*** of these rights or persons who did not possess the full right of bearing arms were based upon individual characteristics of ancestry or personal wealth, and not based upon group membership. This is in contrast to other fundamental rights, such as the freedom of speech, which were qualified by membership in a group, to wit, Parliament, in the English Bill of Rights of 1689.

347.

At common law, the only statutes on the subject of keeping and bearing arms were regulations of ***abuses*** of the right of ***bearing and using arms***, such as regulations of the bearing of arms ***with the intent and in such a manner*** as to terrify the public, to wit, common law affrays, or bearing and using arms for an unlawful purpose, such as to facilitate the commission of a crime or for the purposes of poaching; regulations of ***people who did not possess the full, free, and inalienable right*** to keep and bear arms, because their bearing of arms in public was almost ***per se a nuisance***, and, thus, an abuse of their right to keep and bear arms; and regulations on the ***bearing*** of arms in ***places where the right to bear arms had not historically existed***, such as in churches and courthouses, because the bearing of arms in these places was ***per***

*se a nuisance* and an abuse of one's right to bear arms. All of these ***abuses*** of the right of

***bearing arms*** can rightly be designated as ***nuisances***, and it is from ***nuisance doctrine*** that the

government derives all power to regulate in this field, as it lacks the power to regulate conduct

that falls within the confines of these inalienable, private, individual, sovereign ancestral rights.

348.

This is because the right to ***bear arms***, being an absolute right, cannot be regulated at all,

rather, only ***abuses*** of the right of ***bearing and using arms*** amounting to common law nuisances

or criminal acts (common law felonies) may be regulated by the government, such ***abuses*** of the

right not being within the lawful rights themselves, as no man may so use his own as to violate

the rights of others.

349.

The primary "regulation" in effect at common law, the Statute of Northampton, was only

enacted in affirmation of the common law, and only outlawed ***abuses*** of the right of keeping and

bearing arms which were "said to have ***always been an offence at common law***." WILLIAM

HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 135 (1st ed.1716) (emphasis added).

This Statute only regulated ***abuses*** of the right of bearing arms which amounted to ***affrays***, "[a]n

affray [being] a piblique offence to the terrour of the kings subjects, and is an English word, and

so called, because it affrighteth and maketh men afraid, and is enquirable in a leet as ***a common***

***nusans***." EDWARD COKE, THE THIRD PART OF THE INSTITUTES OF THE LAWS OF ENGLAND:

CONCERNING HIGH TREASON, AND OTHER PLEAS OF THE CROWN AND CRIMINAL CAUSES 157

(LAWBOOK EXCHANGE ed., 2001, 2012)(1817) (emphasis added). *See also* <u>State v. Huntly</u>, 25

N.C. 418, 420 (1843) ("***The argument is, that the offence of riding or going about armed with***

***unusual and dangerous weapons, to the terror of the people, was created by the statute of***

*Northampton, 2nd Edward the 3d, ch. 3d*, and that, whether this statute was or was not formerly in force in this State, it certainly has not been since the first of January, 1838, at which day it is declared in the Revised Statutes, (ch. 1st, sect. 2,) that the statutes of England or Great Britain shall cease to be of force and effect here. ***We have been accustomed to believe, that the statute referred to did not create this offence, but provided only special penalties and modes of proceeding for its more effectual suppression***, and of the correctness of this belief we can see no reason to doubt.")

350.

The Statute of Northampton only regulated ***unlawful conduct*** amounting to an ***affray***, which, is why, as Sir William Hawkins details, "[t]hat ***no wearing of Armes is within the meaning of th[e] Statute [of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People; from whence it seems clearly to follow, That Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons***, or having their usual Number of Attendants with them, for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common fashion to make use of them, **without causing the least Suspicion of** ***an Intention to commit any Act of Violence or Disturbance of the Peace***." WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 136 (1st ed.1716) (emphasis added).

351.

The Statute of Northampton did not attempt to regulate the ***absolute right of keeping arms***, any arms whatsoever, because ***the keeping of any arms whatsoever in the privacy of one's own home can never amount to a nuisance***, to wit, an affray, and, as such, was beyond the power of the Kings to regulate. *See* WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE

CROWN 134-35 (1st ed.1716) (emphasis added) ("[T]he word Affray is derived from the French word Effraier, to terrify, and that in a legal sense it is taken for a public[] Offence, to the Terror of the People, from whence it seems clearly to follow, That there may be an Assault which will not amount to an Affray; *as where it happens in a private Place*, out of the hearing or seeing of any, except the Parties concerned; *in which case it cannot be said to be to the Terror of the People*; and for this Cause such a private Assault seems *not to be inquirable in a Court*-Leet, *as all Affrays certainly are*, as *being common Nusances*.")

<div align="center">352.</div>

In fact, as evidence of the fact that the Statute of Northampton only regulated *abuses* of the right of keeping and bearing arms which amounted to affrays, and, thus, did not regulate the absolute right of keeping arms in any way whatsoever, as the keeping of arms alone, without more, can never amount to a nuisance, while the Statute of Northampton did regulate the bearing of arms in public by those lesser men of the realm, *every man*, regardless of station had the absolute right under the Statute, as under the common law, which it was passed in accordance with, to "not only use force and armes, but assemble company also. As *any* may assemble his friends and neighbours, to keep his house against those that come to rob, or kill him, or to offer him violence in it, and is by construction excepted out of this act: and the sheriff, &c. ought not to deal with him upon this act; for a man's house is his castle, *et domus sua cuique est tutissimum refugium*; for where shall a man be safe, if it be not in his house? And in this sense it is truly said: *Armaque in armatos sumere jura sinunt*." EDWARD COKE, THE THIRD PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONCERNING HIGH TREASON, AND OTHER PLEAS OF THE CROWN AND CRIMINAL CAUSES 161 (LAWBOOK EXCHANGE ed., 2001, 2012)(1817).

<div align="center">353.</div>

And, as referenced above, because the Statute of Northampton only regulated affrays, "***Persons of Quality are in no Danger of Offending against this Statute,***" because our bearing of arms in public is per se no nuisance, not to the terror of anyone. WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 136 (1st ed.1716) (emphasis added).

354.

Plaintiff's ancestors were in "no danger of offending" against the Statute of Northampton, as they were ancestrally and personally part of the class of full rights-holders of the common law right of keeping and bearing arms, to wit, "***Persons of Quality***," who could not be subjected to regulation regarding their right to keep and bear arms. WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 136 (1st ed.1716) (emphasis added).

355.

Because the ***keeping of arms***, ***any arms*** whatsoever, no matter how dangerous and unusual, ***can never amount to a nuisance***, the keeping of arms alone, without more, never amounting to an infringement of someone else's rights or an affray, ***there were no regulations or attempted regulations as to the absolute right of keeping arms, nor any statutes which attempted to regulate or prescribe the types of arms which one may keep***, save the lone Statute of King Henry VIII, promulgated in the reign of a tyrannical king who had no regard for the law, divorced and married numerous wives at a time when such conduct was unlawful, and murdered those with stronger claims to the throne than himself, which Statute only attempted to proscribe a couple certain dangerous and unusual weapons which were ***not ordinary military weapons*** and were seen as ***ineffective*** for the defense of the realm, and, additionally, were only seen to be used by certain "diverse malicious and evil disposed persons," for the purposes of "willfully and shamefully commit[ing] perpetrat[ing] and do[ing] diverse detestable and shameful murders,

robberies, felonies, riot and rout with crossbows little short handguns and little hagbut, to the great peril and continual fear and danger of the Kings most loving subjects," while, at the same time, *lamenting that the law-abiding citizenry had discontinued the practice of keeping and using* longbows, seen as *the most potent and effective ordinary military weapon of the day*, because *all Sovereigns* in the Anglo-American chain of power have recognized that *the power to regulate* the right of keeping and bearing arms *only exists where the keeping and bearing of arms amounts to an unlawful nuisance, an abuse of one's rights*, *and the keeping of arms, without more, can never amount to an unlawful nuisance.* *33 Hen. 8, c. 6, § 1, An Act Concernin Crossbows and Handguns (1541)*, DUKE UNIVERSITY SCHOOL OF LAW, DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/33-hen-8-c-6-§-1-an-act-concernin-crossbows-and-handguns-1541/.

356.

It is also highly likely that King Henry VIII understood this Act to be lawful because it *only attempted to regulate the lower classes in their keeping of the proscribed dangerous and unusual weapons*, and, King Henry VIII may have understood the nuisance doctrine limitation on the right of bearing arms, which limited the peasants' right of bearing arms in public, to also apply to their keeping of dangerous and unusual arms which were ineffective for the purpose of military engagements, especially when such arms were only being utilized by malicious and evil persons for the purpose of unlawful acts, because King Henry VIII excepted from the purview of this Act "such person or persons, have lands, tenements, fees, annuities or office to the yearly value of one hundred pounds," a proxy class intended to comprise all of those "men of Quality" recognized as the class of full rights-holders in the time of Edward I, the ancient gentry of the

blood and name, with respect to the keeping of all of the proscribed dangerous and unusual arms except for "any handgun other than such as shall be in stock and gun of the length of one whole yard, or any hagbutt or demy hake being not of the length of three quarters of a yard," which arms were seen as completely useless for *any purpose at that time but causing an affray by* "us[ing] [such] to ride and go in the King's highways and elsewhere…ready furnished with Quarrel (gunpowder, fire and touche) to the great peril and fear of the King's most loving subjects." Id.

### 357.

*No statutes* at common law attempted to regulate the *absolute right* of *keeping arms*, *any arms* whatsoever, by *anyone*, except for the aforementioned lone Statute of Henry VIII, a tyrant king who had no regard for the law, which Statute itself recognized that the King's power to regulate in this field came from *nuisance doctrine*, and was thus bound by nuisance doctrine, the rights of keeping and bearing arms being *absolute rights*.

### 358.

Even accounting for the Statute of Henry VIII, there were no statutes that attempted to regulate the *keeping* of *military-grade weapons* by the class of full rights-holders, or other free Englishmen for that matter.

### 359.

This is because the right to *keep arms, especially military-grade weapons*, is an absolute right, the keeping of arms, without more, never amounting to a nuisance.

### 360.

Because men of quality were the only ones who held the full, free, and inalienable ancestral right to keep and bear arms in public at common law, they were in no danger of

offending against the Statute of Northampton by bearing ordinary military weapons in public, because their bearing of arms was per se no nuisance, so long as such arms were borne in a normal manner and not accompanied by extraordinarily egregious conduct.

361.

This is in contrast to lower class individuals, whose bearing of arms was almost per se a nuisance, and, therefore, unlawful, though every man may keep "***armes***, [and] assemble company also. As any man may assemble his friends and neighbours, to keep his house against those that come to rob, or kill him, or to offer him violence in it, and is by construction excepted out of this act," because the keeping of arms alone, without more, never constitutes a nuisance. Edward Coke, The Third Part of the Institutes of the Laws of England: Concerning High Treason, and Other Pleas of the Crown and Criminal Causes 161 (15th ed. 1797).

362.

Of course, even gentlemen, if ***bearing arms*** in an ***extreme and outrageous manner***, could be prevented from such an ***abuse*** of the right of ***bearing arms***, because such conduct did not implicate the right itself, but, instead, only an ***abuse*** of the right amounting to a ***nuisance***.

363.

Where acting in a lawful manner, not constituting a nuisance, and, therefore, within the right, however, a gentleman's right to keep and bear arms was ***absolute and unable to be regulated***.

364.

And, as is noted above, at common law ***any man*** could ***keep any arms whatsoever, as any man was within his rights to keep*** "***armes***, [and] assemble company also. As any man may assemble his friends and neighbours, to keep his house against those that come to rob, or kill

him, or to offer him violence in it, and is by construction excepted out of this act." Edward Coke, The Third Part of the Institutes of the Laws of England: Concerning High Treason, and Other Pleas of the Crown and Criminal Causes 161 (15th ed. 1797).

365.

As time wore on, the distinction between men of quality and lower class Englishmen with respect to the rights of keeping and bearing arms became less acute, with *everyone* possessing the full right of keeping and bearing arms in public.

366.

Thus, by the time of Sir John Knight's case, the only regulation on the subject of keeping and bearing arms left in effect in the common law was the Statute of Northampton which was said to be in disuetitude, or disuse, and, which was held to have only regulated the *abuse* of one's right of *bearing arms* which occurred when one bore arms with the intent to terrify the public, punishing only those men who "go armed to terrify the King's subjects," in accord with the common law and the extent of the King's and Parliament's sovereign power, and the sovereign power ancestrally held by the free men of England and inherent in their ancient, fundamental, sovereign ancestral rights of keeping and bearing arms. Sir John Knight's Case, 87 Eng. Rep. 75 K.B. 1686.

367.

While the right was a differential right based upon ancestry at common law, as the Tennessee Supreme Court states in Simpson, suppose this part of the common law was brought to this country by the colonists, "our constitution has completely abrogated it; it says, 'that the freemen of this state have a right to keep and to bear arms for their common defence.'" Simpson

v. State, 13 Tenn. 356, 360 (1833). And, so, too, does the United States Constitution, which says, "the right of the people to keep and bear arms shall not be infringe."

368.

So, while at common law, "***lords and esquires, and their sons***, and persons whose yearly income from land amount to £100, were of suitable condition to keep arms...***with us, every free white man is of suitable condition, and, therefore, every free white man may keep and bear arms***." Aymette v. State, 21 Tenn. 154, 158 (1840) (emphasis added).

369.

Thus, it was the gentleman's right of keeping and bearing arms, the absolute right, which was retained by the Founding Generation in the Second Amendment to the United States Constitution.

370.

Regardless, Plaintiff's ancestors were part of the class of full rights-holders at common law, and, therefore, Plaintiff inherited the full right of keeping and bearing arms possessed by his ancestors at common law, irrespective of the Constitution's abrogation of the differentiality of the right. It was their unlimited ancestral right to keep and bear arms that Plaintiff's ancestors passed to Plaintiff via his lineal bloodline descent from said ancestors, which right had always been beyond the power of all sovereigns to act upon within the Anglo-American/Anglo-Saxon chain of power, and which right remains beyond the power of the present government, the agent of the Sovereign Body, to act upon at present.

371.

It was their ancient absolute rights of keeping and bearing arms that Plaintiff's ancestors expressly retained at the founding of this country and enumerated in the Second Amendment to the United States Constitution.

## COMPLETE ABSENCE OF REGULATION IN ENGLISH COMMON LAW AND THE LAW OF THE AMERICAN COLONIES AND STATES IN ANTEBELLUM HISTORY

372.

Paragraphs 1-371 are re-alleged as if fully restated herein.

373.

As has been detailed above, in England, there were *no regulations* as to the *rights of keeping and bearing arms*, as those rights have always been beyond the power of all Sovereigns in the Anglo-Saxon/Anglo-American chain of power to regulate, but, rather, regulations of *abuses* of the right of *bearing arms*, the bearing of arms by *individuals who did not comprise the class of full rights-holders* as to the rights of keeping and bearing arms, *unlawful activities*, such as *fighting and poaching*, which may incidentally implicate the use of arms during the course of such activities, and regulations prohibiting the *bearing of arms in places where that right had not historically existed*, all of which are acts which amount to legally cognizable *nuisances*.

374.

There were *no regulations* as to the *keeping of arms*, *any arms, whatsoever*, save the lone Statute of King Henry VIII, which did not attempt to regulate the keeping of *ordinary military weapons*, but, rather, only attempted to regulate the keeping of certain dangerous and unusual weapons *seen as ineffective for the defense of the realm* and utilized only by certain

malicious and evil disposed persons for the purposes of murder, robbery, etc, to wit, for the purpose of causing *nuisances*.

<div align="center">375.</div>

In the American colonies and States, up until at least the time of the Civil War, there were *no statutes* that purported or attempted to regulate the unregulatable rights of keeping and bearing arms, but, rather, in line with the common law of England, statutes regulating *abuses* of the right of *bearing arms* amounting to an *affray*; *persons who did not comprise the class of rights-holders and therefore did not possess the right of keeping and bearing arms*, such as slaves, Indians, and freed blacks; *unlawful activities* which may *incidentally* implicate the use of arms, such as criminal acts and poaching; regulations proscribing the *negligent* storage of *dangerous incendiary explosive materials*, such as hay, straw, tar, and gunpowder; regulations which *required* that one *exercise* one's right to *keep ordinary military weapons*; regulations which prohibited the *concealed bearing of certain dangerous and unusual weapons*, which did not implicate the absolute right of bearing arms as it was always outside of the right of bearing arms at common law to bear arms secretly; and regulations which *expanded* the right to *bear arms* so that arms could be borne into churches, a place where the right to bear arms historically did not exist.

<div align="center">376.</div>

There is not a single regulation, statute, act, ordinance, or edict in the historical record of any of the thirteen original colonies or States, from the establishment of said colonies up until at least 1860, that purported or attempted to regulate the *right to keep arms*, as *the right to keep arms is an absolute right*, and *all of the legislatures* in this country *universally understood and recognized that they*, acting on behalf of the Sovereign Body, *were devoid of power* with respect

to the *absolute rights of keeping and bearing arms,* except where the exercise of said rights amounts to an *abuse* of such rights rising to the level of a *nuisance*.

377.

There is not a single regulation, statute, act, ordinance, or edict in the historical record of any of the thirteen original colonies or States, from the establishment of said colonies up until at least 1860, that purported or attempted to delineate which arms one may or may not keep, as *the keeping of any arms whatsoever is entailed within the absolute right of keeping arms*, and *all of the legislatures* in this country *universally understood and recognized that they*, acting on behalf of the Sovereign Body, *were devoid of power* with respect to the *absolute rights of keeping and bearing arms,* except where the exercise of said rights amounts to an *abuse* of such rights rising to the level of a *nuisance*, and, thus, *were without power to regulate the types of arms the class of rights-holders kept*.

378.

There is not a single regulation, statute, act, ordinance, or edict in the historical record of any of the States or territories, which comprised the United States of America in the antebellum period, from the establishment of said States and territories up until at least 1860, that purported or attempted to regulate the *absolute right of keeping arms* or purported or attempted to *prescribe the types of arms which may be kept in accordance with that right*, as *the right to keep arms is an absolute right*, and *all of the legislatures* in this country *universally understood and recognized that they*, acting on behalf of the Sovereign Body, *were devoid of power* with respect to the *absolute rights of keeping and bearing arms,* except where the exercise of said rights amounts to an *abuse* of such rights rising to the level of a *nuisance*, and, thus, *were without power to regulate the types of arms the class of rights-holders kept*.

379.

There has never been any lawful regulation in any State comprising one of the United States of America, nor in any territory which the United States of America, which ever purported or attempted to regulate the Posterity's ***absolute right to keep arms***.

380.

Regulations in the colonies or States that did mention the types of arms that one must ***not store negligently***, primed with gunpowder, in a manner that constituted a ***nuisance***, or that prohibited colonists and citizens from selling arms or disposing of arms by conveyance to slaves or Indians, ***classes of persons who did not possess the right to keep and bear arms***, an act that amounted to an ***unlawful act***, to wit, treason, all concede the fact that one is within one's lawful rights to ***keep***, "cannon, swivels, mortars, howitzers, cohorns, fire arms, bombs, grenades, and iron shells of any kind," to wit, "***military weapons***, or armor," "***instrument[s] of war***." *1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2*, DUKE UNIVERSITY SCHOOL OF LAW, DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/1783-mass-acts-37-an-act-in-addition-to-the-several-acts-already-made-for-the-prudent-storage-of-gun-powder-within-the-town-of-boston-§-2/ (last visited Jan. 31, 2023); *The Public Records Of The Colony Of Connecticut, Prior To The Union With New Haven Colony, May, 1665 Page 79, Image 91 (1850) available at The Making of Modern Law: Primary Sources*, DUKE UNIVERSITY SCHOOL OF LAW, DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/the-public-records-of-the-colony-of-connecticut-prior-to-the-union-with-new-haven-colony-may-1665-page-79-image-91-1850-available-atthe-making-of-

modern-law-primary-sources/ (last visited Jan. 31, 2023); *The Public Records Of The Colony Of Connecticut, Prior To The Union With New Haven Colony, May, 1665 Page 113-114, Image 125-126 (1850) available at The Making of Modern Law: Primary Sources*, DUKE UNIVERSITY SCHOOL OF LAW, DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/the-public-records-of-the-colony-of-connecticut-prior-to-the-union-with-new-haven-colony-may-1665-page-113-114-image-125-126-1850-available-at-the-making-of-modern-law-primary-sources/ (last visited Jan. 31, 2023).

381.

In addition, statutes which regulated ***free blacks' keeping and bearing of arms***, a ***privilege***, ***not a right***, for such individuals, as they did not possess the ancient, inalienable, absolute, private, individual, ancestral sovereign rights of keeping and bearing arms, at least not as to the Kings of England, our predecessor sovereigns, they not being descended from the ancestral class of rights-holders at common law, all provide that it is well within the right of keeping arms, held by those whom comprised the class of full rights-holders, to keep "***any military weapon***." *See 1806 Va. Acts 51, ch. 94.,* DUKE UNIVERSITY SCHOOL OF LAW, DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/1806-va-acts-51-ch-94/ (last visited Jan. 27, 2023). (Before being allowed to exercise the ***privilege*** of keeping and bearing arms "every 'free negro or mulatto' to first obtain a license before carrying or keeping 'any fire-lock of any kind, ***any military weapon***, or any powder or lead.'")

382.

As noted above, in America, as at common law, certain classes of persons did not possess the rights of keeping and bearing arms because they did not ancestrally descend from the class of

rights-holders, and, in addition, in this country they in no way comprised the body politic, the Sovereign Body. *See* <u>Dred Scott v. Sandford</u>, 60 U.S. 393, 406-7 (1856) ("[E]very person, and every class and description of persons, who were at the time of the adoption of the Constitution recognised as citizens in the several States, became also citizens of this new political body; but none other; it was formed by them, and for them and their posterity, but for no one else… It becomes necessary, therefore, to determine who were citizens of the several States when the Constitution was adopted. And in order to do this, we must recur to the Governments and institutions of the thirteen colonies when they separated from Great Britain and formed new sovereignties, and took their places in the family of independent nations. We must inquire who, at that time, were recognised *as the people or citizens of a State whose rights and liberties had been outraged by the English Government*, and who declared their independence *and assumed the powers of Government to defend their rights by force of arms*.

In the opinion of the court, the legislation and histories of the times, and the language used in the Declaration of Independence, show that neither the class of persons who had been imported as slaves nor their descendants, *whether they had become free or not*, were then acknowledged as a part of the people, nor intended to be included in the general words used in that memorable instrument.").

383.

Because the above-referenced individuals did not ancestrally possess the rights of keeping and bearing arms within the Anglo-American/Anglo-Saxon chain of power, it was a *privilege* for them to be allowed to keep and bear arms, not a right, and this is why they could be forced to obtain a license to do so.

384.

And, as at common law, where low-ranking persons' bearing of arms was *per se a nuisance*, they not being men of quality, in America too, these low-ranking individuals', to wit, slaves and their descendants, whether free or not, keeping and bearing of arms was understood universally to be a nuisance per se. *See Ordinances of the Borough of Vincennes, with the Act of Incorporation and Supplement Thereto Prefixed Page 54-55, Image 54-55 (1820) available at The Making of Modern Law: Primary Sources.*, DUKE UNIVERSITY SCHOOL OF LAW, DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/ordinances-of-the-borough-of-vincennes-with-the-act-of-incorporation-and-supplement-thereto-prefixed-page-54-55-image-54-55-1820-available-at-the-making-of-modern-law-primary-sources/ (last visited Mar. 26, 2023). ("[An Ordinance to Prevent *Nuisances*, Etc.] § 7. Be it further ordained by the authority aforesaid, That any negro or mulatto, shall be punished with thirty-nine stripes on the bare back, if found with deadly weapons, other than the legal implements of his, or her business, when engaged therein; and it is hereby made the duty of the town constable, and permitted to any other citizen, to disarm and imprison such negro or mulatto, as may be found with a belt or butcher-knife, dirk, sword, or pistol, and make complaint to any magistrate within this Borough, to award the aforesaid punishment.")

385.

There is not a single regulation in the history of either the English common law, from the earliest recorded statutes to the time of the Founding, or American legislative history, from the earliest colonial settlement up until at least the Civil War, which attempted to regulate the *class of rights-holders*, to wit, *free Englishmen, the Founding Generation and their Posterity, the Sovereign Body of this Country*, in their keeping of *military weaponry*, because, at the very

least, the ***class of protected arms, which members of the Posterity are entitled to keep in conjunction with our right of keeping arms, incudes <u>military-grade weapons</u>***.

386.

On the contrary, ***all*** of the regulations of actions amounting to ***abuses*** of the rights of keeping and bearing arms, classes of persons ***who did not possess the right*** of keeping and bearing arms, and the ***negligent*** storage of arms, both at common law and in American colonial and antebellum history, not only imply but expressly concede and recognize that the class of rights-holders of the full, free, and inalienable right of keeping and bearing arms are well within our rights to keep ***military grade weapons***.

387.

In addition, all of the antebellum statutes regulating the concealed bearing of arms, an act which was not entailed within the right of bearing arms at common law, and, as such, regulations which did not implicate the absolute right of bearing arms as no man was within his right of bearing arms to bear arms *secretly* at common law, expressly concede the fact that the ***class of full rights-holders***, to wit, ***the Posterity***, are well within our right of keeping arms to keep not just military grade weapons but dangerous and unusual weapons as well, as they would not have found it necessary to regulate the ***manner*** of ***bearing said arms***, unless it was within one's right to keep said arms. In addition, these legislatures would not have nearly ***universally*** excepted from the purview of their concealed-carry statutes, relating to the concealed carrying of dangerous and unusual weapons, those "***travelling on a journey***." *1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89, § 1.,* Duke University School of Law, Duke Center for Firearms Law Repository of Historical Gun Laws, https://firearmslaw.duke.edu/laws/1813-ky-acts-100-

an-act-to-prevent-persons-in-this-commonwealth-from-wearing-concealed-arms-except-in-certain-cases-ch-89-§-1/

(last visited Jan. 27, 2023).

388.

If the legislatures *universally only regulated the concealed carrying of certain dangerous and unusual arms*, they must have *universally understood that it was within the right of the class of rights-holders to keep such weapons*, and, therefore, *beyond the power of the government or legislature to regulate the keeping of such arms*, as, otherwise, *they would have simply prohibited the possession of said arms entirely*.

389.

As the Supreme Court of Tennessee makes clear in <u>Page</u>, it was merely because the right to bear arms at common law, and that retained at the time of the Founding being no more expansive with respect to bearing arms secretly than that at common law, did not include the right to bear arms *secretly* or to bear them with the *intent of going armed*, to wit, *with the intent to cause an affray* or commit and unlawful act, that the legislatures and Courts understood that it was within the legislature's power to regulate the concealed bearing of dangerous and unusual weapons, *not because the keeping of such weapons was not entailed within the right of keeping arms,* as, ""*[u]nder the constitution, every man has a right to own and keep these weapons*, [they being of the type proscribed by the statute], nor is this right interfered with by the prohibition against 'carrying' them, in the sense in which the Legislature uses the word," <u>Andrews v. State</u>, 50 Tenn. 165, 201 (1871) (emphasis added).

390.

The **complete absence** of any regulations or attempted regulations as to the absolute right of keeping any arms whatsoever by **the class of full rights-holders**, to wit, free Englishmen, the Founding Generation, and their Posterity, by all thirteen colonies and original States, and those States admitted to the Union in the antebellum period, across the span of two-hundred plus years, thus evidencing that it was the **universal** understanding of all of the various legislatures and all of the various legislators that comprised those legislatures that the **absolute right of keeping arms** was **beyond the legislature's** (government's/Sovereign's) **power to act upon**, proves conclusively that across all time-periods and across all colonies and regions which comprised what was to become and did become the United States, **it was universally understood**, by the time of colonial settlement, but more especially by the time of the Founding of this country and the Ratification of the United States Constitution, that the **right to keep arms is an absolute right**, and a right which entails the right to **keep any weapons whatsoever, but, at the least, the right to keep military-grade weapons**, "**instrument[s] of war**." *The Public Records Of The Colony Of Connecticut, Prior To The Union With New Haven Colony, May, 1665 Page 113-114, Image 125-126 (1850) available at The Making of Modern Law: Primary Sources*, DUKE UNIVERSITY SCHOOL OF LAW, DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/the-public-records-of-the-colony-of-connecticut-prior-to-the-union-with-new-haven-colony-may-1665-page-113-114-image-125-126-1850-available-at-the-making-of-modern-law-primary-sources/ (last visited Jan. 31, 2023).

391.

And it is this understanding as to the absolute right to keep arms, held by the colonists and Founders, that matters when determining the expanse of the right at present, because it was the right, as understood by these individuals, which was retained for themselves and their

Posterity, and which passed lineally to Plaintiff, through his bloodline descent from said Founding Generation, which governs this court, because it was the sovereign power inherent in this right which was retained from all governmental actions, for, as the Supreme Court states in Bruen, "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.' *Heller*, 554 U.S. at 634–635, 128 S.Ct. 2783. The Second Amendment was adopted in 1791…Historical evidence that long predates or postdates [this] time may not illuminate the scope of the right." New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2119 (2022). Thus, the lone Statute of Henry VIII is not relevant for the purposes of this inquiry.

392.

And, ***while the Constitutional right to keep and bear arms*** is governed by the Founding Generation's understanding as to the expanse of the rights of keeping and bearing arms at the time of the Founding, and, thus, ***may be more expansive than the common law right***; the Founding Generation, the original Sovereign Body of this country, and their Posterity, the present Sovereign Body of this country, lack(ed) the sovereign power to act upon the absolute rights of keeping and bearing arms, said rights being beyond the sovereign power of our predecessor sovereigns to act upon, and, as such, regardless of the Founding Generation's intent, ***at the bare minimum, Plaintiff still possesses his ancient, absolute, private, individual, ancestral sovereign common law right to keep and bear arms***, the right of English "men of quality," which right entailed the right to keep any arms whatsoever, based upon all the legal commentary at common law, the majority understanding as to the right of keeping arms at common law, and the near-universal (save the lone statute of a tyrant king) recognition in English and colonial/antebellum American statutes of the absolute right of keeping any arms

whatsoever in all statutes and acts regulating ***abuses*** of the rights of keeping and bearing arms

amounting to nuisances at common law; and, even based upon the understandings of the tyrant

King Henry VIII, the absolute right of keeping arms entailed, at the least, the right to keep

***military-grade weapons***.

## AMERICAN CASE LAW AND LEGISLATIVE HISTORY

393.

Paragraphs 1-392 are re-alleged as if fully restated herein.

394.

***All courts in this country*** initially ***universally*** held that the right to ***bear arms*** protected

the right to bear ***all arms***, dangerous and unusual weapons and ordinary military weapons. *See*

Simpson v. State, 13 Tenn. 356, 360 (1833) (emphasis added) ("By this clause of the

constitution, an express power is given and secured to all the free citizens of the state ***to keep***

***and bear arms for their defence, without any qualification whatever as to their kind or***

***nature***."); Nunn v. State, 1 Ga. 243, 251 (1846) (emphasis added) ("[t]he right of the people to

bear arms shall not be infringed.' The right of the whole people, old and young, men, women and

boys, and not militia only, ***to keep and bear arms of every description, and not such merely as***

***are used by the militia***."); State v. Reid, 1 Ala. 612, 614-619 (1840) (emphasis added) ("By the

first section of the act, 'to suppress the evil practice of carrying weapons secretly,' [Acts of

1838--9.] it is enacted, '***that if any person shall carry concealed about his person, any species***

***of fire arms, or any Bowie knife, Arkansaw tooth pick, or any other knife of the like kind, dirk,***

***or any other deadly weapon (dangerous and unusual weapons of that time period)***, the person

so offending, shall on conviction thereof, before any court having competent jurisdiction, pay a

fine not less than fifty nor more than five hundred dollars, to be assessed by the jury trying the

case; and be imprisoned for a term not exceeding three months, at the discretion of the judge of said court…***Under the provision of our constitution, we incline to the opinion that the Legislature cannot inhibit the citizen from bearing [these] arms openly, because it authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence.***"); State v. Huntley, 25 N.C. 418, (N.C. 1843) ("***A gun is an 'unusual weapon***,' wherewith to be armed and clad. No man amongst us carries it about with him, as one of his everyday accoutrements — as a part of his dress — and never, we trust, will the day come when any deadly weapon will be worn or wielded in our peace-loving and law-abiding State, as an appendage of manly equipment. ***But although a gun is an 'unusual weapon,' it is to be remembered that the carrying of a gun, per se, constitutes no offense. For any lawful purpose*** — either of business or amusement — ***the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result***, ***which*** essentially ***constitute the crime***. He shall not carry about this or any other weapon of death ***to terrify and alarm***, and ***in such manner as naturally will terrify and alarm*** a peaceful people," to wit, he shall not bear such arms for the purpose of committing an affray); Cockrum v. State, 24 Tex. 394, 401-03 (1859) (emphasis added) ("***The right to carry a bowie-knife*** for lawful defense ***is secured, and must be admitted. It is an exceedingly destructive weapon***. It is difficult to defend against it, by any degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. ***The bowie-knife differs from these in its device and design; it is the instrument of almost certain death***…He who carries such a weapon, for lawful defense, ***as he may***, makes himself

more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon." Yet, citizens may still keep and carry such an unusual and dangerous weapon for lawful self-defense purposes, because "[a] law cannot be passed to infringe upon or impair [the right of keeping or bearing arms], *because it is above the law, and independent of the law-making power*."); Bliss v. Com., 12 Ky. 90, 91-92 (1822) (emphasis added) ("The right of the citizens to bear arms in defence of themselves and the state, must be preserved entire…That the provisions of the act in question do not import an entire destruction of the right of the citizens to bear arms in defense of themselves and the state, will not be controverted by the court; for though the citizens are forbid wearing weapons concealed in the manner described in the act, they may, nevertheless, bear arms in any other admissible form. *But to be in conflict with the constitution, it is not essential that the act should contain a prohibition against bearing arms in every possible form--it is the right to bear arms in defense of the citizens and the state, that is secured by the constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution*…Not merely all legislative acts, which purport to take it away; but all which diminish or impair it *as it existed when the constitution was formed*, are void. If, therefore, the act in question imposes *any restraint on the right*, immaterial what appellation may be given to the act, *whether it be an act regulating the manner of bearing arms or any other*, the consequence, in reference to the constitution, is precisely the same, and its collision with that instrument equally obvious… The right existed at the adoption of the constitution; *it had then no limits short of the moral power of the citizens to exercise it*, and *it in fact consisted in nothing else but in the liberty of the citizens to bear arms*. Diminish that liberty, therefore, and you necessarily restrain the right; and such is the diminution and restraint,

which the act in question most indisputably imports, by prohibiting the citizens wearing weapons in a manner which was lawful to wear them when the constitution was adopted.").

<center>395.</center>

Later courts held that the prefatory clause to the Second Amendment to the United States Constitution, "a well regulated militia, being necessary to the security of a free state," while not restricting the class of rights-holders, as "with us, every free white man is of suitable condition, and, therefore, every free white man may keep and bear arms," announced the purpose for which the common law right to keep and bear arms was retained, to wit, *the prevention of tyranny by means of standing armies and select militias*, as "[t]he evil that was produced by disarming the people in the time of James II. was that the king, *by means of a standing army* quartered among the people, *was able to overawe them, and compel them to submit to the most arbitrary, cruel, and illegal measures*. *Whereas, if the people had retained their arms, they would have been able*, by a just and proper resistance to those oppressive measures, either to *have caused the king to respect their rights*, or surrender (as he was eventually compelled to do) the government into other hands…The complaint was against the government," and for such purpose "[t]he free white men may keep arms to protect the public liberty, *to keep in awe those who are in power, and to maintain the supremacy of the laws and the constitution*." Aymette v. State, 21 Tenn. 154, 157-158 (1840) (emphasis added). *See* also Andrews v. State, 50 Tenn. 165, 182–83 (1871) ("In reference to the second article of the Amendments to the Constitution of the United States, Mr. Story says, vol. 2, s. 1897: 'The importance of this article will scarcely be doubted by any persons who have duly reflected upon the subject. The militia is the natural defense of a free country against sudden foreign invasion, domestic insurrection and *domestic usurpations of power* by rulers. *It is against sound policy for a free people to keep up a large military*

*establishment and standing armies in times of peace*, both from the enormous expense with which they are attended, and the facile means which they afford to ambitious rulers to subvert the government, or *trample upon the rights of the people*. *The right of the citizen to keep and bear arms, has justly been considered as the palladium of the liberties of the republic, since it offers a strong moral check against usurpation and arbitrary power of rulers; and will* in general, even if these are successful in the first instance, *enable the people to resist and triumph over them*.'")

396.

In line with this purpose, these courts held that the prefatory clause to the Second Amendment qualified and restricted the class of protected arms for the purposes of *bearing arms* from all arms, as was the case at common law, to only those arms which were "*effectual in war*," to wit, "such as are *usually employed in civilized warfare*, and that constitute the *ordinary military equipment…If the citizens have these arms in their hands*, they are prepared in the best possible manner to repel any encroachments upon their rights by those in authority." Aymette v. State, 21 Tenn. 154, 158 (1840). *See also* Andrews v. State, 50 Tenn. 165, 182 (1871) ("It is said by the Attorney General that the Legislature may prohibit the use of arms common in warfare, but not the use of them in warfare; *but the idea of the Constitution is, the keeping and use of such arms as are useful either in warfare, or in preparing the citizen for their use in warfare*, by training him as a citizen, to their use in times of peace."); Fife v. State, 31 Ark. 455, 458-61 ("It is manifest from the language of the article, and from the expressions of these learned commentators, that *the arms which it guarantees American citizens the right to keep and to bear*, are such as are needful to, and ordinarily used by a well regulated militia, *and such as are necessary and suitable to a free people, to enable them to resist oppression, prevent*

*usurpation*, repel invasion, etc., etc…Mr. Bishop, treating of the provision of the Constitution of the United States, which secures to *the people* the right to keep and bear arms, says: 'If we look to this question in the light of judicial reason, without the aid of specific authority, we shall be led to the conclusion, that *the provision protects* only *the right to keep such arms as are used for purposes of war*, in distinction from those which are employed in quarrels and brawls and fights between maddened individuals, since such, only, are properly known by the name of arms, and such, only, are adapted to promote the security of a free State…[those weapons which are] *effective as a weapon of war*, and useful and necessary for 'the common defense.'")

397.

And, while Mr. Bishop's logic is highly flawed, as the right of keeping and bearing arms that was retained by the Founding Generation, and expressly enumerated in the Second Amendment to the United States Constitution, may have been more expansive than the common law right of keeping arms, *see* Bliss, *but could not have been less expansive than the common law right*, the Founding Generation (as did their predecessor sovereigns) lacking the collective sovereign power to act upon, regulate, or abrogate in the slightest degree the ancient, inalienable, private, individual, ancestral sovereign common law right of keeping and bearing arms, and the right to keep arms, any arms whatsoever, at common law, was an *absolute unregulatable right*, as, the keeping of any arms whatsoever could never amount to a nuisance, without more, and, as such, was beyond the power of the Kings of England and the Founding Generation to act upon or regulate in any manner; the *point is clear, that even those with the most restrictive view of the rights of keeping and bearing arms, as retained in the Second Amendment, understood that the right to keep arms protected the right to keep "arms as are used for purposes of war."* Fife v. State, 31 Ark. 455, 459 (1876).

398.

      This anti-tyranny purpose was universally accepted, although most courts at the time acknowledged that such a purpose had always been at the heart of the rights of keeping and bearing arms; that it was still the ancient, inalienable, private, individual, ancestral sovereign right that was retained to effectuate this purpose; and that, though the prefatory clause announced the purpose, the right thus retained, being the common law right to *keep and bear any weapons whatsoever*, so long as one did not bear them *with the intent to terrify the public*, to wit, cause an affray, *entailed the right to keep and bear arms of all descriptions*. *See* <u>Nunn v. State</u>, 1 Ga. 243, 249-51 (1846) ("If this right, 'inestimable to freemen,' has been guarantied to British subjects, since the abdication and flight of the last of the Stuarts and the ascension of the Prince of Orange, did it not belong to our colonial ancestors in this western hemisphere? Has it been a part of the *English* Constitution ever since the bill of rights and act of settlement *and been forfeited here by the substitution and adoption of our own Constitution? No notion can be more fallacious than this! On the contrary, this is one of the fundamental principles, upon which rests the great fabric of civil liberty*, reared by the fathers of the Revolution and of the country. And the Constitution of the United States, in declaring that the right of the people to keep and bear arms, should not be infringed, *only reiterated a (universal) truth* announced a century before, in the act of 1689, '*to* extend and *secure the rights* and liberties *of English subjects*'—whether living 3,000 or 300 miles from the royal palace. And it is worthy of observation, that both charters or compacts look to the *same motive*, for the irrespective enactments. The act of 1 *William and Mary*, *declares that it is* <u>against law</u> *to raise or keep a standing army in the kingdom*, in time of peace without the consent of Parliament, *and therefore places arms in the hands of the people*; and *our Constitution assigns as a reason why*

*this right shall not be interfered with, or in any manner abridged, that the free enjoyment of it will prepare and qualify a well-regulated militia, which are necessary to the security of a free State*…In solemnly affirming that a well-regulated militia is necessary to the *security* of a *free State*, and that, in order to train properly that militia, the ***unlimited right of the people to keep and bear arms*** shall not be impaired, are not the ***sovereign people*** of the State committed by this pledge ***to preserve this right inviolate***? Would they not be recreant to themselves, to free government, and false to their own vow, thus voluntarily taken, to suffer this right to be questioned?...'The right of the people to bear arms shall not be infringed.' The right of the whole people, old and young, men, women and boys, and not militia only, ***to keep and bear arms of every description, and not such, merely as are used by the militia***, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree…Our opinion is, that any law, State or Federal, is repugnant to the Constitution, and void, which contravenes this *right*, ***originally belonging to our forefathers, trampled under foot by Charles I. and his two wicked sons and successors***, re-established by the revolution of 1688, conveyed to ***this land of liberty by the colonists***, ***and finally incorporated conspicuously in our own Magna Charta!***... We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen ***of his natural right*** of self-defence, ***or*** of his ***constitutional right*** to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and void."); State v. Reid, 1 Ala. 612, 615 (1840) ("The bill of rights was doubtless induced by the high prerogative claims of the Stuarts, even after the restoration of Chas. the II., but more especially by the extraordinary assumptions of Jas. the II., ***by which he attempted to***

*assail the liberties* and religion *of the people*, and to render inefficient the enactments of Parliament, by the exercise of a dispensing power.")

<center>399.</center>

And, in reply to the State's argument that the right to *keep arms* can be regulated, so as to prevent anyone but militiamen and soldiers from keeping arms, the Supreme Court of Tennessee held, "**Bearing arms** *for the common defense* may well be held to be a political right, or for protection and maintenance of such rights, intended to be guaranteed;" for how else would one effectuate the common defense without others rising up with him, "*but the right to keep them,* **with all that is implied fairly as an incident to this right,** *is a private individual right, guaranteed to the citizen, not the soldier.*" Andrews v. State, 50 Tenn. 165, 182 (1871).

<center>400.</center>

The argument that these rights were or are in any way confined to the *organized or active militia* due to the prefatory clause are laughable and disingenuous, and wrong as a matter of law, as the rights of keeping and bearings have *always been possessed by the individual qua individual*, with the class of full rights-holders at common law being defined by *personal characteristics of wealth and ancestry*, and *every court in this country, from the time of the Founding up until the Supreme Court holding in* Miller, save one highly erroneous, malicious and tyrannical court, the supreme court of kansas in its holding in Blaksley, *unanimously and universally holding that the rights of keeping and bearing arms are personal, individual rights*. Even the first Supreme Court case on the subject, Dred Scott v. Sandford, made note of the fact that if freed blacks were to be considered citizens of the United States under the Constitution, that they would then be within their rights to "to enter every other State whenever they pleased…[and] to keep and carry arms wherever they went," Dred Scott v. Sandford, 60

U.S. 393, 417 (1856), even though it cannot genuinely be maintained that freed blacks would have ***ever been considered to be members of the militia, organized or otherwise, in the States of the South,*** where slavery was still extant and the threat of slave revolts constant.

401.

And even if the proponents of the militia restriction as to the class of rights-holders were right (which they aren't) as to the prefatory clause of the Second Amendment confining the right to the militia alone, and assuming it were within the power of the Founding Generation to so abrogate the common law right in such a manner, this would still not deprive Plaintiff, a white male member of the Posterity, to wit, a member of the Sovereign Body of this country, from keeping or bearing arms, because Plaintiff would still be entailed within the class of rights-holders under said definition, Plaintiff being a white male member of the Posterity over the age of eighteen and under the age of forty-five, those members whom comprised the militia at the time of the Founding and the class of persons whom would have been understood by the Founding Fathers and the Founding Generation to be co-extensive with the definition of "militia" as used in the prefatory clause to the United States Constitution. And by their very argument that the right of keeping and bearing arms is confined to the militia, as the Founders would have understood that term, proponents of said argument admit and concede, as did the supreme court of kansas in Blaksley, that the arms which the class of rights-holders have the right to keep are ***military-grade weapons***.

402.

Thus, while the prefatory clause to the Second Amendment really just announces a universal truth, the most that could be said of that clause is that the Founders, perhaps, understood the term "militia" to fully encompass and include all the members of the class of full

rights-holders at common law, to wit, those *free men of America* who ancestrally possessed the ancient, inalienable, absolute, private, individual, sovereign ancestral right to keep and bear arms at common law, and had inherited said right from their *free English ancestors*, who had possessed said right inviolate from time immemorial.

403.

The courts that believed that the prefatory clause to the Second Amendment somehow restricted the class of protected arms, by announcing the purpose for the retention of the common law right, understood, in line with the common law, that the only means by which the rights of keeping and bearing arms could be regulated was nuisance doctrine because such regulations do not infringe nor act upon the rights themselves, as no man is within his rights when he abuses his rights in such a manner as to infringe the private rights of others, to wit, no man is within his rights to cause a nuisance, the Supreme Court in Andrews stating, "[t]he principle on which all right to regulate the use in public of these articles of property, is, that no man can so use his own as to violate the rights of others, or of the community of which he is a member." Andrews v. State, 50 Tenn. 165, 185 (1871).

404.

The legislative history, and these same Supreme Courts' later holdings, however, prove that everyone understood that the right to *keep any arms whatsoever*, even dangerous and unusual arms, but especially military-grade weapons, was and is an *absolute right* that could not and cannot now be regulated, because the right is beyond the power of the government to act upon, the keeping of arms alone, without more, never amounting to a nuisance.

405.

All of the legislative enactments challenged in the various state courts concede the fact that one is entitled to keep even the dangerous and unusual arms proscribed for the purpose of bearing them *secretly* because they only prohibit the bearing of them *secretly,* and *excepted, almost universally,* from their effect, those that were on journeys out of the county, both of which actions, the proscription as to bearing secretly and the exception, imply and concede that one is within one's right to keep such weapons.

406.

In addition, the Supreme Court that invented the ordinary military weapons restriction on the class of protected arms for the purposes of bearing arms in <u>Aymette</u>, the Supreme Court of Tennessee, which reaffirmed that restriction in its holding in <u>Andrews</u>, a case decided by a *divided* court, with the dissenters stating that they viewed *all arms* as protected arms for the purposes of *bearing* as well as keeping arms, not just ordinary military weapons, held in <u>Page</u>, the sister case to <u>Andrews</u> decided just seven months later by a *unanimous* Supreme Court, that *"[u]nder the constitution, every man has a right to own and keep these weapons*, [they being of the type proscribed by the statute, to wit, dangerous and unusual weapons], nor is this right interfered with by the prohibition against 'carrying' them, in the sense in which the Legislature uses the word," <u>Andrews v. State</u>, 50 Tenn. 165, 201 (1871) (emphasis added), that is to say, *every man has the right to own and keep dangerous and unusual arms in addition to ordinary military weapons*.

407.

In <u>Page</u>, the Court only upheld the legislature's statute which absolutely proscribed the carrying of the enumerated dangerous and unusual weapons by reading into the statute the requirement that a defendant have the requisite *criminal intent* of "thus going armed," stating,

"we are far from understanding the Legislature as intending to make every act of carrying one of these weapons criminal. Under the constitution, ***every man has a right to own and keep these weapons***, nor is this right interfered with by the prohibition against 'carrying' them, in the sense in which the Legislature uses the word...***It would probably be difficult to enumerate all the instances in which one of these weapons could be carried innocently, and without criminality***. It is sufficient here to say, that, without the intent or purpose of being or going armed, the offense described in this statute can not be committed." <u>Andrews v. State</u>, 50 Tenn. 165, 201 (1871).

408.

Thus, the very Supreme Court that invented the ordinary military weapons restriction on the class of protected bearable arms did not view every act of carrying dangerous and unusual weapons as falling within its state legislature's absolute prohibition as to the carrying of dangerous and unusual weapons, because, the Court understood that such a regulation would be unlawful and unconstitutional, every man having the right to own and keep all types of arms, even dangerous and unusual arms, and that to list the ways in which one could lawfully carry such dangerous and unusual arms would be too exhaustive, but that they could be borne in ways which constituted an ordinary lawful use of such arms.

409.

Regardless of the right to keep and bear dangerous and unusual arms, ***all courts universally held that one has the right to keep ordinary military weapons and to bear ordinary military weapons in public***. The Supreme Court of the United States endorsing this view of the class of protected arms in <u>United States v. Miller</u>, 307 U.S. 174, 178, 59 S. Ct. 816, 818, 83 L. Ed. 1206 (1939).

410.

Ordinary military weapons are the "accouterment[s] of the militia" <u>Strickland v. State</u>, 137 Ga. 1, 72 S.E. 260, 266 (1911). Those arms which are within "judicial notice that th[ese] weapon[s] [are] *any part of the ordinary military equipment* or that [their] use could contribute to the common defense." <u>United States v. Miller</u>, 307 U.S. 174, 178, 59 S. Ct. 816, 818, 83 L. Ed. 1206 (1939) (emphasis added). They are "*war arms*," <u>Wilson v. State</u>, 33 Ark. 557, 560 (1878) (emphasis added), "**such as [are] in ordinary use [in the military], and** *effective as a weapon of war*, and useful and necessary for 'the common defense.'" <u>Fife v. State</u>, 31 Ark. 455, 461 (1876).

"[T]he idea of the Constitution is, the keeping and use of *such arms as are useful either in warfare*, or in preparing the citizen for their use in warfare." <u>Andrews v. State</u>, 50 Tenn. 165, 182 (1871) (emphasis added). "As we understand the able opinion of Judge Green, in the case of Aymette v. State, 2 Hum., 158, *he holds the same general views on this question*, which are to be found in this opinion. He says: 'As the object for which the right to keep and bear arms is secured is of a general nature, to be exercised by the people in a body for their common defense, so *the arms--the right to keep which is secured--are such as are usually employed in civilized warfare*, and *constitute the ordinary military equipment*. If the citizens have these arms in their hands, they are prepared in the best possible manner, to repel any encroachments upon their rights by those in authority.'" <u>Andrews v. State</u>, 50 Tenn. 165, 184–85 (1871). "Under this head, with a knowledge of the habits of our people, and of the arms in the use of which *a soldier* should be trained, we would hold, *that the rifle of all descriptions, the shot gun, the musket, and repeater, are such arms; and that under the Constitution the right to keep such arms, can not be infringed or forbidden by the Legislature*." <u>Id.</u> at 179 (emphasis added).

It is clear that this list of arms by Judge Freeman in the above-referenced opinion was intended to encompass the ordinary military weapons of the day, those arms that were in regular use by the armed forces of the United States, and later state supreme courts understood the statements of Judge Freeman as such, stating, "[t]he learned judge might well have added *to his list of war arms*, the sword, though not such as are concealed in a cane." Fife v. State, 31 Ark. 455, 459–60 (1876) (emphasis added).

411.

Such were the holdings of the courts that embraced the ordinary military weapons restriction on the class of protected arms under the right of keeping and bearing arms as enumerated in the Second Amendment to the United States Constitution. Perhaps best summarized by the Supreme Court of Texas, who wholeheartedly embraced this restriction on the class of protected arms, after originally rejecting any such restriction in Cockrum, "[t]he word 'arms' in the connection we find it in the constitution of the United States, refers to *the arms of a militiaman or soldier*, and *the word is used in its military sense*. *The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of the artillery, the field piece, siege gun, and mortar, with side arms.*" English v. State, 35 Tex. 473, 476 (1872) (emphasis added). Arms "*as are useful and proper to an armed militia...such 'arms' as are used for purposes of war*, in distinction from those which are employed in quarrels and broils, and fights between maddened individuals, since such only are properly known by the name of 'arms,' and such only are adapted to promote 'the security of a free state.'"" Id. at 474–75 (emphasis added).

412.

Thus, *every court, in every State of this country, universally agreed that, at a minimum,* "*the arms the right to keep which is secured are such as are* usually *employed in civilized warfare*, and *that constitute the ordinary military equipment*. If the citizens have these arms in their hands, *they are prepared in the best possible manner to repel any encroachments upon their rights by those in authority*." Aymette v. State, 21 Tenn. 154, 158 (1840) (emphasis added).

413.

And, while these holdings restricting the class of protected arms to *only those arms utilized by the military* primarily relate to the arms which one is entitled to *bear in public*, the Supreme Court of Tennessee makes clear in Page that the ordinary military weapons restriction *does not apply* to the types of arms one is entitled to keep, *all arms being entailed within the right of keeping arms*, and, at a minimum, one clearly has the right to *keep* what one has the right to *bear*, when one of the purposes for which the right to keep and bear arms was retained "was based on the principle of the assize of arms. *This implied the general obligation of all adult male inhabitants to possess arms*, and, with certain exceptions, to cooperate in the work of defence.' '*The possession of arms also implied the possession of ammunition*, and the authorities paid quite as much attention to the latter as to the former.' 'A year later (1632) it was ordered that any single man who had not furnished himself with arms might be put out to service, and this became a permanent part of the legislation of the colony." United States v. Miller, 307 U.S. 174, 179–80, 59 S. Ct. 816, 818–19, 83 L. Ed. 1206 (1939) (emphasis added).

414.

Thus, at the bare minimum, the Posterity have the right to keep *ordinary military weapons*, the arms which make up the *accouterments of a soldier in the United States military*,

under the Second Amendment to the United States Constitution, as this was the ***most restrictive understanding as to the class of protected arms under the Second Amendment to the United States Constitution,*** in all of American case law, from the time of the Founding up until the Supreme Court of the United States' decision in <u>Miller</u>.

415.

The Supreme Court's holding in <u>Miller</u> as to the class of protected arms has never been overturned, restricted, or abrogated in any way, but, rather, the Supreme Court's holding in <u>Miller</u> has been wholeheartedly reaffirmed and relied upon by the Supreme Court of the United States time and time again.

<u>PLAINTIFF HAS THE RIGHT TO PURCHASE AND KEEP MACHINE GUNS, TO WIT, ORDINARY MILITARY WEAPONS</u>

416.

Paragraphs 1-415 are re-alleged as if fully restated herein.

417.

Based upon the foregoing, Plaintiff has both the absolute, ancient, inalienable, private, individual, ancestral right and the constitutional right to purchase and keep an M-16 rifle and other machine guns, to wit, ordinary military weapons, or to convert his presently lawfully possessed AR-15 rifles into machine guns, the functional equivalent of M-16 rifles, without the government's permission.

<u>THE NATIONAL FIREARMS ACTS ARE FACIALLY UNCONSTITUTIONAL</u>

418.

Paragraphs 1 through 417 are re-alleged as if fully restated herein.

419.

First, the National Firearms Acts are unconstitutional in that they attempt to regulate a right which the government has no power to regulate, as, the right to keep and bear arms has been beyond the power of all sovereigns in the Anglo-American chain of power to regulate, and, therefore, could not be within the present government's power to regulate, and "neither the declaration of independence, nor the treaty confirming it, *could give us more than that which we before possessed, or to which Great Britain was before entitled*." Johnson v. M'Intosh, 21 U.S. 543, 584, 5 L. Ed. 681 (1823). The Sovereign Body "*could confer no power* [which they lack] on any…Government, established by [their] authority." Dred Scott v. Sandford, 60 U.S. 393, 450–51, 15 L. Ed. 691 (1857) (emphasis added).

420.

Even if the Sovereign Body had intended to divest themselves of this right (which they did not), this right is beyond the power of the Founding Generation or their Posterity to regulate or relinquish to governmental control because "there are *certain natural rights*, of which men, when they form a social compact, *cannot deprive or divest their posterity*; *among which are* the enjoyment of life and liberty, with *the means of* acquiring, possessing, and *protecting property*, *and pursuing and obtaining* happiness and *safety*." ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES 112 (LIBERTY FUND ed., 1999) (1803) (emphasis added).

421.

Second, the National Firearms Acts are unconstitutional, because, regardless of whether one finds that it could be within the Sovereign Body's power to regulate the right of keeping and bearing arms (which it never could be, since the right to keep and bear arms is an ancient, inalienable, private, individual, ancestral right), the powers to regulate this right were not only

"***not only not granted*** to [the government], [by the Sovereign Body, in the United States Constitution,] ***but are in express terms denied***, and ***they are forbidden to exercise them***," Dred Scott v. Sandford, 60 U.S. 393, 450–51, 15 L. Ed. 691 (1857) (emphasis added). *See* St. George Tucker, View of the Constitution of the United States 253 (Liberty Fund ed., 1999) (1803) (emphasis added) ("The congress of the United States possesses ***no power*** to regulate, or interfere with domestic concerns, or police of any state; ***nor will the constitution permit any prohibition of arms to the people***; or of peaceable assemblies by them, for any purpose whatsoever, and in any number, whenever they may see occasion.")

422.

Third, the National Firearms Acts are ***unlawful and unconstitutional attempts to create select militias***, as they except from their purview of purported regulation those who are peace officers and members of the military, while at the same time purportedly depriving law-abiding citizens from possessing ordinary military weapons, thus creating a disparity in weapons technology between those weapons in the hands of governmental forces and those in the hands of the law-abiding citizenry, thereby facilitating governmental tyranny, as "[w]herever standing armies are kept up, and the right of the people to keep and bear arms is, under any color or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction." St. George Tucker, View of the Constitution of the United States 239 (Liberty Fund ed., 1999) (1803).

423.

This exception for governmental forces is in direct contravention to, and a defeat of, the primary purpose of the common law and constitutional rights to keep and bear arms, announced universally by all Founding-era commentators and Founding-era and early American courts, to

wit, the prevention of governmental tyranny, standing armies, the illegal formation of *select militias*, and to "*offer[] a strong moral check against usurpation and arbitrary power of rulers; and…enable the people to resist and triumph over them*,'" Andrews v. State, 50 Tenn. 165, 182–83 (1871) (emphasis added), as the evil which this ancient, fundamental, inalienable, private, individual, ancestral sovereign right had confronted and overcome time and time again, throughout the entirety of English history, was fresh in the minds of the Founders of this Country, who remembered that in "the time of James II.[,]…the king, *by means of a standing army quartered among the people*, *was able to overawe them, and compel them to submit to the most arbitrary, cruel, and illegal measures*. Whereas, if the people had retained their arms, they would have been able, by a just and proper resistance to those oppressive measures, either to have caused the king *to respect their rights*, or surrender (as he was eventually compelled to do) the government into other hands…*The complaint was against the government*." Aymette v. State, 21 Tenn. 154, 157 (1840) (emphasis added). *See also* THE FEDERALIST NO. 46 (Detailing that the right to keep and bear arms in America entails the right to *keep military grade weapon*, and that because the people are thus armed, the federal government cannot pose a threat to the ancient rights of the people; "The only refuge left for those who prophesy the downfall of the state governments, is the visionary supposition that the *federal government may previously accumulate a military force for the projects of ambition*…That the people and the states should, for a sufficient period of time, elect an uninterrupted succession of men ready to betray both; that the *traitors* should, throughout this period, *uniformly and systematically pursue some fixed plan for the extension of the military establishment*; that the government and the people of the states should *silently and patiently* behold the gathering storm, until it should be prepared to burst on their own heads…Extravagant as the supposition is, let it however be made. Let a

regular army, fully equal to the resources of the country, be formed; ***and let it be entirely at the devotion of the federal government***, still it would not be going too far to say, that the state governments, ***with the people on their side***, would be able to repel the danger. The highest number to which…a standing army can be carried in any country, does not exceed…one twenty-fifth part of the number able to bear arms…To th[is] would be opposed a militia amounting to near half a million ***citizens*** with arms in their hands…fighting for their common liberties…***Besides the advantage of being armed, which the Americans possess over the people of almost every other nation***, the existence of subordinate governments, to which the people are attached, and by which militia officers are appointed, forms a barrier against the enterprises of ambition…***Notwithstanding the military establishments in the several kingdoms in Europe, which are carried as far as the public resources will bear***, the governments are afraid to trust the people with arms. ***And it is not certain, that with this aid alone [to wit, possessing military-grade weapons,] they would not be able to shake off their yokes.*** But, were the people to possess the ***additional advantages***" of a local government elected by themselves and a well-regulated militia, with officers appointed by the local governments, "it may be affirmed with the greatest assurance, that the throne of every ***tyranny*** in Europe would be speedily overturned ***in spite of the legions which surround it***.")

<div align="center">424.</div>

Fourth, the registration requirements in the National Firearms Acts are unconstitutional as they act as an unconstitutional ***prior restraint*** on the exercise of a constitutional right, requiring that one ask permission before exercising one's fundamental right to keep and bear ordinary military weapons, by requiring that one not just get the Bureau of Alcohol, Tobacco, Firearms and Explosives' permission before obtaining an ordinary military weapon, but also the local

chief law enforcement officer's permission, neither such requirements being constitutional, as one is not required to ask the government permission before exercising a fundamental right which the government lacks all power to regulate or act upon.

<div align="center">425.</div>

Fifth, while a background check to determine whether or not one is a felon, which can be conducted almost instantaneously utilizing the National Instant Criminal Background Check System, "NICS," may be constitutional (doubtful), the undue delay in obtaining permission to possess ordinary military weapons imposed by the National Firearms Acts, coupled with the Bureau of Alcohol, Tobacco, Firearms and Explosives' internal policies, is an undue delay which infringes on the law-abiding Posterity's right to keep and bear ordinary military weapons.

<div align="center">426.</div>

Sixth, the National Firearms Acts, coupled with the BATF's rule 74-8, which provides that "when registration of firearms by government entities is approved pursuant to [the NFA], such approval shall be marked 'official use only.' Ruling 74-8 further provides that the BATF will approve subsequent transfers of such firearms only to other governmental entities for official use, and that otherwise such firearms ***must be destroyed or abandoned to the BATF***," Cox v. Bureau of Alcohol, Tobacco, and Firearms, Dep't of Treasury of U.S., 410 F. Supp. 864, 865 (N.D. Ga. 1976), aff'd, 571 F. 2d 267 (5th Cir. 1978) (emphasis added), ***unconstitutionally creates select militias***, by allowing certain governmental entities to possess ordinary military weapons, while at the same time disallowing law-abiding citizens, ***and unconstitutionally restricts the flow of ordinary military weapons into the stream of commerce***, thereby, effectively depriving law-abiding citizens from exercising their right to keep and bear such weapons by both making the purchase of such items cost prohibitive, when they otherwise

wouldn't be, and by making the aforementioned ordinary military weapons extremely rare in civilian commercial contexts.

<div align="center">427.</div>

In addition, the National Firearms Acts are unconstitutional in that they work an ***absolute*** deprivation of the Posterity's right to keep and bear ordinary military weapons made after the end of the year of 1986, by ***absolutely prohibiting*** the possession of such ordinary military weapons.

<div align="center">428.</div>

The National Firearms Act started as an unconstitutional tax on ordinary military weapons amounting to an unconstitutional, impermissible, regulatory destruction of the Posterity's common law and constitutional rights to keep and bear said ordinary military weapons.

<div align="center">429.</div>

Indeed, the very purpose of the tax was to destroy the Posterity's right to keep and bear ordinary military weapons, the BATF detailing, "[w]hile the NFA was enacted by Congress as an exercise of its authority to tax, the NFA had ***an underlying purpose unrelated to revenue collection. As the legislative history of the law discloses, its underlying purpose was to curtail, if not prohibit, transactions in NFA firearms***. Congress found these firearms to pose a significant crime problem because of their frequent use in crime, particularly the gangland crimes of that era such as the St. Valentine's Day Massacre. The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate ***to carry out Congress' purpose to discourage or eliminate transactions in these firearms***." *National Firearms Act,* BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (April 7, 2020),

https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited October 7, 2022) (emphasis added).

430.

The National Firearms Acts are no longer pre-textually a tax on said ordinary military weapons, but, instead, through the passage of subsequent gun regulations, such as the Gun Control Act of 1968 and the Firearms Owners' Protection Act of 1986, amount to clear attempted regulations on the Posterity's right to keep and bear such weapons, such as M-16 rifles and other machine guns, regardless of when they were made, and an *absolute prohibition* on the possession of ordinary military weapons manufactured or placed into the stream of commerce after "the effective date of the prohibition, May 19, 1986," in the Firearms Owners' Protection Act, in *clear violation* of the Posterity's common law and constitutional rights to keep and bear such weapons. *National Firearms Act*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (April 7, 2020), https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited October 7, 2022).

431.

The National Firearms Acts define machine guns, the keeping and bearing of which they attempt to heavily regulate and prohibit with respect to those machine guns manufacture post-1986, as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C.A. § 5845.

432.

This definition clearly encompasses not just M-16 rifles, but a plethora of ordinary military weapons which Plaintiff, as a member of the Posterity, by way of his lineal, legal, and

biological descent from members of the body politic of the Founding Generation, has the lawful

fundamental, inalienable, private, individual, ancient ancestral common law right to keep and

bear, such right being retained for Plaintiff by his aforementioned ancestors and enumerated in

the Second Amendment to the United States Constitution, though "[t]he right to bear arms is not

granted by the Constitution; neither is it in any manner dependent upon that instrument for its

existence." United States v. Cruikshank, 92 U.S. 542, (1875).

433.

This Court can take judicial notice of the fact that this definition encompasses M-16

rifles, M-4 rifles, Squad Automatic Weapons (SAWs), and the like, and can take judicial notice

of the fact that M-16 rifles, M-4 rifles, Squad Automatic Weapons (SAWs) comprise a part of

the ordinary military equipment issued to infantry soldiers in the United States military, among

other service members, as such knowledge is both "(1) Generally known within the territorial

jurisdiction of the court; or (2) Capable of accurate and ready determination by resort to sources

whose accuracy cannot reasonably be questioned." Riley v. Georgia Ass'n of Club Executives,

313 Ga. 364, 366, 870 S.E.2d 405, 408 (2022).

434.

The National Firearms Acts are unconstitutional in that they prohibit the Posterity from

making their own military weapons, regardless of whether or not those weapons are ever placed

within the stream of commerce, a purely intrastate activity that is beyond the power of Congress

to regulate both under the commerce clause, and beyond the power to regulate as that power is

expressly denied to Congress as enumerated in the Second Amendment to the United States

Constitution. See 26 U.S.C.A. § 5822 (emphasis added) ("No person shall make a firearm ***unless***

***he has (a) filed with the Secretary a written application***, in duplicate, to make and register the

firearm on the form prescribed by the Secretary; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the firearm to be made in the application form in such manner as the Secretary may by regulations prescribe; (d) identified himself in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) *obtained the approval of the Secretary* to make and register the firearm and the application form shows such approval. Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.")

<center>435.</center>

Furthermore, the Acts prohibit transfers of ordinary military weapons from one member of the Posterity to another member of the Posterity, without first asking permission and receiving governmental approval of said transfer, in clear violation of the Posterity's common law and constitutional rights to keep and bear arms, stating, "**(a) Application.**--A firearm shall not be transferred unless (1) *the transferor of the firearm has filed with the Secretary a written application*, in duplicate, for the transfer and registration of the firearm to the transferee on the application form prescribed by the Secretary; (2) any tax payable on the transfer is paid as evidenced by the proper stamp affixed to the original application form; (3) the transferee is identified in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; (4) the transferor of the firearm is identified in the application form in such manner as the Secretary may by regulations prescribe; (5) the firearm is identified in the application form in such manner as the Secretary may by regulations prescribe; and (6) the

application form shows that ***the Secretary has approved the transfer*** and the registration of the firearm to the transferee. Applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law.

**(b) Transfer of possession.**--The ***transferee of a firearm shall not take possession of the firearm unless the Secretary has approved the transfer*** and registration of the firearm to the transferee as required by subsection (a) of this section." 26 U.S.C.A. § 5812 (emphasis added).

436.

Thus, the National Firearms Acts attempt to unconstitutionally regulate the Posterity's common law and constitutional rights to keep and bear arms by purporting to require the Posterity to ask permission from government officials ***before*** exercising their fundamental, inalienable, private, individual, ancient, ancestral common law and constitutional rights to keep and bear arms, which is in and of itself an unconstitutional prior restraint on the exercise of a constitutional right, but, more than that, is something that the government lacks all power to require, as the government has ***no power*** to regulate in this field where such regulation confronts the confines of the ancient, inalienable, private, individual, ancestral common law right to keep and bear arms as enshrined and enumerated in the Second Amendment to the United States Constitution.

437.

The Acts attempt to prohibit the following activities, stating:

"***It shall be unlawful for any person—***

**(a)** to engage in business as a manufacturer or importer of, or dealer in, firearms without having paid the special (occupational) tax required by section 5801 for his business or having registered as required by section 5802; or

**(b)** to receive or possess a firearm transferred to him in violation of the provisions of this chapter; or

**(c)** *to receive or possess a firearm made in violation* of the provisions of this chapter; or

**(d)** to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or

**(e)** to transfer a firearm in violation of the provisions of this chapter; or

**(f)** *to make a firearm in violation of the provisions of this chapter*; or

**(g)** to obliterate, remove, change, or alter the serial number or other identification of a firearm required by this chapter; or

**(h)** to receive or possess a firearm having the serial number or other identification required by this chapter obliterated, removed, changed, or altered; or

**(i)** to receive or possess a firearm which is not identified by a serial number as required by this chapter; or

**(j)** to transport, deliver, or receive any firearm in interstate commerce which has not been registered as required by this chapter; or

**(k)** to receive or possess a firearm which has been imported or brought into the United States in violation of section 5844; or

**(l)** to make, or cause the making of, a false entry on any application, return, or record required by this chapter, knowing such entry to be false." 26 U.S.C.A. § 5861 (emphasis added).

As has already been detailed extensively in this complaint, such unconstitutional regulations are beyond the power of the government to enact under either the commerce clause, the Second Amendment, or the common law, and directly implicate and infringe the Posterity's right to keep and bear ordinary military weapons.

438.

The penalty for failing to comply with said unconstitutional provisions is severe, constituting felony offenses, and the collective Acts which comprise the National Firearms Act regulatory scheme are regularly enforced and prosecuted to the fullest. *See* Kurt R. Erskine, *New York Man Pleads Guilty to Unlawfully Dealing More Than 100 Firearms*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, https://www.atf.gov/news/pr/new-york-man-pleads-guilty-unlawfully-dealing-more-100-firearms (last visited October 7th, 2022) ("[A] prolific gun dealer, has pleaded guilty to charges of unlawfully dealing firearms, making a false statement to a federally licensed firearms dealer, and interstate travel and purchase of firearms with intent to deal without a license.")

439.

18 U.S.C.A. § 922 attempts to unconstitutionally regulate the Posterity's right to keep and bear ordinary military weapons, as part of this comprehensive regulatory scheme. Said code section states, "**(a)** *It shall be unlawful*… **(3)** *for any person*, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector *to transport into or receive in the State where he resides* (or if the person is a corporation or other business entity, the State where it maintains a place of business) *any firearm purchased or otherwise obtained by such person outside that State*, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a firearm obtained in conformity with subsection (b)(3) of this section, and (C) shall not apply

to the transportation of any firearm acquired in any State prior to the effective date of this chapter." 18 U.S.C.A. § 922 (emphasis added).

This attempted unconstitutional regulation infringes the common law and constitutional rights to keep and bear arms, as retained by the Founding Generation on behalf of themselves and their Posterity, and passed to Plaintiff, lineal bloodline descendant of members of said Founding Generation, as the right to keep and bear arms entails the right to bear them for "any lawful purpose," State v. Huntley, 25 N.C. 418, (N.C. 1843), and the only restriction as to the bearing of arms at common law was when said right was *abused* in such a manner as to constitute an *affray*, or common law *nuisance*, to wit the bearing of arms *with the intent to, and in such a manner as will, naturally terrify the public*, as all Sovereigns within the Anglo-American chain of power lacked the power to regulate the keeping or bearing of arms except insofar as the *abuse* of those rights *constituted a nuisance*, "[t]he principle on which all right to regulate the use in public of these articles of property, is, that no man can so use his own as to violate the rights of others, or of the community of which he is a member." Andrews v. State, 50 Tenn. 165, 185 (1871).

<div align="center">440.</div>

18 U.S.C.A. § 922 states, "(a) *It shall be unlawful… (4) for any person*, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector*, to transport in interstate* or foreign commerce any destructive device, *machinegun* (as defined in section 5845 of the Internal Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity." 18 U.S.C.A. § 922 (emphasis added).

This, too, is an unconstitutional purported regulation on the bearing of arms when such bearing does not constitute a nuisance. For the reasons enumerated in Paragraph 409, this code section is an invalid unconstitutional attempted regulation on the Posterity's right to bear ordinary military weapons.

441.

18 U.S.C.A. § 922 states, "(a) *It shall be unlawful... (7) for any person to manufacture* or import *armor piercing ammunition*, unless—

**(A)** the manufacture of such ammunition *is for the use of the United States, any department or agency of the United States, any State, or any department, agency, or political subdivision of a State*;

**(B)** the manufacture of such ammunition is for the purpose of exportation; or

**(C)** the manufacture or importation of such ammunition is for the purpose of testing or experimentation and has been authorized by the Attorney General." 18 U.S.C.A. § 922 (emphasis added).

This is a clearly unconstitutional attempted regulation as to the Posterity's right to keep ordinary military munitions incidentally necessary to the use of the ordinary military weapons which the Posterity is well within their rights to keep and bear, and is an unconstitutional attempt to create select militias with disparate arms technology, in direct contravention to the very purpose for the Founding Generation's retention of their common law right to keep and bear arms as enumerated in the United States Constitution.

This statute is in an unconstitutional attempt to defeat that right and place disparate military technology into the hands of the governments' (both State and federal) select militias and standing armies.

442.

18 U.S.C.A. § 922 goes on to state, *"(a) It shall be unlawful… (8) for any manufacturer or importer to sell or deliver armor piercing ammunition*, unless such sale or delivery--

(A) *is for the use of the United States, any department or agency of the United States, any State, or any department, agency, or political subdivision of a State*;

(B) is for the purpose of exportation; or

(C) is for the purpose of testing or experimentation and has been authorized by the Attorney General." 18 U.S.C.A. § 922 (emphasis added).

For the reasons enumerated in Paragraph 411, this code section is an invalid unconstitutional attempted regulation on the Posterity's right to keep and bear munitions necessary for the effective use of ordinary military weapons, and incidental to the keeping and bearing of such weapons.

443.

18 U.S.C.A. § 922 goes on to state, "(o)(1) Except as provided in paragraph (2), *it shall be unlawful for any person to transfer or possess a machinegun*.
(2) This subsection does not apply with respect to--

(A) *a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof*; or

(B) any lawful transfer or lawful possession of a machinegun *that was lawfully possessed before the date this subsection takes effect*." 18 U.S.C.A. § 922 (emphasis added).

This code section is highly unconstitutional, not just because it is an attempted regulation as to the fundamental, unregulatable right of the Posterity to keep and bear ordinary military

weapons, and, therefore, wholly beyond the power of the government to enact, but also because it is an unconstitutional attempt to create *select militias*, by excepting from its purview those possessing such weaponry under the authority of the United States, a State, or political subdivisions thereof, in direct contravention of the very purpose for the Founding Generation's retention of the common law right to keep and bear arms, to wit, the *prevention of tyranny, standing armies, and select militias*.

As this Act *flatly prohibits* the possession of *ordinary military weapons* manufactured after the date the above-referenced subsection takes effect, to wit, the end of 1986, this Act is a clearly unconstitutional attempted regulation as to the Posterity's right to keep and bear ordinary military weapons in standard use in the United States military.

444.

The punishment for violating the provisions of this Act are severe, as "[w]hoever knowingly violates subsection (a)(6), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both." 18 U.S.C.A. § 924. This code section is regularly enforced and violators are prosecuted fervently, "[a] Cincinnati man was sentenced in U.S. District Court to 37 months in prison for illegally possessing a pistol that had been converted into an automatic weapon, which he used *in self-defense* during a shootout outside a restaurant." Kenneth L. Parker, *Cincinnati Man Sentenced to 37 Months in Prison for Possessing Pistol He Converted into Fully Automatic Weapon Using 3D-Printed Parts*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, https://www.atf.gov/news/pr/cincinnati-man-sentenced-37-months-prison-possessing-pistol-he-converted-fully-automatic (last visited October 7th, 2022, 4:51 PM) (emphasis added).

445.

The National Firearms Acts, are "statute[s] which, under the pretence of regulating, amount[] to a destruction of the right" to keep and bear ordinary military weapons, and, thus, are unconstitutional. State v. Reid, 1 Ala. 612, 616–17 (1840).

446.

This Court can take judicial notice of the fact that, not just in this jurisdiction, but throughout this entire country, the possession of machine guns, to wit, ordinary military weapons, by law-abiding citizens is *extraordinarily rare* because of the fact that these regulations were not just *intended* to work a deprivation of the Posterity's right to keep such arms, but also that these regulations have, in fact and effect, worked a deprivation of the Posterity's right to keep and bear ordinary military weapons, as, by and large, the Posterity do not possess such weaponry. *See National Firearms Act*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (April 7, 2020), https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited October 7, 2022) ("[w]hile the NFA was enacted by Congress as an exercise of its authority to tax, the NFA had an underlying purpose unrelated to revenue collection. *As the legislative history of the law discloses, its underlying purpose was to curtail, if not prohibit, transactions in NFA firearms*.")

447.

Not only are the National Firearms Acts unconstitutional attempted regulations on the Posterity's common law and constitutional rights to keep and bear ordinary military weapons, to wit, machine guns, the original Act was passed *with the specific impermissible intent of infringing the Posterity's common law and constitutional rights of keeping and bearing arms in a blatant attempt to deprive the Posterity of these rights*, as the official website of the Bureau of Alcohol, Tobacco, Firearms and Explosives, the federal agency tasked with enforcing said

Act, details, "[w]hile the NFA was enacted by Congress as an exercise of its authority to tax, the NFA had *an underlying purpose unrelated to revenue collection. As the legislative history of the law discloses, its underlying purpose was to curtail, if not prohibit, transactions in NFA firearms*. Congress found these firearms to pose a significant crime problem because of their frequent use in crime, particularly the gangland crimes of that era such as the St. Valentine's Day Massacre. The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate *to carry out Congress' purpose to discourage or eliminate transactions in these firearms*." *National Firearms Act*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (April 7, 2020), https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited October 7, 2022).

448.

Such an impermissible unconstitutional intent on the part of Congress to blatantly restrict and extinguish a fundamental, inalienable, private, individual, ancient, ancestral common law and constitutional right, by enacting federal regulation as to a right which it has *absolutely no power to regulate* would never be accepted with respect to *any other* constitutional right, and would never have been allowed to stand in any other context. *Such impermissible, unconstitutional intent, pervades the entirety of the collective Acts which comprise the National Firearms Acts, and taints them all with unconstitutionality*.

449.

Lastly, there are *no analogous regulations or attempted regulations* to the National Firearms Acts, as to the types of arms that one is entitled to keep in conjunction with the exercise of one's absolute right of keeping arms, either in the common law of England, in colonial American history, or in ante-bellum American history. This is precisely because these

aforementioned Acts are highly unconstitutional and infringe directly upon the Posterity's right

to keep and bear arms.

## THE NATIONAL FIREARMS ACT, GUN CONTROL ACT OF 1968, AND FIREARMS OWNERS' PROTECTION ACT OF 1986 ARE UNLAWFUL AND ULTRA VIRES ACTS AS APPLIED TO PLAINTIFF INDIVIDUALLY

450.

Paragraphs 1 through 449 are re-alleged as if fully restated herein.

451.

The National Firearms Acts are unlawful and ultra vires with respect to Plaintiff as an

individual, as they purport to prohibit Plaintiff from keeping machine guns manufactured post-

1986, to wit, ordinary military weapons.

452.

Plaintiff's ancestors, the Blount family of Washington and Hancock Counties, Georgia,

Pitt County, North Carolina, Astley, Worcestershire, Kinlet Hall, Shropshire, and Sodington

Hall, Worcestershire, were of gentry, knightly, and noble rank. They were members of the lower

ranking nobility of England and the Planter class of America, the "men of quality" whose

bearing of arms was per se no nuisance, and, therefore, unanimously held to be outside the

purview of the Statute of Northampton, to wit, that class of persons who held the full, free, and

absolute rights of keeping and bearing arms at common law, and whose rights of keeping and

bearing arms were always beyond the sovereign power of the Kings of England to regulate.

453.

Plaintiff's ancestors, from the dawn of time, have always held the inalienable right to

keep military-grade weapons, to wit, ordinary military weapons, as they were members of that

class of persons whom comprised the warrior class of society, to wit, the noble knightly class, and no king ever had the power to deprive them or divest them of this right.

454.

Plaintiff's ancestors passed this inalienable right to Plaintiff through the blood, and Plaintiff possesses the inalienable right to keep and bear ordinary military weapons, among other arms, by way of his lineal, legal, and biological bloodline descent from said ancestors.

455.

The Founding Generation, the original Sovereign Body of this country, only inherited that sovereign power held by the King of England, their predecessor sovereign.

456.

As the Kings of England lacked the power to regulate which types of arms Plaintiff's ancestors were entitled to keep in conjunction with their inalienable right to keep arms, and the King additionally lacked the power to divest them of this right, the original Sovereign Body of this country, the Founding Generation, too, lacked the power to regulation Plaintiff's ancestors in their exercise of this right, so long as their exercise did not amount to an abuse of their right by infringing the private rights of others, to wit, a nuisance.

457.

As the keeping of arms alone, without more, can never amount to a nuisance, it was beyond the power of the Founding Generation, acting as a Sovereign Body, to regulate the types of arms that Plaintiff's ancestors were entitled to keep in conjunction with their inalienable right to keep arms.

458.

The Founding Generation also lacked the power to divest either themselves or their Posterity of the rights of keeping and bearing arms because each man, and each successive generation of Posterity, is individually sovereign with respect to these rights, unrestrainable and unregulatable with respect to these rights, with "no limits short of the moral power of the citizens to exercise it," so long as he is acting within the bounds of these rights, which is why these rights are known as a fundamental, inalienable right, always being beyond the power of all sovereigns within the Anglo-American chain of power to regulate. Bliss v. Com., 12 Ky. 90, 92 (1822).

459.

The present government could not possibly have any more power than the maximum amount of power held by the Founding Generation, the initial Sovereign Body, when they freed themselves from the yoke of the King of England and assumed his sovereign powers, but, in fact, this government has much less sovereign power than the Founding Generation, as it is a government of limited, enumerated powers, and has no power to act except where it has been vested with sovereign power by the Founding Generation.

460.

Thus, because the Sovereign Body at the time of the Founding, acting in concert, lacked the power to regulate or divest Plaintiff's ancestors of their ancient, inalienable, private, individual, ancestral rights of keeping and bearing arms, or to prescribe which types of arms may or may not be kept in accordance with these rights, the present government, which inherited the sovereign powers expressly enumerated in the Constitution from said Founding Generation, could not have the power to regulate Plaintiff in his exercise of his right to keep arms by prescribing the types of arms which he may or may not keep, as Plaintiff inherited through his

bloodline descent from said Blount ancestors their ancient, individual, private, inalienable, ancestral rights of keeping and bearing arms.

461.

As the National Firearms Acts purport to do something that has been beyond the power of all sovereigns in the Anglo-American chain of power to do, to wit, regulate Plaintiff's ancient, individual, private, inalienable, ancestral right to keep and bear arms, they purport to do something that could not be within the power of the United States government and amount to unlawful, ultra vires acts on the part of the United States, and, thus, are null and void ab initio, and this Court should declare them to be unconstitutional acts on the part of said United States and enjoin Defendants from enforcing said unconstitutional acts.

BURDEN OF PROOF

462.

Paragraphs 1-461 are re-alleged as if fully restated herein.

463.

Because this country is a country where the governments, both State and federal, lack all power to act except where that power has been expressly granted to those governments in enumerations in their constitutions, before the government may validly act it must point to a constitutional provision from whence it draws its authority and power to act.

464.

Thus, the burden of proof in cases of challenged governmental action always initially rests on the government.

465.

And, as in this case, in cases challenging governmental action where the government has no power to act, as is the case with respect to the Posterity's fundamental ancestral rights, or where the government is acting without express constitutional authority, to wit, not in accordance with its enumerated powers, the burden of proof as to the validity of the government's actions never passes to the plaintiff.

466.

Thus, ***the burden of proof*** as to the constitutionality of the National Firearms Act, the Gun Control Act of 1968, and the Firearms Owners' Protection Act of 1986 ***rests on the government defendants throughout the entirety of this case***, as, when the government attempts to regulate the right to keep and bear arms "'the Government bears the burden of proving the constitutionality of its actions,'" New York State Rifle & Pistol Assn., Inc. v. Bruen, No. 20-843, 20 (U.S. Jun. 23, 2022), ***by showing that it is not regulating activity that falls within the confines of these rights***.

467.

The Supreme Court of the United States held this to be so in Bruen, where it held that ***to meet this burden the government must prove that there were historical regulations of the type challenged,*** in order to show that the Founding Generation understood the conduct thus regulated as falling outside of the confines of the rights of keeping and bearing arms. *See* New York State Rifle & Pistol Assn., Inc. v. Bruen, No. 20-843, 13 (U.S. Jun. 23, 2022) ("we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.")

468.

These regulations must have existed at or near the time of ratification of the United States

Constitution to be relevant because "not all history is created equal. 'Constitutional rights are

enshrined with the scope they were understood to have when the people adopted them." New

York State Rifle & Pistol Assn., Inc. v. Bruen, No. 20-843, 30 (U.S. Jun. 23, 2022). Because the

Second Amendment was enshrined in 1791, the legislative history that is most instructive as to

the extent of the right to keep and bear arms as enumerated in that instrument is "th[e] history

'[b]etween the [Stuart] Restoration [in 1660] and the Glorious Revolution [in 1688],'" leading up

to that time period immediately preceding, and immediately subsequent to, the time of the

Founding. Id. at 39.

469.

Thus, to meet its burden, the government must point to a common law, colonial, or early

State regulation which regulated the keeping of ordinary military weapons, and, again, as the

Supreme Court held in Bruen, colonial and early State regulations should be afforded more

weight because they give insight into what the Founding Generation understood the extent of the

confines of the right of keeping and bearing arms to be at the time of the Founding, and therefore

the sovereign power which they withheld from the government.

470.

While *the common law right is the floor* as to the arms which members of the Posterity

are entitled to keep in this country, and no regulations, save the lone regulation of the tyrant King

Henry VIII, at common law ever attempted to regulate or prescribe the types of arms which free

Englishmen of "Quality," to wit, the class of full rights-holders at common law, were entitled to

keep in conjunction with their absolute, private, individual, ancient, ancestral sovereign right to

keep arms, such regulations being beyond the sovereign power of the Kings of England to enact, as, the keeping of arms alone, without more, can never amount to a nuisance; and, even the lone Statute of the tyrant King Henry VIII *never attempted to regulate the keeping of military-grade weapons by free Englishmen, but, rather, lamented their disuse*; and the Sovereign Body of this country, the Founding Generation and their Posterity, can never act upon or abrogate this right in the slightest; the *right to keep and bear arms as retained by said Sovereign Body at the time of the Founding*, *may have been*, and probably was, *more expansive* than the traditional common law right. *See* Bliss.

<div align="center">471.</div>

And, there was not a single statute passed from the time of colonial settlement of any of the thirteen (13) original colonies, up until at least the 1860, in any of the original thirteen colonies or States, or in any State extant in this country during that time period, which ever attempted to regulate the types of arms which one may keep in conjunction with one's ancient, absolute, private, individual, ancestral sovereign common law or constitutional rights of keeping and bearing arms, precisely because, the right of keeping arms is an absolute right, the keeping of arms alone, without more, never amounting to a nuisance, and, thus, the colonists, colonial legislators, the Founders, the Founding Generation, and the State legislators all understood that it was beyond the power of the Sovereign Body, acting with the full force of its joint-sovereign power through their legislatures, to act upon the inviolate rights of keeping or bearing arms except where the exercise of said rights amounted to a *nuisance*, to wit, an *abuse* of said rights in such a manner as to infringe the rights of others.

<div align="center">472.</div>

***The government will not be able to meet its burden*** in this case because there were no regulations at or near the time of the Founding, nor in prior history, which regulated the class of full rights-holders in the exercise of their absolute common law right of keeping arms, any arms whatsoever.

STANDARD OF REVIEW

473.

Paragraphs 1-472 are re-alleged as if specifically restated herein.

474.

The correct standard of review to be employed by this Court in reviewing the above-referenced regulations' infringements of the right of the Posterity to keep ordinary military weapons is ***absolute scrutiny***; ***where the right to keep and bear arms exists, it exists absolutely***, inviolate, and the government ***lacks all power*** to regulate the common law and constitutional rights of keeping and bearing arms.

475.

Where the government's regulations transgress the confines of these rights, by not regulating ***abuses*** of the right of ***bearing arms***, persons who do not possess the right, or the ***bearing*** of arms in ***places*** where the right to ***bear arms did not historically exist***, but instead attempt to regulate the rights themselves, the governmental regulations are flatly unlawful, unconstitutional, illegitimate, without force, and null and void ab initio, regardless of how compelling the purpose for the regulation.

476.

The right to keep any arms whatsoever was absolute in the common law, and is absolute at present.

477.

Thus, the National Firearms Acts, insofar as they attempt to regulate the keeping of arms, any arms whatsoever, are unconstitutional.

478.

Even based upon the most restrictive understanding as to the class of protected arms for the ***purposes of bearing arms*** in public, espoused by some, but not all, of the 1800's courts of this country (the other courts holding that ***all arms***, even dangerous and unusual arms, are protected for the purpose of ***bearing and keeping arms***), Plaintiff, as a member of the Posterity, is well within his rights to keep and bear ***ordinary military weapons***.

479.

Because ordinary military weapons were ***universally*** understood by ***all courts*** to be arms which the Posterity are entitled to keep and bear, the National Firearms Act, Gun Control Act of 1968, and Firearms Owners' Protection Act of 1986 are unconstitutional, invalid, ultra vires, void and of no effect insofar as they attempt to regulate and prohibit Plaintiff from keeping such weapons.

480.

Insofar as the National Firearms Act, Gun Control Act of 1968, and Firearms Owners' Protection Act of 1986 attempt to regulate and prohibit Plaintiff's, a member of the law-abiding Posterity, possession of machine guns which make up "the usual equipment of the soldier," Andrews v. State, 50 Tenn. 165, 186–87 (1871), in the United States military, "such as are usually employed in civilized warfare, and that constitute the ordinary military equipment," Aymette v. State, 21 Tenn. 154, 158 (1840), these Acts transgress the powers of the government and infringe upon Plaintiff's right to keep and bear arms.

## INJUNCTIVE RELIEF

### 481.

Paragraphs 1-480 are re-alleged as if specifically restated herein.

### 482.

Plaintiff is entitled to a permanent injunction, in this case, enjoining Defendants from enforcing the National Firearms Act, Gun Control Act of 1968, and Firearms Owners' Protection Act of 1986 against him, as Plaintiff will suffer irreparable harm to his common law and constitutional rights of keeping and bearing arms, and other constitutional rights, if the National Firearms Act, Gun Control Act of 1968, and Firearms Owners' Protection Act of 1986 are enforced against Plaintiff by defendants when Plaintiff acquires an M-16, M-4, Squad Automatic Weapon, or the like, to wit, ordinary military weapons, in the near future.

### 483.

The defendants will suffer *no* harm by this Court's issuance of a permanent injunction enjoining the defendants from enforcing the unconstitutional National Firearms Act, Gun Control Act of 1968, and Firearms Owners' Protection Act of 1986 against Plaintiff, as the defendants are not within their rights or acting in accord with the authority delegated to them by the United States Constitution when they attempt to enforce said Acts.

### 484.

It is within this Court's power to enjoin the enforcement of a criminal statute so long as a criminal prosecution has not yet begun, because there is no adequate remedy at law.

### 485.

All that is required for Plaintiff to have standing to seek an injunction of a criminal statute is that prosecution would be imminent should Plaintiff proceed in a manner contrary to

the challenged law, and here, Defendants regularly enforce the provisions of the National

Firearms Act, Gun Control Act of 1968, and Firearms Owners' Protection Act of 1986.

ATTORNEY'S FEES

486.

Paragraphs 1-485 are re-alleged as if specifically restated herein.

487.

As the above-referenced National Firearms Act, Gun Control Act of 1968, and Firearms

Owners' Protection Act of 1986 are unconstitutional infringements and deprivations of

Plaintiff's ancient, common law, inalienable, private, individual ancestral right to keep and bear

arms, as retained by Plaintiff's ancestors for Plaintiff, and enshrined and enumerated in the

Second Amendment to the United States Constitution, passed under the color of law, and

enforced by Defendants under the color of law, in bad faith, with the impermissible

unconstitutional intent and effect of depriving Plaintiff of his rights by absolutely prohibiting his

possession of machine guns manufactured after 1986, to wit, ordinary military weapons, Plaintiff

is entitled to attorney's fees.

488.

While Plaintiff proceeds pro se in this action, Plaintiff is a lawyer, a graduate of Duke

University School of Law, and a scorer of a 173, the 99th percentile, on the LSAT, and a 169.6

on the Multistate Bar Exam (MBE) portion of the Uniform Bar Exam (UBE) and a 169 on the

MBE portion of the Georgia Bar Exam, roughly the 95th percentile on said MBE portions of said

Bar Exams.

489.

As such, Plaintiff's time is extremely valuable, Plaintiff charging between $300 and $500 per billable hour for work that he completes for clients as a private practice attorney.

490.

As Plaintiff is one of the most intelligent attorneys in this country and one of the most competent attorneys in this field of the law, Plaintiff should be allowed to collect attorney's fees in connection with his self-representation in this case, as the very intent of 28 U.S.C. § 2412(b) is to enable United States citizens to vindicate their rights when said rights are unconstitutionally infringed by the federal government.

491.

Plaintiff has spent hundreds of hours drafting this complaint and researching the law so that he may effectively vindicate his right to keep and bear arms before this Court.

WHEREFORE, Plaintiff prays that this honorable Court:

1. Declare that the National Firearms Act, the Gun Control Act of 1968, and the Firearms Owners' Protection Act of 1986 are UNCONSTITUTIONAL, UNLAWFUL, NULL AND VOID, and OF NO EFFECT, insofar as they attempt to regulate and prohibit Plaintiff, as a member of the Posterity, from keeping machine guns which comprise the ordinary military equipment of the United States active duty military and national guard contingents;

2. Issue an injunction enjoining Defendants from enforcing the said unconstitutional Acts against Plaintiff;

3. Order that Defendants pay Plaintiff reasonable attorney's fees pursuant to 28 U.S.C. § 2412(b);

4. Cast all costs of litigation on the government Defendants;

5. Order that service and process issue to Defendants; and,

6. Order such other relief that this Court finds is just and adequate in this case.

Respectfully submitted this 5th day of April, 2023.

Mark Jerome Johnson Blount, Esquire
Juris Doctor, 2020, Duke University School of Law
Georgia Bar Member Number: 539062
Missouri Bar Member Number: 75092
*Pro Se*

Mark J.J. Blount, Esq.
664 N Montego St.,
Nixa, MO 65714
markblountesquire@gmail.com
(478) 232-2167