**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| MARK JEROME JOHNSON BLOUNT, ( | |
| ( | |
| Plaintiff, ( | |
| v. ( | |
| ( | |
| THE UNITED STATES OF AMERICA; ( | CIVIL ACTION NO: 6:23-CV-3106-MDH |
| MERRICK GARLAND, Attorney General of ( | |
| the United States, in his OFFICIAL and ( | |
| INDIVIDUAL capacities; THE BUREAU OF ( | |
| ALCOHOL, TOBACCO, FIREARMS AND ( | |
| EXPLOSIVES, an agency of the United States ( | |
| of America; and BERNARD G. HANSEN, ( | |
| Special Agent in Charge of the Bureau of ( | |
| Alcohol, Tobacco, Firearms and Explosives, ( | |
| Kansas City Field Division, in his OFFICIAL ( | |
| and INDIVIDUAL capacities, ( | |
| ( | |
| Defendants. ( | |

MOTION FOR LEAVE TO FILE OVER-LIMIT BRIEF

COMES NOW, Plaintiff, Mark Jerome Johnson Blount, Gentlemen-Esquire, and files

this Motion for Leave to File an Over-limit Brief in Support of his Motion for Summary

Judgment, showing the Court as follows:

1.

Plaintiff filed his pro se complaint challenging the National Firearms Act, 26 U.S.C. §

5812, *et seq.*, the Gun Control Act of 1968, and the Firearms Owners' Protection Act of 1986, 18

U.S.C. § 922, *et seq.*, hereinafter, collectively, "National Firearms Act," insofar as these

provisions prohibit Plaintiff, as a law-abiding citizen member of the Posterity, from keeping

military-grade ordinary military weapons, to wit, machine guns manufactured post-1986 that are

in regular use in the United States armed forces.

2.

Plaintiff bases his claim, that the challenged provisions of the National Firearms Acts are unlawful, on the fact that they directly act upon and infringe both Plaintiff's ancestral common law rights of keeping and bearing arms and his constitutional rights of keeping and bearing arms.

3.

Plaintiff rests his challenge to the National Firearms Acts, and the National Firearms Acts are in fact unlawful, ultra vires, unconstitutional, and null and void ab initio, on the following points of law:

1. The rights of keeping and bearing arms are, and have always been, absolute, private, individual, fundamental, inalienable, ***ancestral*** sovereign rights held by the class of rights-holders, to wit, free Englishmen and their Posterity (in the common law), and, after the time of the Founding of this country, the Founding Generation and their Posterity (in this country), as individuals qua individual, as to all Sovereigns within the Anglo-American chain of power from time immemorial.

2. For the class of full rights-holders, to wit, "gentlem[e]n of name and blood,"[1] these rights have always existed outside the sovereign power of all Sovereigns within the Anglo-American chain of power to act upon or regulate in the slightest degree.

3. These rights, being absolute rights, have only ever been bound, both in England and, consequently, in this country, by ***nuisance*** doctrine, as no man is within his rights, not even his fundamental rights, to use his own so as to violate the rights of others, and, thus, from the dawn of time to the present, the Sovereigns within the Anglo-American chain of power, both the Kings of England and their successor sovereigns,

---

[1] EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 594 (E. AND R. BROOKE ed., 1797).

the Sovereign Body of this country, have derived all power to act with respect to exercises of these rights from **nuisance doctrine**, as "[*t]he principle on which all right to regulate the use in public of these articles of property, is, that no man can so use his own as to violate the rights of others*, or of the community of which he is a member."[2]

4. Because **nuisance doctrine** is the **sole** source of **all sovereign power to regulate** with respect to exercises of these absolute ancestral rights, there was a **nuisance-based differential right** of **bearing arms in public** at common law depending upon whether or not one was a "gentleman of name and blood,"[3] part of the lower nobility, to wit, a "great m[a]n or other lawful person[] of good repute,"[4] whose bearing of **any types of arms** in public was **per se no nuisance**, because the bearing of arms by such persons is **per se not to the reasonable terror of anyone**, and, therefore, **per se no affray,** or whether one was a lower-class free Englishman, whose bearing of arms in public was much more likely to constitute an affray, if such arms were borne **in such a manner** as to evince an intent to terrify the public. This was recognized not only by the foremost legal commentators at common law, who explain that "**Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons**, or having their usual Number of Attendants with them, for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common fashion

---

[2] <u>Andrews v. State</u>, 50 Tenn. 165, 185 (1871) (emphasis added).
[3] EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 594 (E. AND R. BROOKE ed., 1797).
[4] *13 Edw. 1 (1285) (Eng.) (Statutes for the City of London),* DUKE UNIVERSITY SCHOOL OF LAW, DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/13-edw-i-1285-eng-statutes-for-the-city-of-london/ (last visited Jan. 29, 2023) (emphasis added).

to make use of them, **without causing the least Suspicion of _an Intention to commit any Act of Violence or Disturbance of the Peace_**,"[5] because "_no wearing of Armes[, any types of arms whatsoever,] is within the meaning of th[e] Statute [of Northampton],_" to wit, **_no wearing of any types of arms_** falls outside the scope of **_any free Englishman's_** right of bearing arms in public, "**_unless it be accompanied with such Circumstances as are apt to terrify the People_**,"[6] but also by the Kings of England themselves, even the most tyrannical kings of England, such as King Henry VIII, who recognized and conceded that **_every free Englishman_** is within his rights to **_keep_** both military-grade ordinary military weapons and dangerous and unusual weapons which can be put to any lawful use, including aiding in defense of the realm in the slightest degree, and to bear such arms in public, so long as he is not doing so in **_such a manner as to constitute an affray,_** and, also, that **_all members of the class of full rights-holders_** of these ancient ancestral rights from time immemorial, as the lineal bloodline descendants of those that held these rights from the beginning of time as to all Sovereigns within the Anglo-Saxon chain of power, have more **_expansive rights of bearing arms in public,_** and, as such, are within our rights to **_bear dangerous and unusual arms in public, even when said arms are primed and ready for offensive action_**, as King Henry VIII recognized and conceded that the keeping and bearing of dangerous and unusual arms, primed and ready for offensive use, by **_men of quality_** is **_per se no nuisance,_** per se not to the reasonable terror of anyone, and, therefore, **_per se within the scope of the absolute ancestral right of men of_**

---

[5] WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 136 (1st ed.1716) (emphasis added).
[6] WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 136 (1st ed.1716) (emphasis added).

***quality to bear arms in public***, and ***per se outside the scope of the sovereign powers*** of the Sovereigns within the Anglo-American chain of power to act upon, and for this reason King Henry VIII understood that it was beyond his sovereign power to regulate "***person or persons [that] have land, tenement, fees annuities or office, to the yearly value of one hundred pounds as aforesaid***," in our "***carry[ing]…[on our] Journey, going or riding in the King's highway or elsewhere***, any crossbow ***bent*** or gun ***charged*** or furnished with powder, fire or touche for the same."[7]

5. Because ***nuisance doctrine*** is the ***only limitation*** upon these absolute ancestral rights, while there clearly was a differential right to ***bear arms in public*** at common law, based upon personal individual characteristics of ***ancestry*** and wealth, because the fear to be derived from observing ***certain persons*** bearing ***certain arms*** in public in ***certain manners***, such as primed and ready for offensive action, was, in fact, ***reasonable*** when a ***peasant*** was so bearing arms in public but was ***per se unreasonable*** when a man of quality, a gentleman of name and blood, was so bearing arms, ***there was no differential right to keep arms*** because the ***mere act of keeping arms alone***, without more, can ***never amount to a nuisance or an affray***, it being a ***purely private act***, the keeping of any arms whatsoever by any free Englishman can never be to the reasonable terror of the public, and, thus, ***every free Englishman***, regardless of ancestral status, is possessed of the full, free, and inalienable right to ***keep any types of arms*** whatsoever, both military-grade weapons and dangerous and unusual arms.

---

[7] *33 Hen. 8, c. 6, § 1, An Act Concerning Crossbows and Handguns (1541)*, DUKE UNIVERSITY SCHOOL OF LAW, DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/33-hen-8-c-6-§-1-an-act-concernin-crossbows-and-handguns-1541/.

6. As such, there were **_no regulations_** throughout the entirety of English common law history which attempted or purported to regulate **_any free Englishman_** in their keeping of any types of arms whatsoever, save the Statute of King Henry VIII, which recognized and conceded that **_every_** free Englishman, regardless of ancestral status, is entitled to keep and bear both military-grade ordinary military weapons and **_any dangerous and unusual arms_** which can, in any way, be put to a lawful use or aid in defense of the realm in the slightest degree, so long as said arms were not being **_borne_** in **_such a manner_** as to amount to an **_affray_**; and the Statute of Charles II, which **_did not attempt to regulate the class of full rights-holders in our keeping of any types of arms whatsoever_**.

7. Plaintiff's lineal, legal, and biological ancestors, members of the Blount family of Astley, Kinlet, and Sodington Hall, were members of the class of full rights-holders of these absolute ancestral sovereign rights, both at common law and at the time of the Founding of this country, as they were "gentlem[e]n of name and blood,"[8] part of the lower nobility, "great men or other lawful persons of good repute,"[9] being both members of a noble family and descended from numerous other noble families, and the Kings of England themselves, through female lines, and, thus, were individuals possessed of the fundamental, inalienable, private, individual, sovereign, absolute, ancestral rights of keeping and bearing arms with **_their broadest possible scope_**,

---

[8] EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 594 (E. AND R. BROOKE ed., 1797).

[9] *13 Edw. I (1285) (Eng.) (Statutes for the City of London),* DUKE UNIVERSITY SCHOOL OF LAW, DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/13-edw-i-1285-eng-statutes-for-the-city-of-london/ (last visited Jan. 29, 2023) (emphasis added).

because their keeping of any types arms and bearing of any types of arms in public was *per se no nuisance*, and also were members of the body politic of the Colony and State of North Carolina, and, consequently, members of the original Sovereign Body of this country, at the time of the Declaration of Independence, the treaty confirming it, and the ratification of the United States Constitution, to wit, at the time of the Founding of this country, having also fought ardently in this country's fight for independence as members of the North Carolina Militia.

8. Not only were Plaintiff's ancestors entitled to keep and bear ***any types of arms whatsoever in public***, being men of quality, their public bearing of any types of arms was ***per se no affray, per se not to the reasonable terror of anyone***, they were also possessed of the ***duty*** via the Statutum de Militibus, and various antebellum American militia Acts, to keep "***military armes.***"[10]

9. Thus, throughout the entirety of the common law, from the beginning of time up until the time of the Founding of this country, no King of England, nor his Parliaments, was possessed of the power to act upon Plaintiff's absolute ancestral rights of keeping and bearing arms, nor the power to regulate or prescribe the types of arms which Plaintiff's ancestors were entitled to keep in conjunction with said rights.

10. Plaintiff's ancestors passed to Plaintiff, through his lineal, legal, and bloodline descent from said progenitors, their absolute, ancestral rights of keeping and bearing arms, inviolate, and with the same scope that said rights possessed when Plaintiff's ancestors exercised them, outside the power of all Sovereigns within this chain of

---

[10] EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND: CONTAINING THE EXPOSITION OF MANY ANCIENT AND OTHER STATUTES 597 (E. AND R. BROOKE ed., 1797).

power to act upon or regulate in the slightest degree, and their corresponding rights and duty to keep military-grade weapons for the preservation of the lawful order of the realm as to foreign invasion, domestic insurrection, and tyrannical governmental action, and these rights rest in Plaintiff at present.

11. Within a chain of power, fundamental rights and sovereign power pass inviolate from antecedent rights-holder/Sovereign to their posterity, with the same scope of which they were possessed by the antecedents within the chain. This is because one can give no more power or rights than one possesses, and because the very first Sovereigns within the chain of power were possessed of no power to act upon the fundamental rights of the rights-holders, which is why they are known as *fundamental* rights, as any activity which has ever been within the power of a Sovereign to legitimately regulate, can never be a fundamental right, said Sovereigns could not possibly pass to their successor Sovereigns, within their chain of power, the power to act upon or regulate said fundamental rights. For this reason, fundamental rights and sovereign power are the flip sides of the same coin, they comprise the sum total of the sovereignty of a nation, and they act as necessary restraints upon one another.

12. At the time of the Founding of this country, the Founding Generation, Plaintiff's ancestors, did not break the chain of power, but, rather, merely re-forged the chain by replacing a faulty chink in the chain, to wit, a tyrannical senior-line sovereign cousin, with a functional chink in the chain, to wit, all those junior-line sovereign cousins of his living in the American colonies who comprised the body-politics of the various colonies. We did no more than what we had done throughout English history whenever one of our senior line cousins tyrannically and unlawfully infringed our

rights, in order to more effectually vindicate and preserve said ancient ancestral rights, we replaced the malfeasant cousin with a cousin who was more respectful and cognizant of said rights. (See Richard II and Henry IV; Henry VI and Edward IV; Richard III and Henry VII; Charles I; and James II and William II).

13. Thus, the present-day chain of power extant in this country is the Anglo-American chain of power, and we, as a Sovereign Body, are bound by those ***pre-existing limitations*** on the sovereign powers of our predecessor sovereigns within our chain of power, the Kings of England, from whom we inherited our joint-sovereign powers, and we could not possibly act upon the Posterity's ancient, absolute, private, individual, ancestral sovereign rights of keeping and bearing arms, even if we expressly intended to via express enumerations attempting to vest our agent, the government, with the power to directly act upon said rights, because we, as a Sovereign Body, can possess no more power to act with respect to our absolute ancestral rights than our predecessor Sovereigns, the Kings of England, possessed, and our predecessor Sovereigns possessed no power to act upon the rights-holders' exercises of these rights insofar as we acted within the scope of these absolute rights.

14. Even if we did break the chain of power, we immediately re-forged it by claiming all right to title, land, and power under the color of our predecessor-in-title's, the Kings of England, color of title.

15. For these reasons, at the time of the Founding, it was universally recognized, including by the highest Court in this country, that all right to sovereign power and territory was possessed by virtue of, and limited to the extent of, that power and territory possessed by our predecessor Sovereigns, the Kings of England, ***and***

*"**neither the declaration of independence, nor the treaty confirming it, could give us more than that which** we before possessed**, or to which Great Britain** was before entitled**. It has never been doubted*, that either the United States, or the several States, **had** a clear **title to all the lands** within the boundary lines described in the treaty, **subject…to the Indian right of occupancy***, and that the exclusive power to extinguish that right, was vested in that government which might constitutionally exercise it."[11]  "The British government, which was then our government, ***and whose rights have*** passed ***to the United States***, asserted title to all the lands occupied by Indians, within the chartered limits of the British colonies. It asserted also a limited sovereignty over them, and the exclusive right of extinguishing the title which occupancy gave to them. These claims have been maintained and established as far west as the river Mississippi, by the sword."[12] "All our institutions recognise the absolute title of the [government to colonial lands], ***subject only to the Indian right of occupancy***."[13]

16. Because the absolute ancestral sovereign rights of the Founding Generation and their Posterity are pre-existing limitations on that sovereign power possessed by our predecessor Sovereigns, the Kings of England, which passed to us as a Sovereign Body, at the time of the Founding, the Founding Generation, as the Sovereign Body of this country, was possessed of no sovereign power to act upon either their or their Posterity's absolute ancestral rights, and it was understood that there would be continuity of common law and that all of the ancient ancestral rights of the Founding

---

[11] <u>Johnson v. M'Intosh</u>, 21 U.S. 543, 584–85, 5 L. Ed. 681 (1823) (emphasis added).
[12] <u>Johnson v. M'Intosh</u>, 21 U.S. 543, 588, 5 L. Ed. 681 (1823) (emphasis added).
[13] <u>Johnson v. M'Intosh</u>, 21 U.S. 543, 588, 5 L. Ed. 681 (1823) (emphasis added).

Generation and their Posterity would remain intact and inviolate, beyond the joint-sovereign powers of the Sovereign Body of this country to act upon or regulate in the slightest degree.

17. Even if the Founding Generation was possessed of the sovereign power to act upon these absolute ancestral rights, which they were not, they did not intend to, but, rather, **expressly prohibited** their governments from acting upon said rights.

18. Plaintiff's ancestors, Isaac Blount of Hencoop Swamp and Benjamin Blount of Hencoop Swamp, being members of the body politic of the Colony and State of North Carolina at the time of the founding of this country, were members of the Founding Generation, the original Sovereign Body of this country, who imbued this country and its respective States with their sovereign status and sovereign powers.

19. At the time of the Founding, Plaintiff's aforementioned ancestors not only **retained** all of the **sovereign power** inherent in their fundamental, ancient, private, individual, ancestral "pre-existing rights,"[14] which they had "'inherited from [their] English ancestors.' *Id.*, at 599, 128 S.Ct. 2783,"[15] **for "[themselves] and [their] Posterity,"** passing said rights **inviolate** to Plaintiff at present, by virtue of Plaintiff's lineal, legal, and bloodline descent from said progenitors, but, also, they **expressly evidenced their retention of said rights through enumeration in the Second Amendment to the United States Constitution**, and "**[t]hese powers, and others, in relation to rights of person**, which it is not necessary here to enumerate, are, **in express and positive terms**, **denied to the General Government**;...

---

[14] New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 213 L. Ed. 2d 387, 142 S. Ct. 2111, 2127 (2022).
[15] Id.

*__The powers over person__ and property __of which we speak are not only not granted to Congress, but are in express terms denied, and they are forbidden to exercise them__.* And this prohibition is not confined to the States, but the words are general, and extend to the whole territory over which the Constitution gives it power to legislate, including those portions of it remaining under Territorial Government, as well as that covered by States. *__It is a total absence of power everywhere within the dominion of the United States__.*"[16]

20. Because the Founding Generation lacked all power, and, thus, all subsequent Sovereign Bodies of this country lacked and lack all power, to act upon the absolute ancestral rights of the Founding Generation and their Posterity to keep and bear arms, the ancestral common law rights of keeping and bearing arms, as held by the Posterity, can be no less expansive than the rights of keeping and bearing arms as possessed by our arms-bearing ancestors at common law.

21. However, it is an indisputable fact, that, at the time of the Founding, the Founding Generation, the original Sovereign Body of this country, was possessed of the *absolute plenary power __to limit__ themselves in the exercise of their inherited joint-sovereign power, and, it is indisputable that they did so limit themselves in their exercise of these inherited powers, by creating governments of limited and enumerated powers*, which governments were the only means by which they could effectuate the joint-sovereign power which they inherited as a Sovereign Body. Thus, to the extent that the Founding Generation understood the scope of these rights to be expanded from their scope at common law, by not considering certain acts relating to

---

[16] <u>Dred Scott v. Sandford,</u> 60 U.S. 393, 450, 15 L. Ed. 691 (1857) (emphasis added).

the bearing of arms in public as constituting a cognizable affray, whereas at common law such acts had been understood as constituting a per se affray, the Founding Generation, by evidencing their retention of these expanded rights through express enumeration in the Second Amendment to the United States Constitution, thus limited their joint-sovereign power to act upon certain well-recognized nuisances at common law springing from the abusive exercises of these rights.

22. Thus, the Posterity's rights of keeping and bearing arms under the constitutional rights of keeping and bearing arms may be more expansive (for some members of the Posterity) than the scope of their ancestral common law rights of keeping and bearing arms.

23. Therefore, each member of the Posterity's ancestral rights of keeping and bearing arms are their floor rights in this country, but may not be the ceiling of their rights.

24. For these reasons, it was regularly recognized by the ***overwhelming majority*** of ***pre-20th century courts*** in this country, to wit, all those courts that actually objectively applied the law in good faith, as well as the foremost legal commentators, that the rights of keeping and bearing arms, as held by the Posterity, cannot be regulated in the slightest degree, but, rather, only ***abuses*** of these rights rising to the level of a ***nuisance***, as at common law, can be regulate, and, therefore, that all of the Sovereign Body's sovereign power with respect to these rights must be drawn from ***nuisance doctrine***.

25. Because it was also the universal understanding of all of the legislatures of this country, from the time of the earliest English colonial settlement of the American colonies to the time of the Civil War, that the rights of the Posterity to keep and bear

arms are absolute ancestral rights which cannot be acted upon or regulated in the slightest degree insofar as the exercise of these rights does not amount to a nuisance, and their universal understanding that the keeping of arms alone, without more, can never amount to a nuisance, there were *no regulations* in American colonial or antebellum history which attempted to regulate these absolute rights, but, rather, as at common law, only regulations attempting to prohibit *nuisances* springing from the *abusive* exercise of these rights, and there were *no regulations* which attempted to regulate, prescribe, or proscribe the types of arms which the class of rights-holders are entitled to keep in conjunction with our rights of keeping and bearing arms, because the *mere keeping of any types of arms alone*, without, more, can never amount to a nuisance or an affray.

26. In addition, *the overwhelming majority* of the 1800's courts of this country, including the Supreme Court of Tennessee, the court that invented the ordinary military weapons restriction on the class of protected arms for the purposes of bearing arms in public, and the Supreme Court of Texas, the court that most whole-heartedly endorsed and adopted that restriction, understood, recognized, and conceded that the right to *keep arms, as held by the Posterity*, entails the right to *keep any and all arms*, as the mere keeping of arms alone, without more, can never amount to a nuisance, and, thus, can never fall outside the scope of the absolute ancestral right of keeping arms, as held by the Posterity, nor within the sovereign power of the Sovereign Body of this country to act upon or regulate in the slightest degree. *See* Andrews v. State, 50 Tenn. 165, 201 (1871) (emphasis added) (The Court, in a *unanimous* opinion, when upholding an Act of the legislature of the State of

Tennessee, which attempted to ***absolutely prohibit*** the carrying of ***dangerous and unusual arms*** <u>in public</u>, as to a constitutional challenge, held, "[it was] far from understanding the Legislature as intending to make every act of carrying one of these weapons criminal," but, rather, only the carrying of these arms "***with the intent of thus going armed***," in a manner synonymous to that proscribed by the common law, and punished more specifically by the Statute of Northampton, to wit, bearing arms "***<u>for the purpose of an affray, and in such manner</u> as to strike terror to the people,***"[17] as "***every man has a right to own and keep these weapons***, nor is this right interfered with by the prohibition against 'carrying' them, in the sense in which the Legislature uses the word. ***To constitute the carrying criminal, the intent with which it is carried must be that of going armed***, or being armed, or wearing it for the purpose of being armed. In the case before us, ***the intent with which Page was carrying his pistol was fully developed***. ***He was carrying it that he might be armed***, ***<u>as</u> was <u>shown by his threatened assault</u> upon the prosecutor***. It would probably be difficult to enumerate all the instances in which one of these weapons could be carried innocently, and without criminality. ***It is sufficient here to say, that, <u>without the intent or purpose of being or going armed</u>, the offense described in this statute can not be committed***." )

27. Furthermore, ***all courts of this country, from the time of the Founding up until and including the United States Supreme Court decision in <u>U.S. v. Miller</u>, universally recognized that the rights of keeping and bearing arms entail the right to keep and bear military-grade weapons in ordinary use in the United States military***.

---

[17] <u>O'Neill v. State</u>, 16 Ala. 65, 67 (1849) (emphasis added).

28. Because the absolute ancestral and constitutional rights of keeping and bearing arms are ***absolute rights***, and the government possesses ***no power*** to act upon these rights, and could ***never*** possess the power to act upon these rights, the Supreme Court of the United States, in <u>Bruen</u>, correctly held that the level of scrutiny for a court to apply when assessing the constitutionality of governmental regulations respecting these rights is ***absolute scrutiny***,[18] where these rights exist, they exist ***absolutely***, and ***any governmental action which acts in the slightest degree upon conduct falling within the scope of these rights is invalid, illegal, unconstitutional, ultra vires, and null and void ab initio***.

29. The challenged provisions of the National Firearms Acts ***unlawfully and unconstitutionally*** attempt to ***absolutely prohibit*** Plaintiff, a member of the class of rights-holders, from keeping machine guns manufactured post-1986 and in regular use in the United States armed forces, to wit, ordinary military weapons, manufactured post-1986.

30. Plaintiff's absolute ancestral and constitutional rights ***clearly entail the right to keep military-grade ordinary military weapons***, such as machine guns manufactured post-

---

[18] *See* <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 142 S. Ct. 2111, 2126–27, 213 L. Ed. 2d 387 (2022) (emphasis added) ("[W]e hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, ***the government <u>must demonstrate</u> that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation <u>is consistent</u> with this Nation's historical tradition may a court conclude that the <u>individual's conduct falls outside</u> the Second Amendment's 'unqualified command.'***…[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition ***that delimits the <u>outer bounds</u> of the right to keep and bear arms***.")

1986 and in regular use in the United States military. Plaintiff intends to lawfully exercise his rights by keeping such arms.

31. Because the government possesses **no power** to act upon these rights, the **government bears the burden of proof and persuasion, the <u>entirety of the case</u>, to show that its regulations do not act upon conduct falling within the scope of these absolute rights**, but, rather, merely on conduct falling outside the scope of these absolute rights, as that scope was understood by the Founding Generation.

32. To satisfy its burden, the government must point to **historically "analogous"**[19] **regulations, <u>extant at or near the time of the Founding,</u>**[20]**and <u>widely accepted as lawful,</u>**[21] to the presently challenged regulation, to show that the Founding Generation did not understand the conduct which the government is presently attempting to regulate as falling within the scope of these absolute ancestral rights, but, rather,

---

[19] <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 142 S. Ct. 2111, 2131, 213 L. Ed. 2d 387 (2022) (emphasis added).

[20] <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 142 S. Ct. 2111, 2136, 213 L. Ed. 2d 387 (2022) (emphasis added) ("We categorize these historical sources because, when it comes to interpreting the Constitution, **not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have <u>when the people adopted them.</u>'…**The Second Amendment was adopted in **1791**[, and, therefore,] [h]istorical evidence that long predates [that] date may not illuminate the scope of the right…**Similarly, we must also guard against giving post-enactment history more weight than it can rightly bear. It is true** that in <u>Heller</u> we reiterated **that evidence of 'how the Second Amendment was interpreted from <u>immediately after its ratification through the end of the 19th century'</u> represented a '<u>critical tool of constitutional interpretation.</u>'…** But to the extent <u>later history [and case law]</u> contradicts what the text says, **<u>the text controls</u>**.")

[21] <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 142 S. Ct. 2111, 2154–55, 213 L. Ed. 2d 387 (2022) ("We have already explained that we will not stake our interpretation of the Second Amendment upon a law in effect in a single State, or a single city, 'that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms' in public for self-defense. <u>Heller</u>, 554 U.S. at 632, 128 S.Ct. 2783; see <u>supra</u>, at 2153. Similarly, we will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence.")

merely as conduct amounting to an *abuse* of said rights rising to the level of a *nuisance*, and, thus, as amounting to conduct falling outside the scope of these absolute ancestral rights, and within the sovereign powers of the Sovereign to regulate.

33. This is the *only means* by which the government can satisfy its burden because the Founding Generation correctly understood that, because the absolute ancestral rights of keeping and bearing arms are absolute ancestral rights, which have always been beyond the power of all Sovereigns, including the Sovereign Body of this country, within the Anglo-American chain of power, to act upon or regulate in the slightest degree, the only conduct which can be regulated with respect to these rights is an *abusive exercise of these rights rising to the level of a nuisance*, thus amounting to conduct falling outside the scope of these absolute rights. Therefore, if the Founding Generation regulated some activity relating to the exercise of these rights, and these regulations were widely implemented and widely accepted as lawful, the activity thus regulated must not fall inside the scope of these absolute unregulatable rights, but, rather, must amount to an *abusive* exercise of these rights rising to the level of a *nuisance*.

34. *The government will be unable to carry its burden in this case* because the challenged provisions of the National Firearms Acts *are blatantly unlawful, unconstitutional, and ultra vires*, as is evidenced and proven by the fact that there were *no regulations*, *extant at or near the time of the Founding*, nor from the very earliest regulation on record at common law upon until the time of the American Civil War, which ever attempted to regulate the class of rights-holders of the full, free, and

inalienable ancestral rights of keeping and bearing arms in our *mere* keeping of *any types of arms*, save the lone Statute of King Henry VIII, because *every King, parliament, and American colonial and antebellum legislature universally understood* that these absolute ancestral rights entail not only the right to keep military-grade ordinary military weapons, but also *any weapons that can be put to any lawful use, including aiding in defense of the realm in the slightest degree,* as the *mere* keeping of such arms is *per se no nuisance*, and, therefore, *per se conduct falling within the scope of these absolute ancestral rights*. And, it cannot be said that weapons, which are presently employed by the *professional military forces of the United States,* cannot aid in defense of the realm in the slightest degree.

35. Lastly, all of the regulatory history *proves* that Plaintiff possesses *not just the right*, but also the *duty,* to keep *military-grade ordinary military weapons*.

4.

In order to flesh out these legal claims and the principles behind them in any meaningful way, so that this Court can make an informed and legally correct ruling as to the illegal nature of the National Firearms Acts and their infringement of Plaintiff's rights, not just under the Constitution, but also under the higher law that binds the government and the Sovereign Body of this country in all acts, Plaintiff needs one hundred and twenty-five (125) pages double-spaced.

5.

Plaintiff has written a one hundred and twenty-five (125) page double-spaced brief which fully details the lack of analogous regulations, the common law and American case law respecting these rights, and the legal commentary of the foremost legal commentators. Plaintiff's

brief would enable this Court to quickly and efficiently issue its ruling this matter with no need for oral argument or any further proceedings.

6.

Furthermore, Plaintiff needs one hundred and twenty-five (125) pages, just so that he can brief the law, even minutely, regarding all of the claims that he has made, and ensure that this Court is presented with and rules upon all of his claims.

WHEREFORE, Plaintiff prays that this Court:

1. Grant Plaintiff's Motion for Leave to File an Over-limit Brief in the form of Plaintiff's 125-page, double-spaced, Suggestions in Opposition.

Respectfully submitted this 16th day of August, 2023.

/s/ Mark J. Blount_____
Mark Jerome Johnson Blount, Esquire
Juris Doctor, 2020, Duke University School of Law
Georgia Bar Member Number: 539062
Missouri Bar Member Number: 75092
Tennessee Bar Member Number: 040678
*Pro Se*

Mark J.J. Blount, Esq.
664 N Montego St.,
Nixa, MO 65714
markblountesquire@gmail.com
(478) 232-2167

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 16, 2023, I electronically filed the foregoing Motion for Leave to File Over-limit Brief with the Clerk of Court using the CM/EMF system and that I have mailed by United States Postal Service the foregoing to the following:

Defendant Garland, in his individual capacity at:

Attn: Merrick Garland, Att. Gen. U.S.
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Defendant Hansen, in his individual capacity at:

ATTN: Agent Hansen
1251 NW Briarcliff Pkwy, Suite 600
Kansas City, MO 64116

/s/ Mark J. Blount_____
Mark Jerome Johnson Blount, Esquire
Juris Doctor, 2020, Duke University School of Law
Georgia Bar Member Number: 539062
Missouri Bar Member Number: 75092
Tennessee Bar Member Number: 040678
*Pro Se*
664 N Montego St.,
Nixa, MO 65714
markblountesquire@gmail.com
(478) 232-2167

Date: 08/16/2023